BRAHMAJOTHI VASUDEVAN MULUGU,  )
                               )
            Plaintiff,         )
                               )
       v.                      )        1:23CV957
                               )
DUKE UNIVERSITY SCHOOL         )
OF MEDICINE, et al.,           )
                               )
            Defendants.        )

## MEMORANDUM OPINION AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This case comes before the undersigned Magistrate Judge on the Motions to Compel Arbitration or, in the Alternative, to Dismiss the Complaint for Lack of Subject Matter Jurisdiction and Improper Venue (Docket Entries 11, 30 (collectively, the "Motions to Compel Arbitration")), filed (A) by Defendant Duke University (as the proper party in place of Duke University School of Medicine) (see Docket Entry 11 at 1; see also Docket Entry 5 at 6 ("[Plaintiff] was employed by Duke University and worked in the Department of Pharmacology and Cancer Biology (hereafter known as 'PCB'), which is a department within the Duke University School of Medicine.");[1] Docket Entry 8 at 1 ("accept[ing] service of the Summons and Amended Complaint in this matter on behalf of Defendant[] Duke University (incorrectly identified as 'Duke University School of

_____

[1] Pin cites to this document (Plaintiff's Amended Complaint) refer to page numbers that appear in the footer appended upon filing in the CM/ECF system (not to any original pagination). All quotations from the Amended Complaint omit any bold font.

Medicine')")), and (B) by Defendants Donald Patrick McDonnell, Mary Frances Earley Klotman, Geeta Krishna Swamy, Colin Stephen Duckett, and Sharon Adele Dowell-Newton (collectively, the "Individual Defendants," and, together with Defendant Duke University, the "Defendants") (see Docket Entry 30 at 1), respectively. (See Docket Entry dated Feb. 27, 2024 (referring instant Motions to Compel Arbitration to undersigned).) The undersigned Magistrate Judge recommends denial of the Motions to Compel Arbitration because – although the record establishes the existence of a valid agreement between Defendant Duke University and Plaintiff to arbitrate her claims in this case (which she has not disputed the Individual Defendants also may enforce) – the Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act of 2021, Pub. L. No. 117-90, precludes compelled arbitration of this case.[2]

## INTRODUCTION

Plaintiff's Amended Complaint – filed on November 17, 2023 (see Docket Entry 5 at 51) – asserts claims against Defendants (and

---

2 For the reasons stated in Scales v. SSC Winston-Salem Operating, Co., No. 1:17CV539, 2017 WL 4467278, at *1 n.1 (M.D.N.C. Oct. 5, 2017), a magistrate judge generally may enter an order as to a motion to compel arbitration; however, the Motions to Compel Arbitration "[a]lternatively[ ] request[] that [the Amended] Complaint be dismissed under Rules 12(b)(1) and (3) of the Federal Rules of Civil Procedure for lack of subject matter jurisdiction and improper venue since all of Plaintiff's claims are covered by a valid and enforceable agreement to arbitrate" (Docket Entry 11 at 2; accord Docket Entry 30 at 2). As a result, the undersigned Magistrate Judge has issued a recommendation. See 28 U.S.C. § 636(b)(1)(A) & (B) (requiring magistrate judges to issue "recommendations" on motions "to involuntarily dismiss an action").

the late Mohamed Bahie Abou-Donia) (see id. at 2; see also Docket Entry 15 at 2 ("return[ing] the summons [for Dr. Abou-Donia]" and giving reason as "Deceased 'DOD 3-26-23'")), under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e - 2000e-17, and the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. §§ 621-634 (see Docket Entry 5 at 4), for "discriminatory conduct" in the form of "[t]ermination of [her] employment[, f]ailure to promote [her, u]nequal terms and conditions of [her] employment[, r]etaliation[, and] . . . [f]raud" (id. at 5), with such "alleged discriminatory acts occurr[ing] on . . . July 19, 2018-[p]resent" (id.; see also id. ("I believe that [D]efendants . . . are still committing these acts against me." (parentheses omitted))).  According to the Amended Complaint, "Defendants discriminated against [Plaintiff] based on [her] . . . race[, i.e.,] Asian[,] color[, i.e.] Brown[,] gender/sex[, i.e.,] Female[,] religion[, i.e.,] Hindu[,] national origin[, i.e.,] Indian[, and] age[, i.e., born in] 1967." (Id. (parentheses omitted).)  In connection with those claims, the Amended Complaint makes these factual allegations (pertinent to the instant Motions):

1) Dr. Abou-Donia "hired [Plaintiff] to work in his lab [in PCB] as a research scientist in July of 2016" (id. at 6);

2) Defendant McDonnell "was the then-chairman of PCB and . . . Dr. Abou-[D]onia's supervisor at the time of these incidents" (id.; see also id. ("[Defendant] McDonnell stepped down from

chairmanship on July 31, 2020, but remained a faculty member of PCB."));

3) Defendant Klotman "was appointed as the Dean of the Duke University School of Medicine in July 2017 and was the deciding authority at all times during the incidents that happened in this case" (id. at 6-7);

4) Defendant Duckett "is the Vice Dean for Basic Science and a faculty member of PCB who was appointed as the interim-chair after [Defendant] McDonnell stepped down from chairmanship" (id. at 7);

5) Defendant Swamy "is a tenured professor who was first appointed as the Dean for Faculty Development and the Chair of Duke University's Institutional Review Board (hereinafter known as 'IRB')" (id.; see also id. ("Later, she became the Vice Dean and Associate Provost for Scientific Integrity."));

6) Defendant Dowell-Newton "was the then-Business Manager of PCB, who has since retired" (id.);

7) "[o]n May 1, 2018, [Plaintiff] received a letter of congratulations from DoD[, i.e., the Department of Defense,] saying that a proposal [she] had submitted in 2017 was recommended for funding" (id. at 10);

8) "[o]n May 29, 2018, Dr. Abou-[D]onia took [Plaintiff] to [Defendant] McDonnell (the then Chairman) to recommend [Plaintiff]

4

for a position change from research scientist to research assistant professor" (id.);

9) "[Defendant] McDonnell told [Plaintiff] that, if DoD agree[d] to provide [her] 100% [of the] salary, then [they] c[ould] talk about [the] position change" (id.), but "that, ultimately, the decision to change [her] position rested with the Dean, [Defendant] Klotman" (id.);

10) "in [Defendant McDonnell's] lab, at that time, all of the scientists (who were lighter skinned than [Plaintiff]) who got a grant were immediately promoted to research faculty positions" (id.; see also id. at 46 ("During this time, there was no one with [Plaintiff's] skin tone or ethnic background who were faculty members."));

11) "PCB administration, among whom [Defendant] Dowell-Newton was in charge, failed to keep appropriate records of [Plaintiff's] submitted grant, although they did this for others in PCB who received grants, all of whom were lighter skinned than [Plaintiff]" (id. at 11; see also id. ("[Defendants] Klotman and Duke University failed to ensure that PCB administration maintained appropriate records for all researchers, creating a work environment that facilitated the creation of disparities."));

12) during this time period, "[Plaintiff] was not given appropriate support or guidance in [budgeting matters] by Dr. Abou-[D]onia and [Defendant] Dowell-Newton" (id.) and, despite Plaintiff

5

following what direction Dr. Abou-Donia did provide (see id.), "[he] later blamed . . . [her] when [they] met with [Defendant] McDonnell on March 9, 2020, in order to wrongfully establish that [she] had a pattern of excluding [their] collaborators when [she] did not" (id. at 12);

13) in a meeting "[o]n July 19, 2018" (id.), Defendant Dowell-Newton "asked [Plaintiff] if [she] was premenopausal and then [Defendant Dowell-Newton] asked [Plaintiff her] age" (id.; see also id. ("This was the first discriminatory statement [Plaintiff] had heard directly from an administrator, and it occurred 2 months after [her] grant proposal was recommended for funding . . . ."));

14) "[Defendant Dowell-Newton] gave [Plaintiff a] termination letter signed by Dr. Abou-[D]onia . . ., [] said that [she] no longer work[ed] for [him] and that [she] w[ould] be given a new appointment letter, once [Defendant Duke University] receive[d] the grants" (id.);

15) "[o]n August 1, 2018, [Plaintiff's] grant funds were released to [Defendant] Duke University" (id.), but, "in spite of [Plaintiff] reminding [Defendant Dowell-Newton], . . . she did not provide [Plaintiff] with an appointment letter, nor did Dr. Abou-[D]onia, [Defendant] McDonnell, [Defendant] Klotman, or [Defendant] Duke University address this issue" (id.);

16) "[i]t is practice in all the departments that[,] when a faculty or scientist receives a grant, they are asked to give a

6

presentation in the departmental seminars, which occur weekly" (id. at 13), but, "[d]espite [Plaintiff's] request, [she] was never allotted a slot to present [her] study proposal . . . which [she] believe[d] was discriminatory" (id.).

17) "[Plaintiff] sent an email to [Defendant] Klotman on May 12, 2019, . . . requesting [Defendant] Klotman to recommend [Plaintiff] for a position change to research assistant professor" (id. at 14);

18) "[d]uring the first week of July 2019, Dr. Abou-[D]onia asked [Plaintiff] why [Defendant] McDonnell hated [Plaintiff] so much" (id.) and "told [Plaintiff] that [Defendant] McDonnell requested Dr. Abou-[D]onia to come up with some reason to accuse [Plaintiff] so that [she] could be fired" (id.; see also id. (alleging that, according to Dr. Abou-Donia, Defendant McDonnell stated that, upon Plaintiff's firing, Dr. Abuo-Donia would receive Plaintiff's grant and a bonus));

19) on July 15, 2019, during a discussion about the removal of Plaintiff's name from a grant proposal, "[Defendant] Dowell-Newton told [Plaintiff] in front of [another employee of Defendant Duke University] that [Plaintiff was] dispensable" (id.);

20) "[Plaintiff] met [Defendant] McDonnell on July 24, 2019 to discuss the possibility of a position change in connection with [Plaintiff's] email to [Defendant] Klotman" (id.);

21) "[d]uring the discussion, [Defendant] McDonnell told [Plaintiff she was] better off moving to the Department of Medicine if [she was] seeking a faculty position" (id.), advised her that her position with PCB depended on Dr. Abou-Donia remaining there (see id. at 14-15), "and [stated] that [Defendant McDonnell] would not communicate directly with [her] in the future" (id. at 15; see also id. ("[T]he fact that [Plaintiff] was given additional responsibilities beyond [her] role as a scientist . . . and that [she] was handling all th[o]se duties alongside [her] scientific duties to Dr. Abou-[D]onia's satisfaction and with a level of performance meriting two grants from DoD without the requisite increase in position or pay[] was never addressed"));

22) "o]n July 29th, 2019, [Defendant] McDonnell sent [Plaintiff] an email saying that he checked with [Defendant] Dowell-Newton and . . . there was nothing [Defendant McDonell] could do to increase [Plaintiff's] salary" (id.; see also id. ("[Defendant] McDonnell also said that he would not allow [Plaintiff] to use the discretionary funds . . . allotted to [her] grant, saying that he would like to keep it for PCB use."));

23) the next month, "everything started to change rapidly when [Plaintiff] came back from [a c]onference" (id. at 16), as "[she] found a trash bag on [her] chair on August 23, 2019" (id.), "[m]any files and items were missing from [her] desk" (id.), "and [her] desktop computer, on which data was stored, stopped working" (id.);

24) "[w]hen [Plaintiff] reported [her] concerns repeatedly, no further action was taken by [Defendant] Duke University, [Defendant] Dowell-Newton, Dr. Abou-[D]onia, or [Defendant] McDonnell, despite the disappearance of research files" (id.; see also id. ("[T]his set the stage for unfounded allegations against [Plaintiff] of data integrity violations as the days proceeded."));

25) when Plaintiff contacted other department chairs about pursuing her grant work with them, "the faculty members [she] had contacted told [her] that [Defendant] McDonnell was not willing to release the grant" (id. at 17);

26) "[Plaintiff] emailed [Defendant] Swamy on September 9, 2019, regarding [Plaintiff's] concerns that [Defendant] McDonnell would not let [Plaintiff] submit another grant and nor would he release the grant [she] had earned" (id.);

27) "[Defendant Swamy] replied to [Plaintiff] to meet with [Defendant] McDonnell and [Dr.] Abou-[D]onia" (id.), but, before any such meeting occurred, Plaintiff received a memo from Defendant McDonnell "rais[ing] concerns about the deteriorating scientific relationship between Dr. Abou-[D]onia and [Plaintiff]" (id.);

28) "[t]hereafter, Dr. Abou-[D]onia sent a memo on September 14, 2019, . . . per order from [Defendant] McDonnell, containing stipulations [regarding Plaintiff's work]" (id.), which she viewed as a "'performance review' . . . used as a threat . . . to intimidate [her] and implement hierarchy" (id. at 18);

29) as he had previously, in September 2019, "Dr. Abou-[D]onia explained to [Plaintiff] that [Defendant] McDonnell . . . told [Dr. Abou-Donia] that, if Dr. Abou-[D]onia could come up with some complaints about [Plaintiff's] work, [Defendant] McDonnell would immediately transfer [Plaintiff's] grant to Dr. Abou-[D]onia's name and sign the papers necessary to terminate [Plaintiff]" (<u>id.</u>; <u>see also</u> <u>id.</u> ("These actions were discriminatory because those who get grants are supposed to be given mentorship, not memos and indirect threats of termination." (stray comma omitted)));

30) during the same period, Defendant Dowell-Newton questioned Dr. Abou-Donia and another employee of Defendant Duke University in Plaintiff's presence about her long-planned travel to a conference (<u>see</u> <u>id.</u> at 18-19), in a manner she deemed "extremely derogatory and discriminatory because [she] had not observed any other scientists being treated th[at] way" (<u>id.</u> at 19);

31) in October 2019, Plaintiff "demonstrated the infrastructure of [her] database to [Defendant] McDonnell and [Dr.] Abou-[D]onia and Dr. Abou-[D]onia liked it[; h]owever, [Defendant] McDonnell said that he ha[d] to approve it" (<u>id.</u>) and, "[e]ven though [Plaintiff] had given all the data [she] had, [Defendant] McDonnell was still demanding more data, even though [she] kept telling him several times that many of [her] collaborators had not sent [her] samples yet" (<u>id.</u>; <u>see also</u> <u>id.</u> ("Dr. Abou-[D]onia told [an employee of Defendant Duke University] to stop all payments to

the collaborators without telling [Plaintiff ] and thus[ she] didn't receive samples for two years.'"));

32) "[f]rom October of 2019, Dr. Abou-[D]onia began sexually harassing [Plaintiff] on a frequent basis" (id.; see also id. ("Meanwhile, as he continued with the sexual harassment, Dr. Abou-[D]onia would also derail scientific conversations, telling [Plaintiff] that [she] should 'spend more time with [her] family' and that [she] shouldn't 'work too hard' which were sexist comments that [Plaintiff] believe[s] were discriminatory."));

33) Plaintiff "informed" a colleague of Dr. Abou-Donia, as well as numerous other faculty members of Defendant Duke University, about Dr. Abou-[D]onia's conduct and the colleague "told [Plaintiff] that [the colleague] would talk to [Dr. Abou-Donia]" (id.; see also id. at 19-20 (naming colleague and other faculty members so informed and alleging that (A) "[s]ome told [Plaintiff] to report to OIE[, i.e., Defendant Duke University's Office of Institutional Equity], but others told [her] to look for another job, as [she] will be fired," (B) "[t]he frequency of sexual harassment increased over time," (C) "Dr. Abou-[D]onia would say explicit comments and then say, 'Now you go upstairs and tell them,'" meaning "[Defendants] McDonnell and [] Dowell-Newton," and (D) "[Plaintiff] wrote an email to [Defendant] McDonnell, but [she] could not send it because [she] was afraid of retaliation"), 21 (recounting Plaintiff's conversation with official in Defendant

11

Duke University's "Office of Clinical Research" in October 2019, during which "[Plaintiff] told [official] about the incident in which Dr. Abou-[D]onia said 'I like your pussy'" and official "told [Plaintiff] that [she] could get help from PAS - the Personnel Assistance Service and that [she] should report to OIE"));

34) also "[d]uring October of 2019[,] Dr. Abou-[D]onia had hired a new research scientist" (id. at 20), who "had not worked in a lab for 25 years" (id.), "was not held to the same attendance and compliance standards that [Plaintiff] was" (id.), "was paid more than [Plaintiff]" (id.), and "was not harassed" (id.), all of which Plaintiff viewed as "discriminat[ion]" (id.), because "[their] only difference was [their] skin color and [their] religion; [the new research scientist was lighter than [Plaintiff] and [the new research scientist is a Christian" (id.; see also id. at 35-36 ("[D]uring [Dr. Abou-Donia's] informal introduction of [the new research scientist] to [Plaintiff, he stated] that both [the new research scientist] and [Dr.] Abou-[D]onia are White because they had married White people, which [Plaintiff] thought was . . . a discriminatory statement . . . ."));

35) "[i]n November of 2019, in spite of [Plaintiff] sending Dr. Abou-[D]onia several emails with [certain] protocols, he was still repeatedly accusing [Plaintiff] of not providing him with the details" (id. at 21; see also id. ("[Dr. Abou-Donia] was using these protocols to create a company with [the newly hired research

12

scientist], excluded [Plaintiff] from discussions involving [her] work, and used [her] work for his business interests . . . without crediting [her], which is discriminatory."));

36) after Dr. Abou-Donia again asked Plaintiff about research samples, "[o]n December 7, 2019, [she] sent him an email . . . that the samples were sent specifically for [her] project" (id. at 22);

37) that same day, Dr. Abou-Donia approached Plaintiff in the lab, "told [her] that he was leaving for Egypt" (id.), "told [her] that everything will be alright when he return[ed] back, and he made [her] touch his penis" (id.; see also id. ("[Plaintiff] refused but [Dr. Abou-Donia] insisted. [She] was fearful of pushing him away as he was an older man. He blocked the door to stop [her] from getting out. Thus, he assaulted [her].")));

38) later in December 2019, an employee of Defendant Duke University made Plaintiff provide much more verification about travel activity than required "when [she] first applied for a travel grant in 2018 . . . and [she] was concerned about the disparate treatment she received from year to year" (id. at 23);

39) on January 7, 2020, Dr. Abou-Donia resumed his sexual harassment of Plaintiff in the lab (see id. ("[A]gain, he started saying, 'I really like you and no woman has said no to my offering. They all like what I do for them. I like your pussy,' and then he said he was very wet even talking to me."));

13

40) "[Plaintiff] once again told [a colleague of Dr. Abou-Donia, who] mentioned that she will talk to him" (id.);

41) on January 8, 2020, Dr. Abou-Donia once more subjected Plaintiff to workplace sexual harassment (see id. at 24 ("He was saying that he is trying to get samples for my study. Then he went on to say that he likes to talk to me and every time he sees me, he gets aroused and wet. He did not say this to [the new research scientist], who was working in the same lab[ and] is also a married woman, but she is a Christian and lighter than me. When I told [him], let us please be focused on the work, he quickly changed his voice and started demanding data. From there, he told me to walk with him to his car so he could drop me off at my parking garage. . . . Even though I told him I could go later, he insisted. I went with him to his car . . . . When I was about to get [out of his car to get into my car], he put his hand on my left thigh . . . . He also said that he really liked me and that I was his type. At that point, I told him that I wanted to stay professional and got out of the car."));

42) "[d]uring the whole month of January [2020], Dr. Abou-[D]onia would alternate between demanding data, and speaking nicely at first, then leading into sexually explicit comments" (id. at 25; see also id. ("He would also alternate between speaking kindly in private, and[,] if I didn't entertain his conversation, he shouted,

14

asked for data, and also uttered sexually explicit comments that were out of context.'"));

43) "Dr. Abou-Donia would also yell at [Plaintiff] in front of others, saying, among other things, that [she] was just a technician" (id.; see also id. ("The PCB administration who witnessed this behavior from Dr. Abou-Donia, including [Defendants] McDonnell[ and] Dowell-Newton . . . did not act to protect [Plaintiff].'"));

44) "[o]n January 31, [2020,] Dr. Abou-[D]onia sent an email that he wanted [a certain] manuscript" (id. at 26), "threaten[ing] that, if [Plaintiff] did not send him the manuscript and give him all the preliminary and final data, he would tell [Defendant] McDonnell" (id.);

45) in response, "[Plaintiff] explained to [Dr. Abou-Donia] that, having lost [her] desktop computer in the aftermath of the incident that occurred following [her] return from the [conference] on August 21, 2019, [she] lost a considerable amount of data[ and] would need to reduce the number of proteins used for comparison in order to resolve significant data variabilities" (id.; see also id. ("[Plaintiff] had already told [Dr. Abou-Donia] that the paper was not ready for publication because [they] needed to limit the proteins [they] were comparing.'"));

46) on February 3, 2020, "[Plaintiff] received an email from . . . an Associate Professor [with Defendant Duke University] who

15

was appointed as a Research Quality Control Officer" (id.), which made demands of Plaintiff that did not reflect an accurate understanding of the workings of PCB (see id. at 26-27; see also id. at 27 (describing improper pressure applied by Dr. Abou-Donia and Defendant Dowell-Newton to attempt to force Plaintiff to do things she already had done many times or could not do));

47) on February 10, 2020, Plaintiff met with an OIE investigator and "gave her a glimpse of what was happening; then [Plaintiff] told [the investigator] to keep it in her file and not start an investigation for fear of retaliation" (id. at 28);

48) on February 12, 2020, Defendant Dowell-Newton unreasonably questioned Plaintiff about her planned trip to a conference, in an "incident [that] was very similar to what happened when [Plaintiff] mentioned that [she] was going to [an earlier] conference on September 17, 2019" (id.);

49) that interaction led to a further discussion in which "[Defendant] Dowell-Newton said, 'All your data should be on the server'" (id.), despite the fact that, "when [Plaintiff] joined the department, [she] asked [Defendant Dowell-Newton] where to store [Plaintiff's] data, and [Defendant Dowell-Newton] said that each lab ha[d] its own hard drive" (id.), but, in fact, "Dr. Abou-D]onia had not purchased a hard drive" (id.) and instead "established a system where [Plaintiff] would send him the data by email and provide printed copies" (id.);

16

50) on February 19, 2020, Plaintiff talked to a "friend in [Defendant] Duke[ University's] HR Department" (id. at 29) about "what [Plaintiff] was experiencing in [PCB]" (id.);

51) "[that friend] told Plaintiff to send Dr. Abou-[D]onia an email notifying him that [Defendant] Duke [University] ha[d] a zero-tolerance policy against abusive behavior and[,] at 2 AM on February 20,[ 2020, Plaintiff] sent [him] that email" (id.);

52) "Dr. Abu-[D]onia replied at 11:30 AM [that morning] that he never treated [Plaintiff] unprofessionally" (id.) and "demanded that [she] 'stop [her] accusations that never happened'" (id.);

53) also "[o]n the morning of February 20, [2020, Plaintiff's friend] reported what [Plaintiff] had told her [friend] and [Plaintiff] received a call from [another employee of Defendant Duke University's HR Department]" (id.), with whom Plaintiff then met to "share[] how [she] felt completely alienated in the lab and that the environment was becoming toxic by the day" (id.);

54) that employee "told [Plaintiff] that the moment [she] ma[d]e the decision to report, 'your email will be taken away'" (id.) and "[Plaintiff] told [that employee] to hold on to the information [Plaintiff] had shared with her and not create a formal report" (id.; see also id. (alleging that, in subsequent communication on February 23, 2020, Plaintiff conveyed "that [she] was in the middle of [a] project, [she] just wanted everything to be kept on file, and [she] would release everything once [her]

17

project was completed as [she] did not want any interruption in doing [her] research for fear of retaliation")).

55) "[o]n Feb[ruary] 24, 2020, [Defendant] Dowell-Newton had a meeting with Dr. Abou-[D]onia and [Plaintiff]" (<u>id.</u>), "to talk about [Plaintiff's] role in the lab" (<u>id.</u>);

56) after Plaintiff explained all the work she performed, "[Defendant Dowell-Newton] indicated that [Plaintiff was] just a technician" (<u>id.</u>), but, when Plaintiff countered that, "in that case, [she] should only be working from 9 am to 5 pm, and [she] should be paid for overtime" (<u>id.</u>), Defendant Dowell-Newton "chang[ed] her statement" (<u>id.</u>), emphasizing Plaintiff's role as "a scientist and [primary investigator] of the grant" (<u>id.</u>);

57) during the meeting, "Dr. Abou-[D]onia raised his voice several times, and he said . . . he would like to fire [Plaintiff]" (<u>id.</u>), while "[Defendant] Dowell-Newton told [Plaintiff] that [she] should provide the [research] protocol" (<u>id.</u>), which, as Plaintiff explained, "had been given to [Dr. Abou-Donia] several times" (<u>id.</u>), including once when Plaintiff "gave it to [him] in front of [Defendant] Dowell-Newton" (<u>id.</u>);

58) "[o]n Mar[ch] 02, 2020, after briefly speaking with [Defendant] Dowell-Newton that [Plaintiff] had some concerns about harassment [she] was experiencing at PCB, [Defendant Dowell-Newton] informed [Plaintiff] that [Defendant Dowell-Newton] did not have

time to speak with [Plaintiff] and to send [Defendant Dowell-Newton] an email" (id. at 30);

59) "[Plaintiff then] sent an email to [Defendant] Dowell-Newton . . . inform[ing] her that [Defendant] Duke University ha[d] a zero-tolerance policy for harassment, which [Plaintiff] was experiencing, and that [she] wanted [Defendant] Dowell-Newton to keep [that] email on file, so that [Plaintiff] could contact [Defendant Dowell-Newton] if [Plaintiff] needed help from HR, due to [her] fear of retaliation" (id.; see also id. (alleging (A) that, contrary to Plaintiff's request, Defendant Dowell-Newton reported Plaintiff's complaint, and (B) that "[Plaintiff] also emailed [Defendant] McDonnell about sexual harassment"));

60) "[o]n Mar[ch] 6, 2020, [Defendant] McDonnell sent an email, with the subject 'urgent' that he needed to meet both Dr. Abou-[D]onia and [Plaintiff] to discuss challenges in [their] working relationship and data management" (id. at 31);

61) "[they] had a meeting on Mar[ch] 9th, 2020" (id.), at which Defendant McDonnell "started saying that he needed all the data" (id.) and "[Plaintiff] asked him how that could be possible after he sabotaged [her] computer" (id.; see also id. ("I told him that the department did not have a server until last week. . . . [E]ach lab in PCB had its own hard drive."));

62) both Defendant McDonnell and Dr. Abou-Donia became "angry and [Dr. Abou-Donia] said he needed to talk to his lawyer[, b]ut

19

[Defendant] McDonnell told [Dr. Abou-Donia] not to worry, this [wa]s just an internal investigation, and that [Defendant] McDonnell will protect Dr. Abou-[D]onia" (id.);

63) when the meeting ended, an employee of Defendant Duke University took Plaintiff's "files" (id.) and then "asked for [her] laptop" (id.);

64) "[w]hen [Plaintiff] told [the employee] this [wa]s [Plaintiff's] personal laptop, [the employee] insisted that [Plaintiff] give [the employee Plaintiff's] laptop" (id.), which the employee then "gave [] to [Defendant] McDonnell" (id.);

65) after consulting an attorney, "[Plaintiff] request[ed] that [her] personal laptop be returned" (id.), whereupon "[Defendant] McDonnell immediately called [Defendant] Duke University['s] attorney . . . [and] then came to [Plaintiff] and said 'I can take your laptop, I have executive powers and I can destroy you'" (id.; see also id. ("[Defendant McDonnell] was giving [Plaintiff] a verbal threat and slammed the door on [her]. He was shaking with anger . . . .")");

66) because Defendant McDonnell "would not give [Plaintiff her] laptop" (id.), she "went to OIE" (id.), where an employee "told [Plaintiff] to send another email to [Defendant Duke University's attorney] and [Defendant] McDonnell to return [Plaintiff's] personal laptop" (id.);

67) Defendant Duke University's attorney thereafter met with Plaintiff and "apologized" (id.), before telling Plaintiff "that [she] w[ould] receive an email from [Defendant] McDonnell[] as to where [she] c[ould] collect [her] laptop and that [her] laptop was not imaged" (id. at 32);

68) "[h]owever, [according to] documents relating to the investigation against [Plaintiff, ] the laptop was, in fact, imaged" (id.) and it "no longer worked properly after this confiscation" (id.; see also id. ("[Plaintiff] sent an email to [Defendant] McDonnel [sic] and [the employee of Defendant Duke University who took the laptop from Plaintiff] ask[ing] them what they did to [Plaintiff's] laptop, but [she] never got a reply."));

69) "[o]n Mar[ch] 12-19th 2020, Dr. Abou-[D]onia and [Plaintiff] were getting prepared for the labs to be closed down" (id.) and "Dr. Abou-[D]onia would continue to make sexual comments and Dr. Abou-[D]onia would say 'now you can go tell [Defendant] McDonnell[]' and [Defendant] Dowel[l]-Newton[] and would laugh" (id.; see also id. ("Dr. Abou-[D]onia told me that if [I] report[ed] '[Defendant] McDonnell[] will use . . . [Defendant] Swamy[] to destroy your scientific career and you will be homeless.' He also said, 'no matter where you go and complain, faculties stick together and help each other and if you don't listen to me, you will be on the streets.'"));

21

70) "[o]n Mar[ch] 17, 2020, [PCB] reported a theft from [a white female scientist's] lab" (id.), unlike "several times [when Plaintiff] reported the theft of files from [her] desk in Dr. Abou-[D]onia's lab, but emails were never sent out" (id.);

71) "[o]n Mar[ch] 30, 2020, [Plaintiff] received an email from [OIE] . . . that the investigation was underway" (id.) and she "provided evidence . . . relating to the incidents [she] described" (id.), which "greatly affected [her] mental status" (id.);

72) "[f]rom March and April of 2020, [Plaintiff] was trying to transfer [her] position to [another of Defendant Duke University's departments]" (id.), but, when she disclosed that an "investigation was going on for sexual harassment and data integrity" (id. at 33), she received an email from an official with Defendant Duke University stating that "'significant political issues [] should be clarified before . . . consider[ing] such a move'" (id.);

73) when Plaintiff attempted to submit a grant application to improve her ability to transfer to another of Defendant Duke University's departments, "[Defendant] McDonnell intervened and blocked the submission" (id.; see also id. ("[Defendant] McDonnell insisted that [Plaintiff] work for Dr. Abou-[D]onia and [Defendant] McDonnell said he would not allow [her] to switch to another lab without Dr. Abou-[D]onia's approval."));

74) as of July 1, 2020, PCB's "IT support [began to] be provided by [Defendant] Duke [University]" (id.);

75) "[h]owever, when [Plaintiff] had originally asked [Defendant] Dowell-Newton upon joining PCB, [Defendant] Duke University provided no such IT support to PCB, [as] it was each lab's responsibility, and Dr. Abou-Donia failed to provide [Plaintiff] with IT support" (id. at 34);

76) in addition, "[Defendant] McDonnell failed to appropriately supervise Dr. Abou-Donia in making sure that this IT support was provided so that [Plaintiff] could maintain [her] data securely, and initiated an unjustified investigation of [her], which [Defendants] Klotman, Swamy, and Duckett supported, even though it was PCB's own lack of security and enabling of harassment perpetrated by a tenured faculty member that led to the loss of [the] lab's data and [Plaintiff's] research files" (id.);

77) after "all researchers ha[d] gone back to the lab and [Plaintiff] ha[d] not been given the return-to-work plan" (id.), "[o]n July 1, 2020, on the advice of [OIE], [Plaintiff] sent an email to PCB-HR . . . requesting how [she] could get back and [she] got a reply from [Defendant] McDonnell, who copied [Plaintiff] on an email to Dr. Abou-[D]onia, asking [him] to provide [Plaintiff] with a return plan" (id.), despite the fact that "[Plaintiff] could not communicate with Dr. Abou-[D]onia due to the no-contact order instituted by OIE, which either [Defendant] McDonnell failed to adhere to or [Defendant] Duke University failed to duly inform all relevant parties of" (id.);

23

78) "[o]n July 20, 2020, [Plaintiff] received an email from [an employee of Defendant Duke University]" (id. at 35), notifying her that, after "'complet[ing] a review of the data integrity and publication concerns raised[, it was] determined an inquiry under the research misconduct process [wa]s not warranted at th[at] time'" (id.; see also id. ("'The Dean, [Defendant] Klotman, concurred with this assessment . . . .'"));

79) per the email, Defendant Klotman nonetheless "'determined corrective actions [we]re needed'" (id.), which she "'communicated to the Chair, [Defendant] McDonnell, for follow-up'" (id.), but "[i]t was never made clear to [Plaintiff] why corrective actions were needed . . . if no research misconduct was found" (id.);

80) "on July 23, 2020, [Defendants] Duckett and McDonnell sent [Plaintiff] an email inquiring about the whereabouts of experiments notebooks for the three manuscripts [Plaintiff had published]" (id.; see also id. ("The email sounded like an accusation, and it seemed like an artificial barrier for going back to work was presented, especially because the investigation ended."));

81) "[o]n September 1, 2020, [Plaintiff] went back to work" (id.), but she "was not able to conduct experiments because the necessary freezers where [her] samples were stored were locked and [she] did not have access to [them]" (id.; see also id. ("The freezers were not unlocked until October 19, 2020, even though [Plaintiff] sent requests."));

24

82) additionally, "[Plaintiff] noticed that many of [her] files and personal accessories were missing and [they] still have not been returned, nor has the disappearance of [her] files and belongings been investigated or accounted for by either PCB or OIE, or [the office that conducted the data integrity investigation], even though [Plaintiff] reported it" (id.; see also id. at 36 (alleging that, as a result of Defendant Dowell-Newton's instructions, "many of [Plaintiff's] things were discarded, including the two failed computers that [Plaintiff] had kept, which could have been used to show that [she] had properly stored the data with the resources [she] had available, and possibly, that these computers may have also revealed tampering"));

83) "[e]ventually, [Plaintiff] had to start working outside the lab, to avoid unnecessary conflict [with the new research scientist]" (id. at 35; see also id. ("[A] possible motivation for [the new research scientist's] behavior may have been that she was interviewed during OIE's investigation of [Plaintiff's] sexual harassment and assault; she is also a personal family friend of Dr. Abou-[D]onia and both [she] and her husband were former students of Dr. Abou-[D]onia . . . ."));

84) "[Defendant] Duke University never took action to remedy the previous, and continuing indignities [Plaintiff] was facing as [she] attempted to return to work" (id. at 36);

85) "[o]n October 5, 2020, [Defendant] Dowell-Newton sent an email that [Plaintiff] was non-compliant in checking in to the SymMon (Symptom Monitoring) app that [Defendant] Duke [University] was using for employees to check in to work every day" (id.; see also id. (alleging that email threatened that Plaintiff's "card access would be revoked")), but, in fact, "[Plaintiff] had been completing it every single day [she] went to work" (id.), which "[she] verified with . . . the Chief Technology Officer at [Defendant] Duke University [IT office]" (id.);

86) "[Plaintiff] forwarded [a] report of this incident to [OIE], because it constituted another attempt to interfere with [her] right to work without a legitimate reason, which [she] consider[ed] retaliatory" (id.);

87) "[on] November 5, 2020, [Plaintiff] received [the] OIE report . . . that the investigation concluded with the preponderance of evidence showing sexual harassment . . . occurred in [PCB]" (id.; see also id. at 37 ("Although [Plaintiff] gave all the evidence of harassment by [Defendant] McDonnell, only a brief mention was made of his actions."));

88) "[i]mmediately thereafter retaliation intensified, and no remedial action was given" (id. at 36), as "[Plaintiff] was subjected to various retaliatory incidents as part of the ongoing unjustified investigation against [her]" (id.);

89) "[w]hen [Plaintiff] communicated this to [OIE] . . ., she [was] told . . . that [she] had to go through a completely new process of case intake for retaliation . . . [with someone] newly appointed in OIE as an investigator" (id.);

90) as a result, "[Plaintiff] had to re-explain the whole process of what happened and forward evidence [she] had already sent to [OIE] multiple times" (id.; see also id. ("[T]his practice was done to slow down the process and delay [Plaintiff] from working towards [her] grant proposal . . . .");

91) "[i]n November of 2020, [Plaintiff] received samples for [her] grant for the first time after repeatedly requesting collaborators to send [her] samples and after Dr. Abou-[D]onia had canceled payments to the collaborators without [her] consent or knowledge, which caused further delay (which was interference in [her] work that did not happen to other scientists in PCB who were working on grants, who were lighter skinned than [she] was)" (id. at 36-37);

92) "[o]n November 16, [2020, Defendant] Duckett sent [Plaintiff] an email that Dr. Abou-[D]onia had been relieved of his duties at [Defendant] Duke [University]" (id. at 37; see also id. ("On November 25, [2020, Plaintiff] met with [Defendant] Duckett, who clarified his previous statement that Dr. Abou-[D]onia had been 'relieved of his duties' by telling [her that] Dr. Abou-[D]onia had

27

resigned, but that there was a legal case that [Defendant Duckett] was not at liberty to discuss.")).

93) "[on] December 22, 2020, [Plaintiff] received an email from [Defendant] Duckett that [Dr.] Abou-[D]onia submitted his resignation and effectively this mean[t] that his research projects w[ould] be terminated and [Defendant Duckett was] in the process of informing [Dr. Abou-Donia's] funding agency (DoD) of this development and termination of his grants" (id.);

94) "[Plaintiff] replied to [Defendant] Duckett that [she] would like more clarification on [her] role going forward and that . . . [she] would like to know how [she] c[ould] arrange to continue to use [her research samples]" (id. at 38);

95) "[o]n December 23, 2020, [Defendant] Duckett sent an email saying that he had asked [for the] retriev[al of] all the samples since one of the collaborators wanted all her samples back" (id.) and directed Plaintiff to provide "documentation [she] had that [she] was given permission to use the samples [she] had, or [she] could not use the samples" (id.);

96) "[o]n December 24, 2020, [Plaintiff] reached out to all [her] collaborators . . . but only three of them communicated with [her]" (id.), with those three pledging their continued support (see id.); "[h]owever, [the fourth] did not reply and asked for her samples back" (id.);

97) "[o]n January 5, 2021, [Plaintiff] was ordered to pause all [her] work, including writing papers and presenting at conferences" (id.; see also id. ("[Defendants] Duckett and Swamy had started a data integrity investigation once again based upon the spurious allegations of Dr[]. Abou-[D]onia and [Defendant] McDonnell . . . [and] the process of the investigation was not transparent and they informed me that it was confidential and that I was not allowed to discuss what was going on."));

98) later in January 2021, Plaintiff learned that samples of hers stored in the lab's freezer were removed and thus "were tampered with, which was retaliatory" (id.);

99) "[o]n February 9, 2021, after [Plaintiff] was asked to pause all [her] work and not to enter the PCB building, [Defendant] Dowell-Newton sent an email, which was copied to [Defendant] Duckett, stating that [Plaintiff] was spotted in the building" (id. at 38-39), but "[Plaintiff] had not been in the building after January 6, 2021" (id. at 39);

100) "[o]n February 10, 2021, [Defendant] Swamy and [another employee of Defendant Duke University] met with [Plaintiff] on Zoom and [she] was asked to either retract three of [her] papers and relinquish [her] grant [or] otherwise[ Defendant] Duke [University] would take the initiative to notify the publications to retract the manuscript[s] and DoD to terminate [her] grant" (id.);

29

101) "[t]his was a coercive and disproportionate corrective action to demand" (id.) and, when Plaintiff explained why, "[she] was wrongly accused as being disrespectful, when they were the ones who were making mistakes not only in the interpretation of [her] data, but also in basic information regarding the manuscripts and [her] study" (id.; see also id. at 42 ("The retaliatory actions were initiated by [Defendants] Duckett and Swamy after [Defendant] McDonnell stepped down from chairmanship and Dr. Abou-[D]onia resigned."));

102) when Plaintiff reported this ongoing retaliation to the new OIE investigator in February 2021, the investigator "referred to [Plaintiff] as Geeta" (id. at 39), i.e., Defendant Swamy's "first name" (id.), and, "given the nature of the concerns [Plaintiff] was having, [she] found this behavior to be discriminatory" (id.);

103) "[o]n March 10, 2021, [Defendant] Swamy went ahead and suspended [Plaintiff's] grant, which [Defendant Swamy] stated was done with . . . [Defendant] Klotman's approval" (id.; see also id. at 40 ("[Defendants] Swamy . . . and Duckett refused to provide a detailed report of the investigation in progress.  Instead, they forced [Plaintiff] to keep everything confidential."));

104) after Plaintiff appeared by Zoom before a committee (see id. at 40; see also id. at 41 (alleging that committee members also "interviewed [Defendant] McDonnell], but Dr. Abou-[D]onia refused

30

to meet with them")), "the outcome of their decision was the same" (id. at 41) and "[Defendant] Klotman refused to meet with [Plaintiff] at any point, even though she was the deciding authority" (id.; see also id. at 42 ("Throughout the process of investigation both by [Defendant] Swamy and the first committee, they clearly reflected inadequacy in interpreting [Plaintiff's] data. Whatever the evidence [Plaintiff] was able to explain, it was in vain as they ha[d] already decided the outcome."));

105) "[o]n August 9, 2021, [Plaintiff] requested from [Defendant] Duke [University's] Office of Research Administration the process on how to request [a] no-cost extension of [her] project and the director replied to [Plaintiff] to contact [Defendant] Swamy" (id. at 41), but, "[w]hen [Plaintiff] sent an email to [Defendant] Swamy, [Plaintiff] only received an email from her on August 26, 2021, that, on behalf of [Defendant] Duke [University], [Defendant] Swamy notified the DoD of [Defendant Duke University's] research misconduct inquiry finding of a need for an investigation to start and requested unilateral termination of [Plaintiff's] grant that was due to end on August 31, 2021" (id.);

106) "[o]n August 19, 2021, [Plaintiff] filed [her] complaints to the EEOC" (id.; see also id. at 43 ("[The Equal Employment Opportunity Commission ('EEOC')] investigation took more than 2 years, during which period[ Defendant] Duke University failed to

provide the remedies [Plaintiff] was entitled to . . . and failed to prevent the retaliation [Plaintiff] experienced . . . .")); 

107) "[o]n September 14, 2021, [Plaintiff] requested [that OIE,] according to [Defendant] Duke [University's p]olicy, . . . share with [her] the [r]emedial measure[s taken to address the sexual harassment she suffered] and [OIE] replied that [it] did not issue any remedial measures, which was discriminatory" (id. at 41); 

108) "[o]n September 15, 2021, [Defendant] Duckett sent [Plaintiff] a letter that [she was] under investigation, and . . . he [wa]s terminating [her] employment at [Defendant] Duke [University] as of November 2021 . . . and [her] email would be shut down ([despite her] email ha[ving] all the information regarding their communications and [her] data)" (id.; see also id. ("I was not paid from November, while the investigation was ongoing unilaterally, which I consider was discriminatory because the administrators involved in sabotaging me were neither investigat[ed] nor penalized and I was retaliated [against].")); 

109) "[o]n November 8, 2021[,] under the guidance of [Defendant] Swamy, [an employee of Defendant Duke University] sent an email requesting the Military Medicine journal editorial office to retract [Plaintiff's] three manuscripts" (id. at 42); 

110) "[o]n November 18, 2021, [Plaintiff] sent an email to the Military Medicine editorial office describing [her] situation, and the editor . . . replied on November 19, 2021 to [Defendant Duke

32

University's] email requesting the retractions, copying [Plaintiff] on the email, saying that there appeared to be some evidence of retaliation occurring and that [he] would wait until the institution made the final determination" (id.);

111) "the manuscripts were retracted in June 2022" (id.) and, "[w]hen [Plaintiff] inquired, the [Military Medicine j]ournal forwarded the email they sent inquiring about whether [she] had any objections, and [Defendant] Duke University had given the [Military Medicine j]ournal [her] Duke email for communications, which was discontinued by [Defendant] Duke [University] during the termination process, even though [Defendant] Duke [University] had [her] private email" (id.);

112) "[d]uring this period, [Defendant] Swamy took it upon herself to inform DoD to relinquish the DoD grant awarded to [Plaintiff] . . ., which [Defendant Swamy] was coercing [Plaintiff] to do from the time Dr. Abou-[D]onia resigned and [Defendant] McDonnell stepped down from chairmanship, despite the concerns [Plaintiff] had raised regarding the integrity of the investigation given the events that surrounded it and the theft of data [Plaintiff] had reported that had been disregarded" (id. at 43; see also id. (alleging that Defendant Duke University handled shut-down of Plaintiff's and Dr. Abou-Donia's research protocols differently and that employee of Defendant Duke University attributed difference to "political reasons"));

33

113) "[w]hile all these damages were done, the second committee was assigned to investigate the allegations of data integrity violations against [Plaintiff], and during their process of investigation, they continuously misinterpreted the data and were supported in doing so by the deciding authority, [Defendant] Klotman" (id.; see also id. ("[Plaintiff's] concerns about the lack of security in PCB, as well as the data practices of Dr. Abou-[D]onia, and the hostile behavior by both [Defendants] McDonell and [] Dowell-Newton in response to the concerns [Plaintiff] had raised early and often were disregarded."));

114) "[in] May and June, 2022, . . . [Plaintiff] received . . . a formal letter stating that OIE determined that the processes that [Defendants] McDonnell, Klotman, Swamy, . . . and [] Dowell-Newton initiated against [Plaintiff] were not retaliation and that OIE w[ould] not initiate a formal investigation" (id.; see also id. ("[The OIE investigator] was influenced by [Defendant] Swamy as [the OIE investigator] also frequently addressed [Plaintiff] as Geeta[, i.e., Defendant Swamy's first name,] during [their] conversation."));

115) "[o]n Aug[ust] 19, 2022, [an employee of Defendant Duke University] scheduled a meeting of [Plaintiff] with the second committee" (id. at 44), during which Plaintiff (A) contended that "discrimination, harassment, and retaliatory behavior [had] led to this investigation" (id.), (B) emphasized "the negative effects of

34

the bad faith in this investigation on [her] career as the victim of [the] wrongful misconduct of [Defendant ] McDonnell and [Dr. Abou-[D]onia, both of whom initiated the previous investigation and this investigation" (id.), while "motivated to retaliate against [her]," including "because [she] requested a non-tenured faculty position and . . . because of [her] allegation of sexual harassment" (id.; see also id. ("I was assaulted by both [Defendant] McDonnell and [Dr.] Abou-[D]onia.")), and (C) argued that PCB "failed to ensure [her] safety and the safety of [her] work area despite [her] repeated requests and the evidence [she ] provided to negate the allegations [which was] not being considered" (id. at 44-45); and

116) "[o]n Oct[ober] 31, 2022[, i]n spite of [Plaintiff] meeting with the committee and providing all the evidence, the deciding authority[, Defendant] Klotman[,] made a determination of misconduct" (id. at 45; see also id. (alleging that, when Plaintiff tried to appeal that decision, an employee of Defendant Duke University "told [her] . . . the decision was final")).

Before Defendants responded to the Amended Complaint, Plaintiff "move[d] the Court for leave to file [a second] amended complaint . . . ." (Docket Entry 9 at 2.) In particular, Plaintiff sought to add as defendants (A) Ericka Loretta Lewis, who "handled [Plaintiff's] complaints of harassment and assault at [Defendant] Duke University" (id.; see also id. ("propos[ing Ms.

35


Lewis] as an additional defendant due to her culpability in failing to address the harassment and retaliation [Plaintiff] was experiencing at [Defendant] Duke University with the issuance of a remedial action letter that [Plaintiff] was entitled to, per [Defendant] Duke University['s] policy")), and (B) Ashley Edwards-Davis, who "handled [Plaintiff's] complaints of retaliation at [Defendant] Duke University" (id. at 2-3; see also id. at 3 ("propos[ing Ms. Edwards-Davis] as a defendant, because, in addition to causing undue delay in the investigatory process for retaliation by not utilizing the evidence [Plaintiff] had already collected for Ms. Lewis and instead, having [Plaintiff] recount everything [she] had previously discussed with Ms. Lewis while [Plaintiff] was undergoing an investigation [her]self, Ms. Edwards-Davis engaged in discriminatory conduct against [Plaintiff] by referring to [her] as Geeta during multiple meetings")). Plaintiff also requested leave "to add an additional claim of breach of implied covenant of good faith and fair dealing, [based on] the same set of facts as the claims raised before." (Id. at 3.)

Eight days later (still prior to any response to the Amended Complaint by Defendants), Plaintiff:

> moved to amend [her] motion for leave of court to file [a second] amended complaint in order to restate all amendments requested in the original motion, change the identification of [D]efendant Duke University School of Medicine to Duke University, add 42 U.S. Code § 1981 as another basis for jurisdiction, upon which [she] can pursue individual liabilities for the named defendants[,] and challenge the enforceability and the conscionability

36

[sic] of being subject to binding arbitration under
[Defendant] Duke [University's d]ispute [r]esolution
process.

(Docket Entry 10 at 2 (internal quotation marks omitted).)
Thereafter, instead of answering the Amended Complaint, Defendant
Duke University "mov[ed] to compel arbitration of Plaintiff's
claims in this lawsuit and stay this proceeding pursuant to the
Federal Arbitration Act, 9 U.S.C. § 1, et seq." (Docket Entry 11 at
1 (italics omitted)), supporting that motion with a Memorandum of
Law (Docket Entry 12) and declarations (Docket Entries 12-1, 12-2).
Individual Defendants subsequently also "move[d] to compel
arbitration of Plaintiff's claims in this lawsuit and stay this
proceeding pursuant to the Federal Arbitration Act . . . ."
(Docket Entry 30 at 1; see also Docket Entry 31 (Memorandum of
Law).)  Plaintiff opposed both Motions to Compel Arbitration (see
Docket Entries 24, 37), Defendants replied (see Docket Entries 29,
40), and Plaintiff filed a surreply to Defendant Duke University's
reply (see Docket Entry 35).[3]

## DISCUSSION

"[The Federal Arbitration Act ('FAA')] provides for the
enforcement of agreements in which the parties have agreed to
arbitration." Whiteside v. Teltech Corp., 940 F.2d 99, 101 (4th
Cir. 1991) (emphasis omitted).  In that regard:

---

3 Additionally, after Defendants opposed Plaintiff's motions
seeking leave to file a second amended complaint (see Docket Entry
19), Plaintiff replied (see Docket Entry 28).

> To state a claim to compel arbitration under the FAA, [a party] must allege (1) the existence of a dispute between the parties, (2) a written agreement that includes an arbitration provision which purports to cover the dispute, (3) the relationship of the transaction, which is evidenced by the agreement, to interstate or foreign commerce, and (4) the failure, neglect or refusal of the [opposing party] to arbitrate the dispute.

Id. at 102; see also Galloway v. Santander Consumer USA, Inc., 819 F.3d 79, 89 (4th Cir. 2016) ("The written arbitration agreement . . . need not include any written assent to those obligations." (internal quotation marks omitted)). "Moreover, the FAA provides that a party may seek revocation of a contract under 'such grounds as exist at law or in equity,' including fraud, duress, and unconscionability." Sydnor v. Conseco Fin. Servicing Corp., 252 F.3d 302, 305 (4th Cir. 2001) (quoting 9 U.S.C. § 2). Ultimately, "[c]ompelling arbitration is appropriate under the FAA only when there is 'a judicial conclusion' that there is a validly formed, express agreement to arbitrate." Dillon v. BMO Harris Bank, N.A., 173 F. Supp. 3d 258, 263 (M.D.N.C. 2016) (quoting Granite Rock Co. v. International Bhd. of Teamsters, 561 U.S. 287, 303 (2010)), appeal dismissed sub nom. Dillon v. Bay Cities Bank, No. 16-1373 (4th Cir. Apr. 5, 2016) (unpublished).[4]

---

4 "[A] nonsignatory to an arbitration clause may, in certain situations, compel a signatory to the clause to arbitrate the signatory's claims against the nonsignatory despite the fact that the signatory and nonsignatory lack an agreement to arbitrate." American Bankers Ins. Grp. v. Long, 453 F.3d 623, 627 (4th Cir. 2006); see also International Paper Co. v. Schwabedissen Maschinen & Anlagen GMBH, 206 F.3d 411, 416-17 (4th Cir. 2000) (continued...)

<u>Existence of Written Arbitration Agreement</u>

"In determining whether the parties executed a valid agreement to arbitrate, courts generally apply ordinary state-law principles that govern the formation of contracts." <u>Sydnor</u>, 252 F.3d at 305; <u>see also</u> <u>Perry v. Thomas</u>, 482 U.S. 483, 492 n.9 (1987) (ruling that, in disputes over making of arbitration agreement, "state law, whether of legislative or judicial origin, is applicable if that law arose to govern issues concerning the validity, revocability, and enforceability of contracts generally" (emphasis omitted)). "Under North Carolina law, a valid contract 'requires offer, acceptance, consideration, and no defenses to formation.'" <u>Hightower v. GMRI, Inc.</u>, 272 F.3d 239, 242 (4th Cir. 2001) (quoting <u>Koltis v. North Carolina Dep't of Human Res.</u>, 125 N.C. App. 268, 271, 480 S.E.2d 702, 704 (1997)); <u>see also</u> <u>Greene v. OneMain Fin. Grp., LLC</u>, No. 1:17CV848, 2018 WL 5831681, at *4 (M.D.N.C. Nov. 7, 2018) (unpublished) (Biggs, J.) ("[A] mutual promise between an employer and employee to be bound by arbitration is sufficient consideration to form a contract." (citing <u>Johnson v. Circuit City</u>

---

4(...continued)
("Well-established common law principles dictate that in an appropriate case a nonsignatory can enforce . . . an arbitration provision within a contract executed by other parties."). The Individual Defendants explicitly argued that they "may enforce [Defendant Duke University's arbitration agreement with Plaintiff] even though they are not signatories to [that] specific arbitration agreement[]." (Docket Entry 31 at 7; <u>see also</u> <u>id.</u> at 13-17 (developing foregoing argument).) Plaintiff did not dispute that argument. (<u>See</u> Docket Entry 37 at 1-8.)

39

Stores, 148 F.3d 373, 378 (4th Cir. 1998), and Howard v. Oakwood Homes Corp., 134 N.C. App. 116, 120, 516 S.E.2d 879, 882 (1999))).[5]

Procedurally, if the party moving to compel arbitration produces competent evidence of "a written agreement that includes an arbitration provision that purports to cover the dispute," Dillon, 173 F. Supp. 3d at 263, the party opposing arbitration "must make an unequivocal denial that an arbitration agreement exists — and must also show sufficient facts in support," Chorley Enters., Inc. v. Dickey's Barbecue Rests., Inc., 807 F.3d 553, 564 (4th Cir. 2015). "This burden on the opponent only arises, however, after the proponent produces credible, admissible evidence

_____

5 Defendants expressly invoked North Carolina law in seeking to compel arbitration (see Docket Entry 12 at 10; Docket Entry 31 at 10), albeit without undertaking any choice-of-law analysis (see Docket Entry 12 at 10; Docket Entry 31 at 10). Plaintiff did not contest the applicability of North Carolina law in her response to Defendant Duke University's Motion to Compel Arbitration (see Docket Entry 24 at 1-4) and relied on North Carolina law as to unconscionability in opposing Individual Defendants' Motion to Compel Arbitration (see Docket Entry 37 at 4-5). Choice-of-law analysis supports the parties' decision to look to North Carolina law when addressing contractual matters in this employment discrimination case. First, "[i]n a federal question case that incorporates a state law issue, such as contract formation, a district court applies the choice-of-law rules of the state in which it sits unless a compelling federal interest directs otherwise." Baker v. Antwerpen Motorcars, Ltd., 807 F. Supp. 2d 386, 389 n.13 (D. Md. 2011). Second, for disputes about contracts, in North Carolina (where this Court sits), "courts long ago established the principle that the law of the [place] where the contract is made is the rule by which the validity of [the contract], its exposition, and consequences are to be determined." Fast v. Gulley, 271 N.C. 208, 211, 155 S.E.2d 507, 509-10 (1967). Third, because Plaintiff and Defendant Duke University made any contract between them in North Carolina, the Court should look to North Carolina law to resolve contract-related questions.

which satisfies the Court that there was an arbitration agreement." Dillon, 173 F. Supp. 3d at 264. "This standard is akin to the burden on summary judgment." Chorley Enters, Inc., 807 F.3d at 564; see also 9 U.S.C. § 4 ("[U]pon being satisfied that the making of the agreement for arbitration . . . is not in issue, the court shall make an order directing the parties to proceed to arbitration . . . . If the making of the arbitration agreement . . . be in issue, the court shall proceed summarily to the trial thereof.").

"In support of [its M]otion [to Compel Arbitration], [Defendant] Duke [University] submit[ted] . . . [d]eclaration[s] of Antwan Lofton[ and] . . . Denise Motley." (Docket Entry 11 at 1 (referencing Docket Entries 12-1 and 12-2).) Lofton's declaration – signed "under penalty of perjury" (Docket Entry 12-1 at 3)[6] – identifies his jobs with Defendant Duke University through which he (A) gained "familiar[ity] with and ha[d] access to employee records kept by [Defendant] Duke University" (id. at 1), including as to Plaintiff (see id. at 2 (confirming that "Plaintiff was last employed by [Defendant] Duke [University] as a Research Scientist in [PCB] from July 1, 2016 until November 30, 2021"); see also id. at 3 ("Plaintiff's work . . . involved interstate commerce. . . . [A]s a Research Scientist, she performed research funded by grants from federal agencies. Some of these funding sources originated

_____

6 Pin cites to Docket Entry 12-1 refer to the page numbers that appear in the footer appended to that document upon its docketing in the CM/ECF system (not to any internal pagination).

from outside of North Carolina."")), and (B) became "knowledgeable about the binding private dispute resolution procedures applicable to [Defendant Duke University's] non-union[ ] employees" (id. at 2). According to Lofton's declaration, "[a]ll [of Defendant] Duke [University's] employees who are not subject to the terms of a collective bargaining agreement with a labor union agree to resolve any disputes concerning their employment or termination from employment through a private dispute resolution procedure, which includes binding arbitration." (Id.)

More specifically, "[t]he dispute resolution procedure applicable to Plaintiff is [Defendant] Duke [University's] Dispute Resolution Process" (id.), "[a] true and accurate copy of [which Lofton] attached" (id. (referencing id. at 4-14 ("DRP"))). Per the DRP ("issued July 1, 2006" and "last revised June 11, 2021" (id. at 13 (all-caps and bold font omitted))):

1) "[a]ny claim arising out of or relating to employment policies will be settled in accordance with th[e DRP]" (id. at 4; see also id. at 6 ("Th[e DRP] applies to any application, meaning or interpretation of personnel policies or procedures as they affect work activities.")));

2) "[b]oth the staff member and [Defendant] Duke [University] are required to utilize th[e DRP] to resolve disagreements falling within its scope" (id. at 4), which expressly encompasses "[a]ny claim based in whole or in part on federal, state or local laws

whether statutory or common law" (<u>id.</u> at 6; <u>see also</u> <u>id.</u> at 7
("Staff have the right to file a formal grievance using the [DRP]
in order . . . to appeal an employment decision that the staff
member believes to be discrimination based upon his or her age,
color, disability, gender, gender expression, gender identity,
genetic information, national origin, race, religion, sex, sexual
orientation, or veteran status.")); and

    3) the DRP provides for a three-step process, beginning with
"face to face discussion" (<u>id.</u> at 7 (all-caps and bold font
omitted)),[7] progressing to "review [by] the Dispute Review Panel"
(<u>id.</u> at 9), and culminating with "arbitration" (<u>id.</u> at 10 (all-caps
and bold font omitted); <u>see also</u> <u>id.</u> at 4 ("The arbitration step of
th[e DRP] will be governed by the United States Arbitration Act."),
10 ("[I]f the dispute relates to or involves involuntary separation
or includes allegations of sexual harassment or discrimination, the
staff member may request an arbitration hearing.  The arbitration
hearing will be conducted by an outside arbitrator selected from a
panel of neutral arbitrators assigned and administered by the
American Arbitrators [sic] Association (AAA)." (bullet-point
omitted)), 11 ("The arbitration hearing will be guided by the

---

    7 In conjunction with that first step, "the parties may agree
to refer the issue to mediation . . . ."  (Docket Entry 12-1 at 8.)

National Rules for the Resolution of Employment Disputes – as developed by the American Arbitration Association.")).[8]

Motley's declaration, in turn, avers to her "knowledge[] about [Defendant] Duke [University's] online application process" (Docket Entry 12-2 at 1; see also id. at 3 (documenting Motley's signature "under penalty of perjury")), which, "[i]n 2021, [involved] utiliz[ation of] a system called SuccessFactors" (id. at 1). Motley elaborated that "[a]ll candidates, internal and external, who . . . utiliz[ed] SuccessFactors were required to electronically agree to [a] Candidate Certification Policy" (id. at 2), "[a] copy of [which] as it appeared in October 2021 [she] attached" (id. (referencing id. at 4)). That document contains this statement:

> I hereby agree that any dispute or controversy arising out of or related to my employment or termination by [Defendant] Duke University . . ., including any claim based in whole or in part on federal, state, or local laws, whether statutory or common law, shall be subject to final and binding resolution through the . . . [DRP], as may be periodically amended and which is available upon request from the department of Human Resources.

(Id. at 4.) Motley further averred – based on her "responsibilit[y,] as Assistant Vice President, Human Resources [for Defendant Duke University,] . . . for oversight of employee

---

8 Court rulings confirm that, long before Plaintiff began working in PCB, Defendant Duke University required employees to resolve workplace disputes by "binding arbitration." Armstrong v. Duke Univ., No. 1:04CV1206, 2006 WL 213952, at *1 (M.D.N.C. Jan. 27, 2006) (unpublished) (Tilley, C.J.); see also Martin v. Vance, 133 N.C. App. 116, 121-24, 514 S.E.2d 306, 309-11 (1999) (concluding that Defendant Duke University's policies in place since 1994 mandated arbitration of employment-related claims).

SuccessFactors accounts" (id. at 2), which "were created and maintained in the ordinary course of business" (id.) – (A) that "Plaintiff . . . used the SuccessFactors system to apply for positions at [Defendant] Duke University on October 4, 2021 and October 20, 2021" (id. at 3), and (B) that, "[w]hen Plaintiff applied for those positions, she electronically accepted the Candidate Certification Policy" (id.; see also id. (incorporating "copy of the records showing Plaintiff's acceptance of the Candidate Certification Policy")).

Because Defendant Duke University came forward with this evidence of "a written agreement that includes an arbitration provision that purports to cover the dispute," Dillon, 173 F. Supp. 3d at 263,[9] Plaintiff "must make an unequivocal denial that an

_____

9 Put another way, Defendant Duke University "produce[d] credible, admissible evidence which [should] satisf[y] the Court that there was an arbitration agreement," Dillon, 173 F. Supp. 3d at 264. Of particular note, the evidence detailed above (from witnesses with knowledge based on business records) shows that (A) Defendant Duke University issued the DRP (in writing) a decade before Plaintiff took her job with PCB (which involved interstate commerce), (B) the DRP, as of no later than June 11, 2021, required arbitration of claims of the sort raised in this case, and (C) Plaintiff, while employed by Defendant Duke University and in exchange for the opportunity to pursue another job, agreed to resolve employment disputes via the DRP no later than October 4, 2021. That showing would satisfy, at least facially, the requirements, "[u]nder North Carolina law, [for] a valid contract[, i.e.,] offer, acceptance, consideration, and no defenses to formation," Hightower, 272 F.3d at 242 (internal quotation marks omitted). Moreover, because the arbitration agreement extends broadly to "any dispute or controversy arising out of or related to [Plaintiff's] employment or termination" (Docket Entry 12-2 at 4 (emphasis added); see also, e.g., Docket Entry 12-1 at 4 ("Any (continued...)

45

arbitration agreement exists — and must also show sufficient facts in support," <u>Chorley Enters.</u>, 807 F.3d at 564.   However, in opposing Defendant Duke University's Motion to Compel Arbitration, Plaintiff neither "ma[d]e an[y such] unequivocal denial," <u>id.</u>, nor "show[ed any] sufficient facts," <u>id.</u>; to the contrary, as concerns the existence of an agreement, she merely stated (in unverified fashion) that, "if [she] did assent to binding arbitration, which [she] has no knowledge of doing, [she] was not able to enforce arbitration" (Docket Entry 24 at 2; <u>see also</u> <u>id.</u> at 4 (signing without taking oath or acknowledging perjury penalties)).

That equivocal statement does not suffice to call into question the existence of an agreement to arbitrate.   <u>See</u> <u>Corpening v. MoneyLion Inc.</u>, No. 3:19CV282, 2020 WL 13882091, at *2 (W.D.N.C. Apr. 22, 2020) (unpublished) ("The party denying arbitration cannot rely on 'mere unawareness of whether it had made an arbitration agreement.'" (quoting <u>Dillon</u>, 173 F. Supp. 3d at 264)); <u>Greene</u>, 2018 WL 5831681, at *3 ("Notably, [the p]laintiff fail[ed] . . . to specifically address or contest the evidence presented by [the d]efendant.   Specifically, she does not deny that . . . she signed a certificate . . . agree[ing] to comply with [the arbitration

---

9(...continued)
<u>claim</u> arising out of or relating to employment policies will be settled in accordance with th[e DRP]." (emphasis added))), that agreement applies to covered claims predating Plaintiff's assent to the agreement, <u>see</u> <u>Levin v. Alms & Assocs., Inc.</u>, 634 F.3d 260, 267-69 (4th Cir. 2011).

46

requirement]. [The p]laintiff does state [that she lacks] . . .
aware[ness] of . . . [and] any knowledge of the [arbitration
requirement] . . . . These statements fall short of an unequivocal
denial that she signed the certificate agreeing to comply with the
[arbitration requirement]." (internal citation and quotation marks
omitted)); <u>Mitchell v. Craftworks Rests. & Breweries, Inc.</u>, Civ.
No. 18-879, 2018 WL 5297815, at *7 (D.D.C. Oct. 25, 2018)
(unpublished) ("Critically, [the plaintiff] does not outright deny
that she electronically signed the [a]rbitration [a]greement
. . . . Given the evidence [the defendant] submitted, [the
plaintiff's] qualified denial is not enough to create a genuine
dispute regarding her assent to the [a]greement.").[10]

10 When Defendant Duke University replied in support of its
Motion to Compel Arbitration, it noted that, "[i]n her earlier
Amended Motion for Leave to File Amended Complaint[,] Plaintiff
alleged . . . she did not remember agreeing to [the DRP] and she
'had [her] signature copied and pasted without consent at
[Defendant] Duke University' in the past." (Docket Entry 29 at 5-6
(quoting Docket Entry 10 at 4); <u>see also</u> Docket Entry 10 at 4
(denying "knowledge of assenting to [DRP]"); Docket Entry 37 at 5
(mentioning Plaintiff's "challenge[ to DRP] in Doc[ket Entry] 10"
and purporting to "restate all of [her] previous statements").) As
said reply observes, that bald allegation by Plaintiff, which she
failed to submit under oath or subject to perjury penalties (<u>see</u>
Docket Entry 10 at 8), (A) "does not contest [Defendant] Duke
[University's] evidence that a user with Plaintiff's name
electronically accepted the Candidate Certification Policy [and
thereby agreed to resolve disputes via the DRP]" (Docket Entry 29
at 6), and (B) constitutes nothing "beyond pure speculation that
her electronic acceptance of the DRP in 2021 was somehow
fabricated" (<u>id.</u>; <u>see also</u> <u>id.</u> at 6-7 ("Plaintiff admits to
applying to the positions at issue and would have been required to
accept the DRP to complete the application process.")).

Furthermore, along with its reply, Defendant Duke University presented evidence that Plaintiff "also hand-signed an acknowledgment of the DRP in July 2016." (Docket Entry 29 at 6 (citing Docket Entry 29-1 at 3 (setting out second declaration from Lofton under penalty of perjury confirming that he attached thereto "a true and accurate copy of a Duke Staff Handbook Acknowledgment of Receipt signed by Plaintiff which is contained in her personnel file"), 5 (indicating, on attached acknowledgment bearing signature matching Plaintiff's signature on filings in this case (see, e.g., Docket Entry 5 at 51), that, in July 2016, Plaintiff "reviewed" DRP and agreed to advise Defendant Duke University personnel of any "concerns" about DRP)).)[11] Plaintiff subsequently filed a sur-reply addressing an evidentiary issue stemming from Defendant Duke University's reply, but not contesting the evidence of her assent to the DRP in July 2016. (See Docket Entry 35 at 1-4.)

Later, as the evidentiary basis for their Motion to Compel Arbitration, the Individual Defendants relied on (A) Plaintiff's "hand-signed acknowledgment of the DRP" (Docket Entry 31 at 5 (citing Docket Entry 29-1 at 5)), from "July 2016, [when she] accepted employment as a Research Scientist in the [PCB]" (id.), as well as (B) the documentation showing that, "[o]n October 4, 2021 and again on October 20, 2021, Plaintiff executed the Candidate

_____

11 Pin cites to Docket Entry 29-1 refer to the page numbers that appear in the footer appended to that document upon its docketing in the CM/ECF system (not to any internal pagination).

48

Certification, agreeing to resolution [of any disputes] through arbitration" (id. at 6 (citing Docket Entry 12-2 at 2, in turn referencing Docket Entry 12-2 at 4)). Plaintiff "oppos[ed] the [I]ndividual [D]efendants' [M]otion to [C]ompel [A]rbitration . . . given that enforcing the arbitration agreement would be unconscionable" (Docket Entry 37 at 1); however, she did not develop (let alone provide evidentiary support for) any argument to counter the evidence on which Individual Defendants relied to show her agreement to arbitrate (see id. at 1-8; see also id. at 5 (repeating equivocal comment that, "if [Plaintiff] did sign [DRP acknowledgment], [she] ha[s] no personal knowledge of [doing so]" and "restat[ing] all of [her] previous statements")).[12]

In sum, "[Defendants] ha[ve] met [their] burden of presenting sufficient evidence to demonstrate the formation of an agreement to arbitrate. [Plaintiff], meanwhile, may not remember signing [off on] th[at a]rbitration [a]greement, but she has not produced any evidence that casts doubt on the [a]greement's existence." Mitchell, 2018 WL 5297815, at *8; see also Corpening, 2020 WL 13882091, at *5 ("[The d]efendants produced evidence showing the

---

[12] Because Plaintiff could have challenged the evidence first presented with Defendant Duke University's reply either in her sur-reply or in her response to the Individual Defendants' Motion to Compel Arbitration, she "cannot argue that she was denied the opportunity to respond to all of [Defendants'] evidence." Mitchell, 2018 WL 5297815, at *7.

49

existence of an arbitration agreement, meeting [their] burden.
When the burden shifted, Plaintiff failed to [meet her burden].").

<u>Delay and Unconscionability</u>

With the existence of the agreement to arbitrate established,
the Court must examine the challenges Plaintiff has interposed
against enforcement of that agreement, including (as previously
noted) her contentions (A) that "[she] was not able to enforce
arbitration" (Docket Entry 24 at 2; <u>see also</u> Docket Entry 37 at 5
("[Individual D]efendants' [M]otion to [C]ompel [A]rbitration
should be denied because there was never any opportunity for
[Plaintiff] to engage with the [DRP] . . . .")), and (B) "that
enforcing the arbitration agreement would be unconscionable"
(Docket Entry 37 at 1; <u>see also</u> Docket Entry 24 at 3 ("While courts
may consistently uphold arbitration and arbitration agreements,
this only applies when the agreements are valid and enforceable –
not when the agreement in question is unconscionable.")).

Plaintiff based the first of those two contentions on the
assertion that "[Defendant] Duke [University] refused to convene
with [her] to resolve the matter internally following [her]
wrongful termination, even during the 2-year long EEOC
investigation process, when the issue of binding arbitration could
have been raised . . . ." (Docket Entry 24 at 2 (internal citation
omitted).) To support that assertion, Plaintiff cited the
"Declaration of Janet J. Lennon" (<u>id.</u> (referencing Docket Entry 24-

1)), and adverted to "detail[s] in [her] Amended Motion for Leave to File Amended Complaint" (id. (citing Docket Entry 10)). In the former document, Lennon, "a former attorney for [Plaintiff]" (Docket Entry 24-1 at 1; see also id. at 2 ("I provided legal services to Plaintiff . . . from approximately August 8, 2021 to August 10, 2023. I was the legal representative for [Plaintiff] during the relevant time for the [EEOC] investigation.")), "declare[d] . . . under penalty of perjury" (id. at 1) that:

1) "[f]rom the time the EEOC Charge of Discrimination was filed against [Defendant] Duke University by [Plaintiff], which was on or about August 23, 2021, [Lennon] was not directly notified by counsel representing [Defendant] Duke University that [Plaintiff] was under a binding arbitration agreement" (id. at 2); and

2) "EEOC records indicate that [Defendant] Duke University chose not to go to mediation and that is why [Plaintiff's] Charge was no longer designated for mediation by EEOC" (id.).

Plaintiff's Amended Motion for Leave to File Amended Complaint, in turn, points to these events to show her inability to arbitrate her disputes with Defendant Duke University:

1) "[Plaintiff] initiated multiple attempts with the Office of Staff and Labor Relations at [Defendant] Duke University of [her] own volition, which is necessary to even engage in the stages of [the DRP] . . . and none of these attempts to convene ever came to fruition" (Docket Entry 10 at 7 (internal citation omitted) (citing

51

Docket Entry 10-2 at 4-11 (reproducing e-mails between Plaintiff and Lofton (and one of his colleagues) from November 15, 2021, to December 19, 2022)); see also id. ("[A]ny of [those attempts] could have been used to compel [Plaintiff] into binding arbitration . . . ."); Docket Entry 37 at 5-6 ("[W]ell before [Plaintiff] filed a complaint with the EEOC regarding [Defendant] Duke University's conduct, . . . [she] tried to contact the Office of Staff and Labor Relations. . . . [A] call [between Plaintiff and Lofton] was never scheduled . . . as COVID-19 lockdowns occurred."), 7 ("It is unfair surprise to insinuate that [Plaintiff] could have used the [DRP] when [she] could not even get the Office of Staff and Labor [Relations] to respond to [her] emails . . . ."));[13]

_____

[13] Along similar lines intended to show that the unresponsiveness of Defendant Duke University's personnel to Plaintiff's pre-suit requests for assistance should bar enforcement of the DRP's arbitration requirement, her response to the Individual Defendants' Motion to Compel Arbitration also states:

> [T]he [DRP] purports to integrate the [d]epartment [h]ead and the [d]epartment [h]ead's [s]upervisor in th[e DRP's] process. Here, the [d]epartment [h]ead was [Defendant] McDonnell . . . . In one of [Plaintiff's] early meetings with [Defendant] McDonnell on July 24, 2019, . . . [he] state[d] that, "The only responsibility I have to you is through [Dr. Abou-Donia] . . . .

> This contradicts . . . [D]efendants' claims that [Plaintiff] could utilize the [DRP], and even if this statement made by [Defendant] McDonnell was incorrect, . . . [Plaintiff] was wrongfully given the impression that [she] could not go to the [d]epartment [h]ead for help, in addition to not receiving any support from the Office of Staff and Labor Relations or the [OIE].

(continued...)

2) while "exhausting [] administrative remedies through the EEOC, at no point was [Plaintiff's] attorney . . . notified that [Plaintiff] was to participate in binding arbitration" (Docket Entry 10 at 7; see also id. ("[Defendant] Duke University never mentioned in their statements to EEOC that [Plaintiff] was required to participate in binding arbitration . . . .")); and

3) "[Defendant] Duke University even declined mediation, which [Plaintiff] was willing to do" (id. (internal citation omitted)).

As described in a reply to those points, Plaintiff essentially has "argue[d] that [Defendants] have waived the right to compel arbitration because [they] did not raise the DRP before Plaintiff filed this lawsuit." (Docket Entry 40 at 5; see also Docket Entry 29 at 4 ("Plaintiff appears to argue that [Defendant] Duke [University] has waived the right to compel arbitration because it did not raise the DRP at the time [she] sent [various] emails."), 5 ("[Plaintiff] argu[es] that [Defendant] Duke [University] should be precluded from compelling arbitration because it failed to immediately demand arbitration during the pendency of her multiple EEOC [c]harges.").) The Court should adopt Defendants' position that the question of "[w]hether an alleged delay in demanding arbitration results in [D]efendants losing the right to compel

_____

13(...continued)
(Docket Entry 37 at 6-7 (internal ellipsis omitted); see also id. at 7 (objecting to "insinuat[ion] that [Plaintiff] could have used [DRP]," in light of refusal of "[I]ndividual [D]efendants to meet with [her] regarding the harassment and retaliation").)

53

arbitration under the DRP is a procedural matter to be determined by an arbitrator, not by the Court" (Docket Entry 40 at 7; accord Docket Entry 29 at 5). See Glass v. Kidder Peabody & Co., Inc., 114 F.3d 446, 456 (4th Cir. 1997) ("[Q]uestions of mere delay, laches, . . . and untimeliness raised to defeat the compelled arbitration are issues of procedural arbitrability exclusively reserved for resolution by the arbitrator."); see also BG Grp., PLC v. Republic of Arg., 572 U.S. 25, 34 (2014) ("[C]ourts presume that the parties intend arbitrators, not courts, to decide disputes about the meaning and application of particular procedural preconditions for the use of arbitration. These procedural matters include claims of waiver, delay, or a like defense to arbitrability." (internal citation and quotation marks omitted)).

Conversely, Defendants do not dispute this Court's authority to address matters raised via "the FAA provi[sion which permits Plaintiff to] seek revocation of [the arbitration] contract under 'such grounds as exist at law or in equity,' including . . . unconscionability," Sydnor, 252 F.3d at 305 (emphasis added) (quoting 9 U.S.C. § 2). (See Docket Entry 29 at 7-8 (opposing Plaintiff's unconscionability defense without contending that arbitrator should resolve issue); Docket Entry 40 at 8-9 (same).) In furtherance of that defense, Plaintiff (in response to Individual Defendants' Motion to Compel Arbitration) quoted basic definitions of unconscionability (see Docket Entry 37 at 4-5) and

54

then made only one concrete argument for invalidation of the arbitration agreement as unconscionable, i.e., that "[p]rocedural [u]nconscionability was present in this matter" (id. at 7 (emphasis added) (bold font omitted)), because she "could not even get the Office of Staff and Labor [Relations] to respond to [her] emails, or the [I]ndividual [D]efendants to meet with [her] regarding the harassment and retaliation" (id.; see also id. (emphasizing that Individual Defendants "had a conflict of interest, given that they were involved in the retaliation and the harassment")).[14]

Per Plaintiff's own distillation of the applicable law: "'Procedural unconscionability involves "bargaining naughtiness" in the formation of the contract and is equated with the words "unfair surprise" and with the phrase "lack of meaningful choice."'" (Id. at 4 (emphasis added) (internal ellipsis omitted) (quoting Nazarova v. Duke Univ., No. 1:16CV910, 2017 WL 823578, at *5 (M.D.N.C. Mar. 2, 2017) (unpublished) (Osteen, J.), in turn quoting Rite Color Chem. Co. v. Velvet Textile Co., 105 N.C. App. 14, 20, 411 S.E.2d 645, 648 (1992)).) Any failure by Defendant Duke University's Office of Staff and Labor Relations "to respond to [Plaintiff's] e-mails [about harassment and retaliation]" (id. at 7) and/or any failure by "[I]ndividual [D]efendants to meet with [her] regarding

_____

14 Plaintiff's response to Defendant Duke University's Motion to Compel Arbitration includes a generic comment about courts declining to compel arbitration "when the agreement in question is unconscionable" (Docket Entry 24 at 3), but nothing specific to support a finding of unconscionability here (see id. at 1-4).

th[at] harassment and retaliation" (id.), even if attributable to a "conflict of interest" (id.), did not constitute "bargaining naughtiness in the formation of the [arbitration] contract" (id. at 4) (emphasis added) (internal quotation marks omitted)), as it did not constitute any part of the "bargaining . . . in the formation of th[at] contract" (id. (internal quotation marks omitted)). Plaintiff's unconscionability defense, as to which she "has the burden of proof," Nazarova, 2017 WL 823578, at *5 (internal quotation marks omitted), therefore falls short as a matter of law.

<u>Ending Forced Arbitration of Sexual
Assault and Sexual Harassment Act of 2021</u>

Plaintiff has mounted one final attack against compelled arbitration, i.e., that "the conduct [she] alleged in th[is case] . . . include[s] both a sexual harassment and sexual assault dispute . . . [as well as related] retaliation, [such that the case] do[es] not fall under the FAA, per 9 U.S.C[.] § 402." (Docket Entry 24 at 2-3; see also Docket Entry 37 at 7 (arguing that, because "[Defendant] Duke University's misconduct investigation . . . was retaliation following [Plaintiff's] complaints of [] multifaceted discrimination . . ., which included sexual harassment and assault, . . . [Section] 402 is applicable, arbitration cannot be forced for these claims, and the Court does have subject matter jurisdiction").) The code section cited by Plaintiff on this point states (in pertinent part):

56

> Notwithstanding any other provision of this title, at the election of the person alleging conduct constituting a sexual harassment dispute or sexual assault dispute, . . . no predispute arbitration agreement . . . shall be valid or enforceable with respect to a case which is filed under Federal, Tribal, or State law and relates to the sexual assault dispute or the sexual harassment dispute.

9 U.S.C. § 402(a); see also 9 U.S.C. §§ 401(3) ("The term 'sexual assault dispute' means a dispute involving a nonconsensual sexual act or sexual contact, as such terms are defined in section 2246 of title 18 or similar Tribal or State law . . . ."),[15] 401(4) ("The term 'sexual harassment dispute' means a dispute relating to conduct that is alleged to constitute sexual harassment under applicable Federal, Tribal, or State law."), 402(b) ("An issue as to whether this chapter applies with respect to a dispute shall be determined under Federal law.  The applicability of this chapter to an agreement to arbitrate and the validity and enforceability of an agreement to which this chapter applies shall be determined by a court, rather than an arbitrator . . . .").

"Importantly, however, [Section 402] applies only to a 'dispute or claim that arises or accrues on or after the date of enactment of th[e Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act of 2021 ("EFASASHA"), Pub. L. No. 117-90].'"

---

15 Under the incorporated federal statutory definition, "the term 'sexual contact' means[, inter alia,] the intentional touching, either directly or through the clothing, of the genitalia . . . [or] inner thigh . . . of any person with an intent to abuse, humiliate, harass, degrade, or arouse or gratify the sexual desire of any person[.]" 18 U.S.C. § 2246(3).

Palmer v. Johns Island Post Acute, LLC, C/A No. 2:22-3432, 2023 WL 4409038, at *8 (D.S.C. Mar. 7, 2023) (unpublished) (emphasis omitted) (quoting EFASASHA § 3, 136 Stat. 28 (2022)), recommendation adopted, 2023 WL 4117366 (D.S.C. June 22, 2023) (unpublished). Because "EFASASHA was signed into law on March 3, 2022," id., and "does not apply retroactively to [disputes or] claims that [arose or] accrued before its enactment," Bopda v. Comcast of the Dist., LLC, No. 23-2148, 2024 WL 399081, at *1 (4th Cir. Feb. 2, 2024) (unpublished), Defendants rightly have insisted that "it applies only to [disputes or] claims that [arose or] accrued on or after March 3, 2022" (Docket Entry 29 at 2 (internal quotation marks omitted)); accord Docket Entry 40 at 2-3). Accordingly, "the issue is whether [Plaintiff's sexual harassment and/or sexual assault] dispute or claim arose or accrued on or after March 3, 2022." Palmer, 2023 WL 4409083, at *8 (internal quotation marks omitted); see also Papaconstantinou-Bauers v. Jackson Hosp. & Clinic, Inc., No. 2:22CV178, 2024 WL 1158362, at *5 (M.D. Ala. Mar. 18, 2024) (unpublished) ("[C]ourt decisions that have interpreted [EFASASHA] have generally settled upon reading the statute's temporal requirement to say that disputes arise and claims accrue. This is the most reasonable reading of the statutory language." (internal brackets, citation, ellipses, and quotation marks omitted)).

58

Defendants maintain that "Plaintiff's claims all accrued prior to EFA[SASHA]'s effective date of March 3, 2022." (Docket Entry 29 at 3; accord Docket Entry 40 at 3.) "Title VII [sex discrimination] claims plainly accrue at the time of the adverse employment action . . . ." Palmer, 2023 WL 4409083, at *8. Under Title VII, "[f]or sexual harassment to be actionable [as a form of sex discrimination], it must be sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 67 (1986) (internal brackets and quotation marks omitted). At this stage, Defendants have not questioned the legal sufficiency of Plaintiff's sexual harassment claim, but instead have focused on its time-span, i.e., that she "was sexual[ly] harassed by [Dr.] Abou-Donia from October 2019 until [March] 2020." (Docket Entry 29 at 3; accord Docket Entry 40 at 3.)

In that regard, the Amended Complaint alleges (A) that, in "October of 2019, Dr. Abou-[D]onia began sexually harassing [Plaintiff] on a frequent basis" (Docket Entry 5 at 19; see also id. at 20 (stating that "frequency of sexual harassment increased over time" and involved "explicit comments" while they worked)), (B) that, during the same month, Plaintiff reported that sexual harassment – including an "incident in which Dr. Abou-[D]onia said 'I like your pussy'" (id. at 21) – to an official in Defendant Duke University's Office of Clinical Research, who told Plaintiff to

59

inform OIE (see id.), (C) that, on December 7, 2019, Dr. Abou-Donia "made [Plaintiff] touch his penis" (id. at 22; see also id. ("[Dr. Abou-Donia] blocked the door to stop [Plaintiff] from getting out. Thus, he assaulted [her].")), (D) that, on January 7 and 8, 2020, Dr. Abou-Donia (verbally) sexually harassed Plaintiff in the lab (see id. at 23, 24) and, on the latter date, also pressured her to ride in his car where "he put his hand on [her] left thigh" (id. at 24; see also id. ("[Dr. Abou-Donia] also said that he really liked [Plaintiff] and that [she] was his type.")), (E) that, for the rest of that month, Dr. Abou-Donia subjected Plaintiff to "sexually explicit comments" (id. at 25), (F) that, on February 10, 2020, Plaintiff "gave [an OIE official] a glimpse of what was happening[, but ] told [her] . . . not [to] start an investigation for fear of retaliation" (id. at 28), (G) that, in early March 2020, Plaintiff e-mailed Defendants Dowell-Newton and McDonnell about the harassment (see id. at 30; see also id. (alleging that Defendant Dowell-Newton sent Plaintiff's report to OIE against her wishes)), and (H) that, over the week of March 12-19, 2020, while Plaintiff worked to "prepare[] for the labs to be closed down" (id. at 32), "Dr. Abou-[D]onia would continue to make sexual comments" (id.).

"[Those] allegations . . . – which include not only pervasive harassment but also criminal conduct of the most serious nature – are plainly sufficient to state a [Title VII sex discrimination] claim for 'hostile environment' sexual harassment." Meritor, 477

U.S. at 67.[16]   But the remainder of the Amended Complaint's chronology alleges <u>no</u> sexual harassment/assault <u>after March 19, 2020</u>. (<u>See</u> Docket Entry 5 at 32-45.)   Moreover, the Amended Complaint reflects that events unfolded in a way that insulated Plaintiff from further sexual harassment/assault by Dr. Abou-Donia. (<u>See</u> <u>id.</u> at 32 ("On Mar[ch] 30, 2020, [Plaintiff] received an email from [OIE] . . . that the [sexual harassment] investigation was underway."), 34 (indicating that "no-contact order instituted by OIE" barred Dr. Abou-Donia's "communicat[ion] with" Plaintiff), 36 ("On November 5, 2020, [Plaintiff] received . . . [the] OIE report . . . that the investigation concluded with the preponderance of evidence showing sexual harassment . . . occurred in [PCB]."), 37 ("On November 16, [2020, Defendant] Duckett sent [Plaintiff] an email that Dr. Abou-[D]onia had been relieved of his duties . . . .   On November 25, [2020,] . . . [Defendant] Duckett[ ] clarified . . . [that] Dr. Abou-[D]onia had resigned . . . .").)

---

16 In fact, beyond pleading "conduct that . . . constitute[s] sexual harassment under [Title VII]," 9 U.S.C. § 401(4) (defining "sexual harassment dispute" under EFASASHA), the Amended Complaint raises a "sexual assault dispute" under EFASASHA, i.e., "a dispute involving [] nonconsensual . . . sexual contact, as . . . defined in section 2246 of title 18," 9 U.S.C. § 401(3), specifically, "the intentional touching, either directly or through the clothing, of the genitalia . . . [or] inner thigh . . . of any person with an intent to abuse, humiliate, harass, degrade, or arouse or gratify the sexual desire of any person," 18 U.S.C. § 2246(3). (<u>See</u> Docket Entry 5 at 22 (alleging that, on December 7, 2019, Dr. Abou-Donia "made [Plaintiff] touch his penis"); <u>see also</u> <u>id.</u> at 24 (alleging that, on January 8, 2020, "[Dr. Abou-Donia] put his hand on [Plaintiff's] left thigh" while "sa[ying] that he really liked [her] and that [she] was his type").)

Under these circumstances, this distinct <u>adverse employment</u> <u>action</u>, i.e., sexual harassment/assault by Dr. Abou-Donia of a "sufficiently severe or pervasive [character as] to alter the conditions of [Plaintiff's] employment and create an abusive working environment," <u>Meritor</u>, 477 U.S. at 67 (internal quotation marks omitted), <u>ended on March 19, 2020</u>, and thus her corresponding Title VII sex discrimination claim accrued no later than that date, <u>see</u> <u>Palmer</u>, 2023 WL 4409083, at *8 ("Title VII [sex discrimination] claims plainly accrue at the time of the adverse employment action . . . ."); <u>see also</u> <u>Hix v. Dave & Buster's Mgmt. Corp., Inc.</u>, No. 3:23CV623, 2023 WL 9425283, at *6 (D. Or. Nov. 14, 2023) (unpublished) ("[C]ourts interpreting EFA[SASHA] have concluded that sexual harassment claims accrue on the date of the last act that is part of the hostile work environment." (internal quotation marks omitted)), <u>recommendation adopted</u>, 2024 WL 326592 (D. Or. Jan. 29, 2024) (unpublished); <u>Watson v. Blaze Media LLC</u>, No. 3:23CV279, 2023 WL 5004144, at *3 (N.D. Tex. Aug. 3, 2023) (unpublished) (same). Coordinately, a "dispute [over Dr. Abou-Donia's sexually harassing/assaultive conduct] would have arisen, <u>at the latest</u>, when [Plaintiff] pursued her charge of discrimination with the EEOC," <u>Papaconstantinou-Bauers</u>, 2024 WL 1158362, at *6 (emphasis added); <u>see also</u> <u>id.</u> (endorsing "understand[ing of] a 'dispute' as requiring an adversarial posture or disagreement between the parties and not just the existence of

an injury"), which (per the Amended Complaint) she did "[o]n August, 19, 2021" (Docket Entry 5 at 41).[17]

The determination that, well before EFASASHA's effective date of March 3, 2022, (A) Plaintiff's Title VII sex discrimination <u>claim</u> for sexual harassment/assault by Dr. Abou-Donia <u>accrued</u>, and (B) any <u>dispute</u> entirely premised on that conduct <u>arose</u>, however, does not end the inquiry into EFASASHA's application to this case; rather, the Court additionally must grapple with the fact that EFASASHA applies not only to Title VII claims for sex discrimination arising from sexual harassment/assault (and/or mirror-image disputes about such conduct), but also to any "dispute <u>relating to</u> conduct that is <u>alleged to constitute sexual harassment</u> under applicable Federal . . . law," 9 U.S.C. § 401(4) (emphasis added); <u>see also</u> <u>Hix</u>, 2023 WL 9425283, at *9 ("In its ordinary usage, the phrase 'relating to' in a statute broadens and expresses a broad purpose."). And the Amended Complaint includes claim(s)

_____

17 "At that point, [Plaintiff] had formally brought her allegations to a forum with the potential to resolve the issue and was thus clearly at odds with her employer." <u>Papaconstantinou-Bauers</u>, 2024 WL 1158362, at *6. Alternatively, if the Court took the view (adopted by some courts) "that 'a dispute arises when the conduct which constitutes the alleged sexual assault or sexual harassment occurs,'" <u>Castillo v. Altice</u>, 698 F. Supp. 3d 652, 656-57 (S.D.N.Y. 2023) (internal brackets omitted) (quoting with approval <u>Barnes v. Festival Fun Parks, LLC</u>, No. 22CV165, 2023 WL 4209745, at *10 (W.D. Pa. June 27, 2023) (unpublished)), March 19, 2020 would mark the (latest) date on which <u>both</u> (A) Plaintiff's <u>claim</u> for sexual harassment/assault by Dr. Abou-Donia would have <u>accrued</u>, <u>and</u> (B) a <u>dispute</u> as to those events would have <u>arisen</u>.

63

for those very sorts of <u>sexual-harassment-related</u> disputes, as summarized under the heading "Retaliation" (Docket Entry 5 at 47):

> A week after [Plaintiff] asked [Defendant] Dowell-Newton not to report the harassment [Plaintiff] was experiencing due to [her] concerns about retaliation, [her] laptop was confiscated by [an employee of Defendant Duke University] and given to [Defendant] McDonnell, and [he] told [Plaintiff] that he was going to destroy [her] . . . . This <u>started the chain of investigation</u> against [Plaintiff] that was unjustified . . . [and that] affect[s her] ability to have a career in science and remain employed.

(<u>Id.</u> (emphasis added).)

In terms of specifics pertaining to that summary, the Amended Complaint contains these allegations:

1) on or about March 2, 2020, Plaintiff "sent an email to [Defendant] Dowell-Newton . . . inform[ing] her . . . [of] harassment[] which Plaintiff was experiencing, and that [she] wanted [Defendant] Dowell-Newton to keep [that] email on file . . . due to [Plaintiff's] fear of retaliation" (<u>id.</u> at 30), "but [Defendant Dowell-Newton] went ahead and complained, which [Plaintiff] learned from the final report of OIE" (<u>id.</u>);

2) "[o]n Mar[ch] 6, 2020, [Defendant] McDonnell sent an email, with the subject 'urgent' that he needed to meet both Dr. Abou-[D]onia and [Plaintiff] to discuss challenges in [their] working relationship and data management" (<u>id.</u> at 31);

3) during the ensuing meeting on March 9, 2020, Defendant McDonnell "started saying that he needed all the data" (<u>id.</u>) and both he and Dr. Abou-Donia became "angry" (<u>id.</u>);

64

4) at the close of the meeting, an employee of Defendant Duke University "insisted that [Plaintiff] give [the employee Plaintiff's personal] laptop" (id.) and the employee then "gave it to [Defendant] McDonnell" (id.);

5) when Plaintiff later tried to reclaim her laptop, Defendant McDonnell "said 'I can take your laptop, I have executive powers and I can destroy you'" (id.), after which he "slammed the door on [her]" (id.), while "shaking with anger" (id.);

6) during the week of March 12-19, 2020, "Dr. Abou-[D]onia would continue to make sexual comments and [he] would say 'now you can go tell Donald ([Defendant] McDonnell)' and Sharon ([Defendant] Dowel-Newton [sic]) and would laugh" (id. at 32; see also id. ("Dr. Abou-[D]onia told [Plaintiff] that[,] if [she] report[ed Dr. Abou-Donia], 'Donald ([Defendant] McDonnell) will use that woman (indicating [Defendant] Swamy) to destroy your scientific career and you will be homeless.'" (stray comma omitted)));

7) "[o]n Mar[ch] 30, 2020, [Plaintiff] received an email from [OIE] notif[ying her of the] no-contact order and that the [sexual harassment] investigation was underway" (id.);

8) in July 2020, "[Plaintiff] received [a] report from [an employee of Defendant Duke University] that [a review] did not find any [research] misconduct on [her] part" (id. at 34), but Defendant Klotman nonetheless "determined corrective actions [we]re needed" (id. at 35; see also id. ("It was never made clear to [Plaintiff]

why corrective actions were needed . . . if no research misconduct was found . . . ."));

9) "[on] November 5, 2020, [Plaintiff] received [the] OIE report . . . that [OIE's] investigation concluded with the preponderance of evidence showing sexual harassment . . . occurred in [PCB]" (id. at 36);

10) "[i]mmediately thereafter retaliation intensified" (id.), via another "unjustified [data integrity] investigation" (id.; see also id. at 38 (alleging that "[Defendants] Duckett and Swamy had started a data integrity investigation once again based upon the spurious allegations of Dr[]. Abou-[D]onia and [Defendant] McDonnell"), 42 ("The retaliatory actions were initiated by [Defendants] Duckett and Swamy after [Defendant] McDonnell stepped down from chairmanship [of PCB] and Dr. Abou-[D]onia resigned."));

11) "[o]n January 5, 2021, [Plaintiff] was ordered to pause all [her] work" (id. at 38);

12) "[o]n February 10, 2021, [Defendant] Swamy . . . asked [Plaintiff] to either retract three of [her] papers and relinquish [her] grant [or] otherwise[ Defendant] Duke [University] would take the initiative to notify the publications to retract the manuscript[s] and DoD to terminate [her] grant" (id. at 39), notwithstanding the fact that Defendant Swamy had "ma[de] mistakes not only in the interpretation of [Plaintiff's] data, but also in basic information regarding the manuscripts and [her] study" (id.);

66

13) "[o]n March 10, 2021, [Defendant] Swamy went ahead and suspended [Plaintiff's] grant, which [Defendant Swamy] stated was done with . . . [Defendant] Klotman's approval" (id.; see also id. at 41 (alleging that committee endorsed that suspension and that "[Defendant] Klotman refused to meet with [Plaintiff] at any point, even though she was the deciding authority")).

14) "[o]n August 19, 2021, [Plaintiff] filed [her] complaints to the EEOC" (id. at 41);

15) "on August 26, 2021, . . . [Plaintiff learned Defendant] Swamy . . . [had] requested unilateral termination of [Plaintiff's] grant" (id.; see also id. at 43 ("[Defendant] Swamy took it upon herself to inform DoD to relinquish the DoD grant awarded to [Plaintiff] . . ., which [Defendant Swamy] was coercing [Plaintiff] to do from the time Dr. Abou-[D]onia resigned and [Defendant] McDonnell stepped down from chairmanship [of PCB], despite the concerns [Plaintiff] had raised regarding the integrity of the investigation . . . . [T]his was the retaliation Dr. Abou-[D]onia was referring to on Mar[ch] 12, 2020 when he said that [Defendant] Swamy would destroy [Plaintiff's] scientific career."));

16) "[o]n September 15, 2021, [Defendant] Duckett sent [Plaintiff] a letter that [she was] under investigation, and . . . he [wa]s terminating [her] employment at [Defendant] Duke [University] as of November 2021" (id. at 41; see also id. ("[Plaintiff] was not paid from November [2021] . . . ."));

67

17) "[o]n November 8, 2021[,] under the guidance of [Defendant] Swamy, [an employee of Defendant Duke University] sent an email requesting the Military Medicine journal editorial office to retract [Plaintiff's] three manuscripts" (id. at 42), which resulted in "the manuscripts[' ] retract[ion] in June 2022" (id.; see also id. (alleging that Defendant Duke University deprived Plaintiff of opportunity to contest retraction by "giv[ing] the [Military Medicine j]ournal [her] Duke email for communications, [after previously] discontinu[ing that email] during the termination process, even though [Defendant] Duke [University] had [Plaintiff's] private email . . . [and] communicat[ed] with [her] through [that] personal email"));

18) "[in] May and June, 2022 . . ., [Plaintiff] received . . . a formal letter stating that OIE determined that the processes . . . initiated against [her] were not retaliation and that OIE w[ould] not initiate a formal investigation" (id. at 43);

19) on or about August 19, 2022, Plaintiff appeared before a second committee regarding the data integrity investigation and voiced her opposition to the "retaliatory behavior that led to this investigation, which [wa]s in bad faith" (id. at 44); and

20) "[o]n Oct[ober] 31, 2022[, i]n spite of [Plaintiff] meeting with the committee and providing all the evidence, the deciding authority[, Defendant] Klotman[,] made a determination of misconduct" (id. at 45).

Based on those allegations, the Amended Complaint asserts:

> [After Dr. Abou-Donia] harass[ed Plaintiff] sexually and otherwise, [Defendant McDonnell] utiliz[ed] his institutional authority to protect Dr. Abou-[D]onia and subject [Plaintiff] to additional harassment and <u>retaliation</u> through [(A) Defendant] Dowell-Newton, who failed to act responsively to evidence that demonstrated Dr. Abou-[D]onia's . . . misbehavior, [(B) Defendant] Swamy, who proceeded to demand corrective action despite an unsubstantiated and often ambiguous investigatory process, [(C) Defendant] Duckett, whose replacement of [Defendant] McDonnell only served to continue where [Defendant] McDonnell left off . . ., and [(D) Defendant] Klotman, whose actions as the deciding authority led to [Plaintiff's] harassment, <u>retaliation</u>, and eventual termination from [Defendant] Duke University, the institution responsible for enabling this behavior . . . and even continuing this behavior . . . [after Plaintiff was] no longer employed . . . .

(<u>Id.</u> (emphasis added).)

The foregoing retaliation claims are "plainly encompassed by [EFASASHA's] definition of a 'sexual harassment dispute' as 'a dispute <u>relating to</u> conduct that is alleged to constitute <u>sexual harassment</u> under applicable Federal . . . law.'" <u>Molchanoff v. SOLV Energy, LLC</u>, No. 23CV653, 2024 WL 899384, at *3 (S.D. Cal. Mar. 1, 2024) (unpublished) (emphasis and some quotation marks added) (quoting 9 U.S.C. § 401(4)). To begin, "[t]o succeed on a [Title VII] retaliation claim, a plaintiff must prove that (1) she engaged in a <u>protected activity</u>, (2) the employer <u>acted adversely</u> against her, and (3) there was a <u>causal connection</u> between the protected activity and the asserted adverse action." <u>Hoyle v. Freightliner, LLC</u>, 650 F.3d 321, 337 (4th Cir. 2011) (emphasis added); <u>see also</u> <u>Roberts v. Glenn Indus. Grp., Inc.</u>, 998 F.3d 111,

122 (4th Cir. 2021) ("[The plaintiff] certainly engaged in protected activity when he complained of [sexual] harassment – first to . . . supervisor[s] . . . and ultimately to . . . the company's manager of [h]uman [r]esources."). "Here, [the Amended Complaint] alleges that [Defendants acted adversely against Plaintiff] because she engaged in the protected activity of reporting that she was experiencing sexual harassment." Hix, 2023 WL 9425283, at *9 (emphasis added). "Because [such a] retaliation dispute is related to the conduct constituting sexual harassment, it is a 'sexual harassment dispute' [under EFASASHA]." Id.; see also Johnson v. Everyrealm, Inc., 657 F. Supp. 3d 535, 551 n.13 (S.D.N.Y. 2023) ("The statutory term 'sexual harassment dispute' includes not only claims of sexual harassment, but also disputes 'relating to conduct that is alleged to constitute sexual harassment under applicable Federal . . . law.' An example would be a lawsuit bringing a claim against an employer for retaliating against a plaintiff who had reported sexual harassment." (internal citation omitted) (quoting 9 U.S.C. § 401(4))).

Defendants have not disputed that Plaintiff's above-detailed, sexual-harassment-related, retaliation claims meet EFASASHA's definition of a "sexual harassment dispute." (See Docket Entry 29 at 2-3 (omitting any such contention from reply to Plaintiff's invocation of Section 402); Docket Entry 40 at 2-4 (same).) Instead, Defendants have argued that, "as a matter of law[,]

70

Plaintiff's claim[s] for retaliation accrued upon the commencement of the research misconduct investigation in January 2021, not its later completion [on October 31, 2022]." (Docket Entry 40 at 4( emphasis omitted); see also id. (quoting (with alterations) A Soc'y without a Name v. Virginia, 655 F.3d 342, 348 (4th Cir. 2011), for proposition that "'a civil rights claim accrues when the plaintiff knows or has reason to know of the injury which is the basis of the action'" and citing Smith v. University of Md. Baltimore, 770 F. App'x 50, 50-51 (4th Cir. 2019), for "holding that claim accrued when employee learned of her impending termination not on her later discharge date" (internal brackets and some quotation marks omitted)).) The Court should reject that argument because, even if "Plaintiff was aware of the research misconduct investigation against her no later than January 2021 and she immediately asserted that it was the result of retaliation" (id.), the commencement of a research misconduct investigation against Plaintiff (in January 2021) and the determination that she committed research misconduct (in October 2022) each constitute discrete, adverse actions, see Fowler v. South Carolina Dep't of Corr., C/A No. 3:10-3230, 2012 WL 7678131, at *5 (D.S.C. Sept. 25, 2012) (unpublished) ("The United States Supreme Court has made clear that acts of retaliation are discrete acts . . . ." (citing National R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 114 (2002))), recommendation adopted, 2013 WL 876407 (D.S.C. Mar. 8, 2013) (unpublished).

A brief review of the scope of protection Title VII affords against retaliation underscores the propriety of that understanding. "[Title VII's] antiretaliation provision protects an individual . . . from retaliation that produces an injury or harm." Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 67 (2006) (emphasis added). The Supreme Court has adopted this "descri[ption of] the level of seriousness to which this harm must rise," id. (emphasis added): "[A] plaintiff must show that a reasonable [person] would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable [person] from making or supporting a charge of discrimination." Id. at 68 (internal quotation marks omitted). Applying those principles here, the Court should conclude that the prospect of an unjustified investigation for research misconduct surely would cause a reasonable scientist to think twice about reporting sexual harassment, but that an unjustified finding of research misconduct undoubtedly would produce a distinctive harm (and deterrent to report sexual harassment), giving rise to two discrete retaliation claims with two different accrual dates.[18]

_____

18 The authority cited by Defendants supports that conclusion. For example, Defendants relied on the Fourth Circuit's statement that "'a civil rights claim accrues when the plaintiff knows or has reason to know of the injury which is the basis of the action.'" (Docket Entry 40 at 4 (emphasis added) (internal brackets omitted) (quoting with alterations A Soc'y, 655 F.3d at 348).) As discussed above, the determination that Plaintiff committed research misconduct inflicted a different injury than did the commencement
(continued...)

With that distinction between those two materially adverse actions (and thus discrete retaliation claims) drawn and given that the latter retaliation claim accrued on October 31, 2022, after EFASASHA's enactment on March 3, 2022, the Court should further conclude that "[Plaintiff] is not required to submit [that] retaliation claim[] to arbitration," Hix, 2023 WL 9425283, at *9.

Lastly, "the Court [should] hold[] that, because Plaintiff's [October] 2022 retaliation claim alleges conduct constituting a sexual harassment dispute – as defined by 9 U.S.C. § 401(4) – and because the case as a whole relates to that dispute, [EFASASHA] bars enforcement of the arbitration agreement . . . as to all claims in this case . . . ." Molchanoff, 2024 WL 899384, at *5 (stray comma omitted). That holding follows directly from "the text of [EFASASHA, which] is plain and unambiguous," id. at *4:

> "[A]t the election of the person alleging conduct
> constituting a sexual harassment dispute or sexual
> assault dispute, no predispute arbitration agreement
> shall be valid or enforceable with respect to a *case*

_____

18(...continued)
of the research misconduct investigation and thus Plaintiff's retaliation claim predicated on the research misconduct determination accrued on October 31, 2022, when she "kn[e]w or ha[d] reason to know of th[at] injury," A Soc'y, 655 F.3d at 348 (internal quotation marks omitted). Similarly, Defendants pointed to the holding in Smith, 770 F. App'x at 50-51, that a "claim accrued when [an] employee learned of her impending termination not on her later discharge date." (Docket Entry 40 at 4 (emphasis added) (internal brackets and quotation marks omitted).) Here, Plaintiff only "learned of" (id. (internal brackets and quotation marks omitted)) the research misconduct determination on October 31, 2022, "not on [the earlier] date" (id. (internal quotation marks omitted)), when the research misconduct investigation began.

which is filed under Federal . . . law *and relates to the* sexual harassment *dispute*." The ordinary interpretation of <u>case</u> is a proceeding which may encompass many <u>claims</u> or <u>disputes</u>. . . . In other words, [EFASASHA] "keys the scope of the invalidation of the arbitration [agreement] to the entire 'case' relating to the sexual harassment dispute" and "thus does not limit the invalidation to the claim or claims in which that dispute plays a part."

<u>Id.</u> (underscoring added) (internal citation, ellipses, and some quotation marks omitted) (italics in original) (first quoting 9 U.S.C. § 402(a) and then twice quoting <u>Johnson</u>, 657 F. Supp. 3d at 558); <u>see also</u> <u>Turner v. Tesla</u>, 686 F. Supp. 3d 917, 921 (N.D. Cal. 2023) (holding that EFASASHA "renders the parties' arbitration agreement unenforceable in [the plaintiff's] entire case because it involves a plausibly pleaded sexual harassment dispute"); <u>Watson</u>, 2023 WL 5004144, at *3 n.1 ("If a plaintiff alleges a sexual harassment dispute, a predispute arbitration agreement is unenforceable as to the entirety of the case relating to the sexual harassment dispute, not merely the discrete claims in that case that themselves either allege such harassment or relate to a sexual harassment dispute." (internal quotation marks omitted)).

<u>CONCLUSION</u>

The record establishes that Plaintiff agreed to arbitrate the claims she has lodged against Defendant Duke University in the Amended Complaint (and Plaintiff has not disputed that the Individual Defendants likewise may enforce that arbitration agreement as to the Amended Complaint's claims against them). Moreover, Plaintiff's defenses to arbitration based on delay and

74

unconscionability warrant no relief in this Court.  EFASASHA, however, precludes compelled arbitration of this case.

**IT IS THEREFORE RECOMMENDED** that the Motions to Compel Arbitration (Docket Entries 11, 30) be **DENIED.**

<div align="right">

_____/s/ L. Patrick Auld_____
**L. Patrick Auld**
**United States Magistrate Judge**

</div>

August 7, 2024

Case 1:23-cv-00957-UA-LPA   Document 41   Filed 08/07/24   Page 75 of 75