# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
### Civil Action No: 1:23-cv-00957-CCE-LPA

| | |
|---|---|
| **BRAHMAJOTHI VASUDEVAN MULUGU,** | |
| **Plaintiff,** | |
| **v.** | |
| **DUKE UNIVERSITY, et al.** | |
| **Defendants.** | |

## MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Defendants Duke University ("Duke"), Donald McDonnell ("McDonnell"), Mary Klotman ("Klotman"), and Sharon Dowell-Newton ("Dowell-Newton") (together, "Defendants") submit this memorandum in support of their Motion for Summary Judgment.

## STATEMENT OF NATURE OF THE MATTER

Brahmajothi Vasudevan Mulugu ("Plaintiff") is a former research scientist at Duke. She claims to be the victim of a calculated conspiracy involving dozens of Duke employees to frame her for scientific misconduct and destroy her career. The motivation for this plot, she believes, is discrimination or retaliation. Plaintiff's theories have not withstood the scrutiny of discovery. Instead, the evidence shows that Duke officials appropriately investigated serious concerns about Plaintiff's research practices. Consequently, Plaintiff

PPAB 12467900v7

cannot show that there is a genuine issue of material fact and Defendants are entitled to summary judgment on all claims.

## STATEMENT OF FACTS

### A.    Plaintiff's Employment at Duke

Plaintiff worked at Duke as a Research Scientist for more than 25 years, but it was not smooth sailing.  In 2006, she claimed she resigned her position because her supervisor spoke Chinese to others and would get angry with her.  Mulugu Dep. 40:4-41:18.[1]  From 2006 to 2014 she worked for Dr. Auten at Duke.  While there, she asked to become faculty member but was unsuccessful.  Mulugu Dep. 44:7-45:9.  In 2014, Dr. Auten's grant and Plaintiff's position both ended.  Mulugu Dep. 46:23-47:1.  Plaintiff next worked in the Duke Eye Center but within two years was asked to resign because she had taken lab data home on a flash drive and was blamed for leaving a freezer door open.  Mulugu Dep. 60:1-61:14.  Plaintiff also thinks her supervisors may have been unhappy because she asked for a faculty position.  Mulugu Dep. 63:6-64:8.

In July 2016, Plaintiff was hired to work with Dr. Mohamed Abou-Donia ("Abou-Donia") in Duke's Department of Pharmacology and Cancer Biology ("PCB").  Ex. B. Plaintiff's position was fully grant funded, meaning that without a grant, the position would be eliminated.  Mulugu Dep. 72:20-74:3.  McDonnell then served as Chair of PCB and approved Plaintiff's hiring.  Mulugu Dep. 69:14-16.

After starting, Plaintiff was immediately dissatisfied with lab resources.  Mulugu

---

[1] Excerpts attached as Exhibit A.

Dep. 276:5-11. Nevertheless, she began submitting grant proposals and in May 2018 an application to the Department of Defense ("DoD") was awarded. Mulugu Dep. 81:20-82:3. Typically at Duke, only faculty are permitted to serve as Principal Investigator ("PI") of a grant, but McDonnell approved for Plaintiff to serve as PI. Mulugu Dep. 92:19-93:1. Despite this, Plaintiff believes obtaining this grant was the underlying cause of the "unequal treatment, discrimination, harassment, and retaliation" she allegedly experienced. Doc. No. 5, p. 6.

Plaintiff started secretly recording dozens of workplace conversations. Mulugu Dep. 16:13:23; 35:9-17. Plaintiff initially claimed most of these recordings were "accidental" before admitting she purposefully recorded conversations because she was receiving "intrusive" questions from administrators about her grant. Mulugu Dep. 25:16-20; 35:13-36:4.

### B. Plaintiff Again Seeks a Faculty Appointment in 2018

After DoD award, per standard process, Plaintiff sought approval for her study from Duke's Institutional Review Board ("IRB"). Plaintiff claims IRB told her that to allow her to serve as PI for an IRB protocol she would be appointed faculty because "everyone who gets a grant are given a faculty position[.]" Mulugu Dep. 91:17-92:6. In fact, Duke policy did not require that everyone who obtained a grant immediately became faculty. McDonnell Dep. 75:19-76:5.[2] Instead, non-faculty Research Scientists, like Plaintiff, could serve as PI on a grant and IRB protocol if approved by their Chair, which McDonnell

---

[2] Excerpts attached as Exhibit C.

PPAB 12467900v7

did for Plaintiff. Mulugu Dep. 94:5-23.

However, based on her misunderstanding, on May 29, 2018, Plaintiff asked McDonnell for a faculty position. Mulugu Dep. 101:16-19. McDonnell told her that Klotman (Dean of the School of Medicine) would need to decide the issue and encouraged Plaintiff to reach out to Klotman. Mulugu Dep. 99:22-99:3; 101:20-102:2.

On May 13, 2019, Plaintiff emailed Klotman asking for a faculty appointment. Ex. D; Mulugu Dep. 103:15-104:7. Plaintiff believes this email angered McDonnell so much that he undertook a scheme to get her fired. Mulugu Dep. 109:3-23; 111:15-114:3; 115:11-14. Plaintiff did not personally hear McDonnell describe his plot but instead relied on statements by her supervisor Abou-Donia. Mulugu Dep. 112:16-113:20; 113:21-114:5. McDonnell vehemently denies trying to get Plaintiff fired. McDonnell Dep. 38:23-39:5.

Plaintiff met with McDonnell again in late July 2019. Mulugu Dep. 115:23-116:6. McDonnell flatly told her that she would not be appointed as faculty. Mulugu Dep. 118:15-21.

C.    **Research Misconduct Concerns Surface in 2019**

During late summer 2019, Plaintiff's working relationship with Abou-Donia soured. On August 3, 2019, Abou-Donia emailed Plaintiff excoriating her for not delivering data, being distracted by working on a master's, and submitting manuscripts without his knowledge. Ex. E DUKE_00004660-2.

On August 19, 2019, Plaintiff spoke at a conference. Doc. No. 5, p. 16; Mulugu Dep. 132:17-133:5. When she returned on August 23, 2019, she found a trash bag on her

chair, which she did not open.  Mulugu Dep. 133:2-21.  Plaintiff claims files subsequently went missing from her desk including the source data[3] from her 2018 grant application and three papers later published in *Military Medicine*.  Mulugu Dep. 136:7-16.  Plaintiff believes McDonnell sabotaged her.  Mulugu Dep. 136:17-24; 137:9-18.

On September 13, 2019, Abou-Donia met McDonnell to raise concerns about Plaintiff's performance.  Ex. F.  Abou-Donia claimed Plaintiff had failed to share primary data and was not maintaining data on a Duke server.  *Id.*  McDonnell warned Abou-Donia this could be a serious violation of Duke's data provenance[4] policy.  *Id.*

On September 14, 2019, Abou-Donia emailed Plaintiff, copying McDonnell, and asked her "to bring [him] all of the data that [she had] generated in [her] position as a Research Scientist," and claimed she had never shared source data with him.  Ex. G.  McDonnell responded, "[t]hese issues need to be resolved immediately."  *Id.*  McDonnell also noted Plaintiff claimed to have "written several grant applications, papers and abstracts" and asked her to share "the primary data and processed data associated with all of the figures/tables etc. from these documents."  *Id.*

On September 17, 2019, McDonnell expressed his concern regarding issues about data storage/provenance."  Ex. H.  McDonnell recommended they take immediate action "[t]o avoid [him] escalating this dispute to the relevant oversight office(s) at Duke[.]"  *Id.*  Specifically, Plaintiff needed to confirm that "Dr. Abou Donia ha[d] access to all data that

---

[3] Source data is the original, unprocessed information collected during an experiment.  Ex. II, ¶ 7.
[4] Data provenance is the concept of accurately recording the origin of data.  Ex. II, ¶ 8.

PPAB 12467900v7

[Plaintiff] generated while employed as a Research Scientist in PCB. This include[d] all raw and processed data corresponding to each published experiment (papers, abstracts and presentations) and used as supporting data in grant applications." *Id.* McDonnell requested compliance by September 19. *Id.*

On September 19, 2019, Plaintiff responded and claimed that she had shared "all the data" with Abou-Donia "by email periodically," that data was located in a binder, and that she was working on saving data to the Duke server. *Id.* Plaintiff did not claim that any data had been lost or stolen.

In November 2019, Plaintiff emailed McDonnell she "wish[ed she] had realized sooner how critical the data management issues are" and admitted that she "learned that proper data management is required by all government funding agencies, not just by Duke[.]" Ex. I. She also said McDonnell's "questions and concerns [were] well understood and valued" and "[t]here was a serious problem that was overlooked." *Id.*

Nonetheless, Plaintiff still did not provide source data. As a result, in February 2020, McDonnell sought support from PCB's research compliance officer, Dr. Fox. McDonnell Dep. 61:12-22. Shortly thereafter, Abou-Donia and collaborators at other institutions raised concerns that Plaintiff published three related articles in *Military Medicine* without their knowledge. Ex. J.

On February 26, 2020, Fox reported "major concerns about the overall data storage and data sharing practices in the Abou Donia lab." Ex. K. McDonnell immediately sought

PPAB 12467900v7

support from the Duke Office of Scientific Integrity ("DOSI")[5] by emailing Dr. Geeta Swamy ("Swamy"). Ex. L. Swamy referred McDonnell connect with Misconduct Review Officer ("MRO") Donna Kessler due to "potential research misconduct issues as well as data integrity issues." *Id.*

Under Duke policy, research misconduct proceedings occur in three phases. Ex. M. First, the MRO conducts an Assessment to determine whether allegations meet the definition of research misconduct and are credible. *Id.* If so, the matter proceeds to the Standing Committee on Misconduct in Research ("SCMR"). *Id.* SCMR then conducts an Inquiry to determine whether an investigation of the allegations is warranted. *Id.* If SCMR determines an investigation is warranted, they will send a report to the Deciding Official. Finally, the Deciding Official will appoint a committee to conduct an Investigation to "determine whether misconduct did or did not occur." *Id.*

### D. Plaintiff Experiences Sexual Harassment in October 2019 but Does Not Report It Until Late February 2020

Plaintiff claims Abou-Donia sexually harassed her from October 2019 until March 12, 2020. Doc. No. 5, p. 19; Mulugu Dep. 166:11-21. Plaintiff first reported the harassment to Dowell-Newton on February 28, 2020. Ex. N.[6] Dowell-Newton was not

---

[5] DOSI is the office responsible for investigating potential scientific misconduct. Ex. II, ¶ 5.

[6] Plaintiff testified she did not report Abou-Donia's behavior earlier because she was afraid of retaliation. Mulugu Dep. 175:11-19; 181:12-23. However, when asked if she reported the harassment because she "wanted Abou-Donia's behavior to stop?" Plaintiff surprisingly responded "No" and clarified she actually wanted administrators to stop looking into compliance issues. Mulugu Dep. 197:2-16. Additionally, in her initial discussions with OIE, Plaintiff alleged only that McDonnell was retaliating against her because of her "effort to get [her] title changed to a non-tenure research faculty position." Ex. O. Finally, Plaintiff requested immediate appointment as faculty as a remedial measure. Ex. P.

PPAB 12467900v7

aware of any alleged sexual harassment before this meeting. Ex. JJ, ¶ 4. McDonnell first learned about Plaintiff's allegations on March 1, 2020, from Dowell-Newton. McDonnell Dep. 77:10-78:16.

These allegations were referred to Duke's Office of Institutional Equity ("OIE")which is responsible for investigating allegations of discrimination and harassment. Hewitt Dep. 6:16-24.[7] OIE issued an order prohibiting Abou-Donia from contacting Plaintiff and opened an investigation. Mulugu Dep. 200:6-8. In November 2020, OIE issued a report substantiating Plaintiff's allegations of sexual harassment. Mulugu Dep. 200:14-17. Subsequently, the new Interim Chair of PCB, Colin Duckett, informed Plaintiff that Abou-Donia had been relieved of his duties. Mulugu Dep. 200:18-21.

### E.    The Research Misconduct Investigation Reveals a Lack of Source Data

Research misconduct proceedings regarding Plaintiff's research began February 27, 2020.On March 9, 2020, Kessler asked for Plaintiff's data and Plaintiff stated she had data saved on her laptop. Mulugu Dep. 206:9-10. Kessler collected the laptop and took it to McDonnell. Mulugu Dep. 209:7-15. McDonnell did not access the computer. McDonnell Dep. 41:14-18. When Plaintiff later claimed it was a personal laptop, McDonnell returned it. Mulugu Dep. 214:25-215:2.[8] Plaintiff claims this computer stopped working and believes McDonnell sabotaged it. Mulugu Dep. 217:22-218:12.

---

[7] Excerpts attached as Exhibit HH.
[8] Plaintiff claims McDonnell told her he had executive authority and threatened to destroy her in a recorded conversation. Mulugu Dep. 210:10-22. These statements *are not* included on the recordings.

8

PPAB 12467900v7

On July 13, 2020, Kessler issued her Assessment finding the "data management practices of Drs. Mulugu and Abou Donia" failed to meet Duke's expectations and did not support the research and document its reliability. Ex. Q. "The absence of source data/information prevented a definitive assessment of the misconduct allegation. At [that] time, because of the inadequacy of the available research record, there [were] insufficient grounds to warrant an inquiry." *Id.* However, Kessler recommended that DOSI conduct a follow up evaluation. *Id.* The Assessment also stated, "[t]he three publications in question may need correction or retraction based on both the authorship and data documentation concerns raised." *Id.* Klotman agreed with the Assessment and instructed the Chair to undertake corrective actions. Ex. R.

On July 23, 2020, McDonnell and Duckett (incoming interim PCB Chair) emailed Plaintiff and gave her until July 31 to provide source data, sample information, and evidence that Abou-Donia approved each of the three *Military Medicine* papers. Ex. S. Plaintiff did not fulfill these requests. Ex. T. Duckett also personally met with Plaintiff and developed significant concerns about her research practices. Duckett Dep. 81: 18-82:6.[9]

On January 20, 2021, Swamy informed Plaintiff that based on insufficiency of data, Duke had determined that the Plaintiff's publications should be voluntarily retracted and the grant relinquished. Ex. V. On February 26, 2021, Kessler issued a follow-up Assessment. Ex. W. She noted that Plaintiff had provided the supposed data underlying

---

[9] Excerpts attached as Exhibit U.

PPAB 12467900v7

her publications and grant, but it was still of unclear origin and provenance. *Id.* Kessler concluded that there was "sufficient evidence of possible falsification or fabrication of data to warrant an Inquiry." *Id.* Klotman agreed and the matter proceeded to an Inquiry. Ex. X.

Between March and June 2021, SCMR requested documentation from Plaintiff and conducted multiple interviews. On July 1, 2021, SCMR issued its report finding there was "sufficient evidence of possible falsification or fabrication of data to warrant an Investigation" by virtue of "[t]he absence of and/or failure to provide adequate documentation . . . to support the research described in the three 2020 publications, the 2018 DoD grant, and the 2021 draft manuscript[.]" Ex. Y.[10] SCMR recommended retraction of the publications, termination of the grant and return of the funds, and suspension of Plaintiff's research-related activities. *Id.* Klotman accepted these recommendations. Ex. Z. Swamy thereafter relinquished the grant and Duckett issued Plaintiff a notice of termination effective November 30, 2021, because she no longer had funding. Ex. AA.

Klotman then appointed an ad hoc committee of three Duke Ph.D.s to conduct the investigation phase in September 2021. After a year of detailed investigation, on September 30, 2022, the committee issued its Final Investigation Report concluding that Plaintiff could not provide evidence of the source of key data underlying her DoD Grant

---

[10] Names of committee members have been redacted to preserve confidentiality.

PPAB 12467900v7

Application and three publications and validating the early remedial actions.  Ex. BB.[11]

Klotman accepted these findings.  Ex. CC.

## QUESTIONS PRESENTED

Is there a genuine issue of material fact regarding the following:

- whether Plaintiff can make a prima facie case of discrimination or retaliation under Title VII, the ADEA, and/or Section 1981?

- whether Plaintiff can bear her burden of demonstrating that Duke's nondiscriminatory and nonretaliatory reason for ending her employment was pretext for discrimination or retaliation?

- whether Plaintiff asserts timely claims under Title VII, the ADEA, and Section 1981?

- whether Plaintiff can prove the elements of a claim for breach of the implied duty of good faith and fair dealing?

## LEGAL STANDARD

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c)(2).  If the moving party demonstrates it is entitled to summary judgment, the burden then shifts to the nonmoving party to show that there are genuine issues of material fact.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 586–88 (1986).

The party opposing summary judgment may not rest upon mere allegations, but must come forward with specific facts showing that there is a genuine issue for trial. *Emmett v. Johnson*, 532 F.3d 291, 297 (4th Cir. 2008) (internal citations and quotation

---

[11] Names of committee members have been redacted to preserve confidentiality.

marks omitted). "Mere unsupported speculation is not sufficient to defeat a summary judgment motion if the undisputed evidence indicates that the other party should win as a matter of law." *Francis v. Booz, Allen & Hamilton, Inc*., 452 F.3d 299, 308 (4th Cir. 2006). "A pro se plaintiff must comply with Rule 56 of the Federal Rules of Civil Procedure and come forward with sufficient evidence upon which a reasonable jury could return a verdict in his or her favor." *Blake v. Wells Fargo Bank, N.A.*, No. 1:18CV790, 2020 WL 406358, at *8 (M.D.N.C. Jan. 24, 2020) (quoting *Reid v. Charlotte-Mecklenburg Bd. of Educ.*, No. 3:14CV00066, 2016 WL 6080545, at *4).

## ARGUMENT

### A. Plaintiff's Claim for Retaliation in Violation of Title VII Relating to the Research Misconduct Investigation Cannot Survive Summary Judgment

Plaintiff asserts a Title VII claim alleging that in retaliation for reporting sexual harassment to Dowell-Newton, Duke conducted a research misconduct investigation, which resulted in retraction of her papers, termination of her grant, and the end of her employment. Doc. No. 5 pp. 46-47. To establish a prima facie case of retaliation, Plaintiff must show: (1) she engaged in a protected activity; (2) that the employer took a materially adverse action against her; and (3) there is a causal connection between the protected activity and the adverse employment action. *Perkins v. Int'l Paper Co.*, 936 F.3d 196, 213 (4th Cir. 2019). If Plaintiff establishes a prima facie case, the burden shifts to Duke to articulate non-retaliatory reasons for its actions. *Laber v. Harvey*, 438 F.3d 404, 432 (4th Cir. 2006).

PPAB 12467900v7

Plaintiff must establish that her protected activity was the but-for cause of the alleged adverse action. *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013). More specifically, Plaintiff must prove that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action of the employer. *Id.* at 360. She "must establish causation at two different stages of the *McDonnell Douglas* framework: first, in making a prima facie case, and second, in proving pretext and satisfying her ultimate burden of persuasion." *Foster v. University of Maryland-Eastern Shore*, 787 F.3d 243, 250 (4th Cir. 2015). To carry her burden at the pretext stage, Plaintiff must establish *both* that Duke's reason was false and that retaliation was the real reason for the challenged conduct. *Foster*, 787 F.3d at 251. Plaintiff cannot carry her burden at either stage.

i.    Plaintiff cannot prove causation because Duke began investigating her research practices before her protected activity

Plaintiff cannot show that her protected activity (reporting harassment to Dowell-Newton on February 28, 2020) was the but-for cause of the research misconduct investigation and its consequences because Duke began investigating concerns about Plaintiff's research practices *before* the protected activity. The Fourth Circuit affirmed summary judgment for an employer in similar circumstances where adverse action began before the protected activity. *Francis*, 452 F.3d at 309. There, the plaintiff was reprimanded for unprofessional conduct several times in 2002, and in August 2003 submitted a complaint that she believed her USERRA rights were being violated. *Id.* at 301. Six weeks later, the plaintiff was placed on probation due to conduct from before and after her internal complaint and was terminated two weeks after that. *Id.* at 302. The

13

Fourth Circuit affirmed summary judgment and reasoned that "[t]he actions that led to [the plaintiff's] probation and termination began *before* her protected activity, belying the conclusion that a reasonable factfinder might find that [the employer's] activity was motivated by [her] USERRA complaints." *Id.*

The court also stated that "[w]here timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise." *Id.* (quoting *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 95 (2d Cir. 2001)); *see also Perkins*, 936 F.3d at 214 (granting employer summary judgment where protected activity occurred after alleged adverse action).

McDonnell first identified concerns with Plaintiff's research practices in September 2019, a month before Plaintiff experienced any harassment. Ex. F. In November 2019, Plaintiff acknowledged her "questions and concerns [were] well understood and valued[.]" Ex. I. On February 26, 2020, at 9:21pm, McDonnell received Fox's report of "major concerns about the overall data storage and data sharing practices in the Abou Donia lab" and immediately sought support from Swamy on February 27, 2020. Exs. K, L. Kessler was assigned to the review that same day. Ex. DD.

Plaintiff did not report alleged harassment to Dowell-Newton until February 28, 2020. Ex. N. Importantly, McDonnell first learned about Plaintiff's allegations of harassment on March 1, 2020. McDonnell Dep. 77:10-78:16. From this point forward, the research misconduct proceeded in good faith according to Duke policy.

The initial Assessment found that an inquiry was not warranted "because of the inadequacy of the available research record[.]" Ex. Q. Specifically, it concluded that "[t]he available information and documentation appears insufficient to support the research in question and document its reliability." *Id.* In other words, an inquiry could not be conducted simply because Plaintiff could not produce any source data to support her grant or papers. In fact, the Assessment specifically recommended further evaluation of Plaintiff's research practices and potential retraction of the papers. *Id.*

Kessler and Duckett attempted to implement this corrective action for more than six months, but Plaintiff could still not produce the source data. The information provided by Plaintiff as part of that corrective action established "sufficient evidence of possible falsification or fabrication of data to warrant an Inquiry." Ex. W. Kessler issued an Assessment on February 26, 2021, Klotman agreed and the matter proceeded to an Inquiry. Ex. X.

In the Inquiry report, the SCMR recommended additional corrective action. Ex. Y. Klotman approved and Plaintiff's papers were retracted, the grant relinquished, and notice of termination was issued to Plaintiff. Exs. Z, AA. The Final Investigation Report substantiated findings of research misconduct. Ex. BB.

        ii. <u>Duke had legitimate nonretaliatory concerns about Plaintiff's research practices</u>

Duke has identified legitimate nonretaliatory reasons for its actions that Plaintiff cannot show were pretextual. Specifically, Duke had serious concerns about Plaintiff's research practices. In similar circumstances, the Second Circuit held that a research

PPAB 12467900v7

misconduct investigation was a legitimate reason to take employment action. *See Chao v. Mount Sinai Hosp.*, 476 Fed. Appx. 892, 896 (2d Cir. 2012) (affirming summary judgment on discrimination claims because plaintiff could not show that "rigorously-investigated charge and finding that [plaintiff] committed research misconduct and violated professional or ethical standards" was pretext).

Duke followed each step of the Research Misconduct Policy while investigating Plaintiff's conduct. Ex. M. Ultimately, Kessler, three different members of the SCMR, and Klotman concluded that Plaintiff's actions warranted further review, and a separate committee of three different members and Klotman concluded that Plaintiff's actions constituted research misconduct. As a result, SCMR recommended that her papers be retracted and grant relinquished. Ex. Y. Klotman agreed. Ex. Z.

Following the committee's recommendation, Duke relinquished the grant. Ex. AA. Plaintiff's position was fully funded by this grant and, thus, pursuant to Duke policy she was given 60 days' notice of the end of her position. *Id.*

Against the weight of these findings, Plaintiff tries to show pretext by alleging an elaborate conspiracy. Courts across the country "have found plaintiff's mere claim that a conspiracy is at play is insufficient to rebut a proffered legitimate nondiscriminatory reason for the adverse employment action." *Boone v. MountainMade Foundation*, 64 F. Supp. 3d 216, 246 (D.D.C. 2014) (collecting cases). Similarly, "unsubstantiated speculations" that a decisionmaker lied about the termination reason is also insufficient to meet a plaintiff's burden of showing pretext. *Gibson v. Marjack Co., Inc.*, 718 F. Supp. 2d 649, 657 (D.

PPAB 12467900v7

Md. 2010). Finally, in similar circumstances, the Eleventh Circuit recently held that a plaintiff could not avoid summary judgment by claiming that the outcome of an investigation was "predetermined" or manipulated by a decisionmaker. *Joseph v. Bd. of Regents of the Univ. Sys. of Georgia*, 121 F.4th 855, 873 (11th Cir. 2024). The court reasoned that "independent decisionmakers agreed that the investigation was necessary" and that the plaintiff was quarreling with the wisdom of the decision rather than the honesty of the employer's beliefs. *Id.*

Here, Plaintiff believes that more than a dozen scientists and staff at Duke conspired to "frame" her for scientific misconduct and destroy her career. Mulugu Dep. 306:18-307:9. Plaintiff believes that McDonnell was the "ringleader" of the conspiracy. Mulugu Dep. 137:9-15; 178:13-22. She believes numerous Duke leaders, including Kessler, Swamy, Duckett, and Klotman (McDonnell's supervisor) were doing McDonnell's bidding. Mulugu Dep. 229:24-230:8. Finally, she alleges the conspiracy extends to all of the committee members who had predetermined to find against her. Mulugu Dep. 255:13-24.

What evidence has Plaintiff produced to support this shocking subterfuge? None. She has "no clue" who took her missing data. Mulugu Dep. 138:17-19. She has not rebutted McDonnell's vehement denial of responsibility for her alleged loss of files. Plaintiff's claim of a scheme to destroy her data is also specifically contradicted by her own contemporaneous communications. On September 19, 2019, she emailed McDonnell stating all data had been shared with Abou-Donia by email and was accessible in a binder.

PPAB 12467900v7

Ex. H.  Plaintiff did not mention having lost all of her data the prior month.

Plaintiff's conspiracy theory also fails to comport with basic logic.  As a result of the investigation, Duke was forced to retract three papers and relinquish a grant worth more than $1 million.  Mulugu Dep. 316:15-17.  Duke had no financial or reputational incentive to find Plaintiff responsible for research misconduct.  Plaintiff even conceded that this reflected poorly on Duke.  Mulugu Dep. 307:13-15.

Finally, Plaintiff has presented no evidence to suggest that numerous independent decisionmakers, including Kessler, Swamy, Duckett, Klotman, and the six committee members, were taking orders from McDonnell rather than fulfilling their responsibilities in good faith.  To survive summary judgment, Plaintiff must produce sufficient evidence to impute retaliatory intent to these independent decisionmakers.  *McClain v. Lynchburg City Schools*, 531 F. Supp. 3d 1115, 1130 (W.D. Va. 2021).

Despite her claims, Plaintiff admitted that she did not know if anyone on the committees had any animus against her.  Mulugu Dep. 260:3-21.  Plaintiff also testified that she did not know if Klotman or Swamy had any personal intent to discriminate or retaliate against her.  Mulugu Dep. 107:5-15; 233:5-11.  In contrast, each of these independent decisionmakers testified that they formed their own opinions about Plaintiff's research practices and were not influenced by McDonnell.  Duckett Dep. 81:6-82:6; Swamy Dep. 41:7-42:16[12]; Klotman Dep. 44:15-18.  As a result, Plaintiff cannot show that Duke's concerns about her research practices were pretextual.

---

[12] Excerpts attached as Exhibit EE.

PPAB 12467900v7

## B. Plaintiff's Title VII and ADEA Wrongful Termination Claims Fail

Plaintiff asserts a claim under Title VII and the ADEA against Duke for discriminatory wrongful termination. Doc. No. 5, p 5. She believes this was based on her race, color, sex, religion, national origin, and/or age. *Id.*

### i. Plaintiff again cannot make a prima facie case of discrimination

"To establish a claim for race [or other types of] discrimination, a plaintiff has two avenues. A person may establish a claim for race discrimination by providing direct evidence of intentional discrimination or circumstantial evidence." *Blake*, 2020 WL 406358, at *9 (citing *Goldberg v. B. Green & Co.*, 836 F.2d 845, 848 (4th Cir. 1988)). "A plaintiff bears the burden of producing direct or circumstantial evidence 'of sufficient probative force to reflect a genuine issue of material fact.'" *Id.* (quoting *Goldberg*, 836 F.2d at 848). If the plaintiff fails to proffer direct evidence of race discrimination, she "has the burden of creating a prima facie case under the *McDonnell Douglas* burden-shifting framework." *Id.* (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)).

Plaintiff presents no direct evidence of discrimination and must therefore proceed under *McDonnell Douglas*. Plaintiff must show (1) she is a member of a protected class; (2) she suffered adverse action; (3) she was performing at a level that met her employer's legitimate expectations; and (4) the adverse action occurred "under circumstances which give rise to an inference of unlawful discrimination." *McAdams v. Autozone, Inc.*, Case No. 1:05CV10121, 2007 WL 2733710, at *4 (M.D.N.C. Sept. 17, 2007) (quoting *E.E.O.C. v. Sears Roebuck & Co.*, 243 F.3d 846, 851 (4th Cir. 2001)). Plaintiff cannot meet the

PPAB 12467900v7

fourth element of the prima facie case by showing circumstances giving rise to an inference of discrimination.

Plaintiff testified Swamy terminated her employment by relinquishing her grant. Mulugu Dep. 269:20-270:12. Plaintiff, however, has not alleged that Swamy acted with discriminatory intent. Doc. No. 46, p. 14 ("Plaintiff has tendered no factual allegations remotely indicative of racial discrimination by Defendants Swamy or Duckett"); Mulugu Dep. 233:6-11 (confirming Swamy "did not have personal intent to discriminate").

Instead, Plaintiff pins her claims on the theory that McDonnell was using others to discriminate against her. Mulugu Dep. 270:4-12; 284:5-15. This quickly unraveled at her deposition. When asked why she believed McDonnell discriminated against her, Plaintiff responded, "[t]hat question, you have to ask [McDonnell]." Mulugu Dep. 203:12-204:9. McDonnell unequivocally stated, "I can absolutely and positively say that I never acted in any discriminatory manner towards [Plaintiff] . . . I dealt with the request that [she] brought to me in the same way as I would evaluate any colleague." McDonnell Dep. 27:5-14.

When pushed to identify evidence of McDonnell's discriminatory intent, Plaintiff identified a single incident. In 2018, at an ice cream social, McDonnell "pointed at [Plaintiff] and he said, Brahma, stop talking." Mulugu Dep. 288:21-290:2. This banal exchange is not evidence of discrimination and underscores the problem with Plaintiff's entire theory. She sees discrimination everywhere but cannot point to a single fact supporting that belief.

Plaintiff actually confirmed at her deposition that she believes McDonnell was

PPAB 12467900v7

motivated by something other than discrimination. She believes McDonnell was so angry about her email to Klotman requesting a faculty position that he undertook a years-long personal vendetta to get her fired. *See* Doc. No. 5, pp. 5, 9-10; Mulugu Dep. 109:10-110:19. A perceived personal grudge is not evidence of unlawful discrimination.[13]

ii. Duke has identified a legitimate nondiscriminatory reason which Plaintiff cannot show was pretext for discrimination

As described in detail above, Plaintiff's employment ended as a result of serious concerns established about her scientific integrity. Therefore, the burden shifts to Plaintiff to prove this was pretext for discrimination. To show pretext, Plaintiff would need to show that Duke's "proffered nondiscriminatory reasons for the termination are inconsistent over time, false, or based on mistakes of fact." *Parker v. Children's National Medical Center, Inc.*, 2025 WL 1540954, *5 (4th Cir. May 30, 2025) (quoting *Sempowich v. Tactile Sys. Tech., Inc.*, 19 F.4th 643, 652 (4th Cir. 2021)). Ultimately, Plaintiff must show "*both* that the reason was false, *and* that discrimination was the real reason." *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 515 (1993). To show pretext, Plaintiff must do more than dispute the merits of Duke's justification, but show that it was "dishonest or not the real reason for her termination[.]" *Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 280 (4th Cir. 2000).

As explained above, Plaintiff's uncorroborated claims of a conspiracy are insufficient to overcome summary judgment. *Boone*, 64 F. Supp. 3d at 246. Moreover, in

---

[13] This grudge appears to have existed only in Plaintiff's mind. McDonnell was never upset by Plaintiff's email to Klotman. McDonnell Dep. 16:16-17:3. Plaintiff also stated that McDonnell was "the nicest Chairman I have ever known for a long period of time." McDonnell Dep. 35:21-36:4.

21

alleging the plot to frame her, Plaintiff astonishingly admits the findings were true—Plaintiff did not have the source data from the 2018 grant application and 2020 *Military Medicine* papers and was never able to find it. Mulugu Dep. 136:7-137:1. Consequently, Plaintiff cannot show that the reason for ending her employment was pretextual or that the real reason was discrimination.

## C. Numerous Claims Are Untimely

The following claims are confirmed as untimely:

- Violation of Title VII and the ADEA against Duke by failing to appoint her as faculty. Plaintiff was aware she would not be appointed as faculty no later than July 2019. Mulugu Dep. 118:15-21. She did not file her EEOC Charge, however, until September 29, 2021. Ex. FF. This claim is barred because Plaintiff did not file an EEOC charge within 180 days of the alleged discrimination. 42 U.S.C. § 2000e-5(e)(1).

- Violation of Section 1981 against Duke, McDonnell, and Klotman for failing to appoint her as faculty. Doc. No. 46. Plaintiff was aware that she would not be appointed as faculty no later than July 2019. Mulugu Dep. 118:15-21. She did not file this action until November 6, 2023. Doc. No. 1. This claim is barred by the four-year statute of limitations. 28 U.S.C. § 1658.

- Violation of Title VII and the ADEA against Duke for (a) lack of research support and that her "belongings were taken from [her], and this theft was not investigated[;]" (b) being "held to ambiguous standards in regard to [her] departmental role[.]" Doc. No. 5, p. 47. Plaintiff was aware that the lab was "under-resourced" no later than July 2016. Mulugu Dep. 276:5-11. The "theft" of belongings allegedly occurred on August 23, 2019. Doc. No. 5, p. 16; Mulugu Dep. 132:13-137:1. Plaintiff's allegations about "ambiguous standards" all relate to actions taken by McDonnell while he served as Chair of PCB, a position he held until September 1, 2020. Doc. No. 5, p. 35. Plaintiff filed her EEOC Charge on September 29, 2021, well beyond 180 days after she was aware of these incidents. Ex. FF. Those claims are untimely. 42 U.S.C. § 2000e-5(e)(1); 29 U.S.C. § 626(d).

- Violation of Title VII and ADEA against Duke for "Fraud" based on: (a) not receiving a new appointment letter in 2018; (b) being encouraged by

McDonnell on May 29, 2018, to contact Klotman, but when she did in May 2019, he got mad; and (c) McDonnell allegedly stopping Plaintiff from joining other departments in March and April 2020. Doc. No. 5, p. 47; Mulugu Dep. 109:20-110:19; 279:8-280:16; 310:12-14; 312:1-5. Plaintiff was aware of each of these events when they happened, but did not file an EEOC Charge within 180 days. Ex. FF. These claims are time-barred. 42 U.S.C. § 2000e-5(e)(1); 29 U.S.C. § 626(d).

- Violation of Section 1981 against Duke, Klotman, and Dowell-Newton "for failing to keep proper records for Plaintiff's DoD grant[.]" Doc. No. 46, p. 19. Plaintiff claims between May and August 2018, PCB administration lost a copy of her grant application. Doc. No. 5, p. 10; Mulugu Dep. 291:13-292:25. Plaintiff was aware of this alleged issue in August 2018 but did not file this action until November 2023. Doc. No. 1. Her claim is barred by the four-year statute of limitations. 28 U.S.C. § 1658.[14]

## D. Plaintiff Cannot Sustain a Claim for Breach of the Duty of Good Faith and Fair Dealing Based on Duke Policies

Plaintiff asserts a claim for breach of the implied covenant of good faith and fair dealing based on the theory that Duke's research misconduct policy and a Science Culture and Accountability Plan ("SCAP") were contracts. Doc. No. 46, p. 18. Neither the SCAP nor Duke's Research Misconduct Policy created a contract with Plaintiff. The SCAP is a statement of "fundamental guiding principles" for research activities. Ex. GG. The SCAP is not supported by consideration and does not include any mutual obligations. Under North Carolina law, a statement of policy like this does not constitute an enforceable contract. *See Shaughnessy v. Duke Univ.*, Case No. 1:18-CV-461, 2020 WL 4227545, at *5 (M.D.N.C. July 23, 2020) (quoting *Walker v. Westinghouse Electric Corp.*, 77 N.C. App. 253, 259, 335

---

[14] This Section 1981 claim also fails because Plaintiff admitted that Klotman did not personally lose the grant application. Mulugu Dep. 305:1-306:4. She also admitted that she did not know if Dowell-Newton lost the document or was disorganized. Mulugu Dep. 292:19-22. "Personal liability under section 1981 must be predicated on the actor's personal involvement." *See e.g., Benjamin v. Sparks*, 173 F. Supp. 3d 272, 283 (E.D.N.C. 2016) (quoting *Patterson v. Cty. of Oneida*, 375 F.3d 206, 229 (2d Cir. 2004)).

S.E.2d 79, 83–84 (1985) ("unilaterally promulgated employment manuals or policies do not become part of the employment contract unless expressly included in it[.]")). Indeed, Plaintiff testified that she did not know if the SCAP was a contract. Mulugu Dep. 297:12-298:2.

Duke's Research Misconduct Policy is also not a contract. During Plaintiff's employment, the Policy was contained within the Duke Faculty Handbook. Ex. M. This Court has already recognized that Duke's Faculty Handbook is not a contract. *See Shaughnessy*, 2020 WL 4227545, at *5 (quoting *McFadyen v. Duke Univ.*, 786 F. Supp. 2d 887, 982 (M.D.N.C. 2011)). The Research Misconduct Policy demonstrates that it is intended to serve as a set of policies and procedures rather than a contract. It is "regularly reviewed and modified" and "[a]ny such modifications [are] reviewed and approved through the established university review processes." Ex. M, p. 1. Plaintiff also testified that the Research Misconduct Policy "[c]ould be" a contract but "[t]hat, Duke has to decide." Mulugu Dep. 298:13-18. As such, Plaintiff cannot prove that she was party to any contract regarding the research misconduct process and her final claim fails as a matter of law. *McDonald v. Bank of N.Y. Mellon Tr. Co., Nat'l Ass'n*, 259 N.C. App. 582, 587, 816 S.E.2d 861, 864-65 (2018).

## CONCLUSION

Based on the above, Defendants respectfully request that the Court grant their Motion for Summary Judgment on each of Plaintiff's claims.

PPAB 12467900v7

This 30th day of June, 2025.

/s/ Tory Ian Summey
Tory Ian Summey, N.C. State Bar No. 46437
PARKER POE ADAMS & BERNSTEIN LLP
Bank of America Tower
620 South Tryon Street, Suite 800
Charlotte, North Carolina 28202
Telephone: (704) 372-9000
Facsimile: (704) 334-4706
Email: torysummey@parkerpoe.com

Jeremy D. Locklear, N.C. State Bar No. 50842
PARKER POE ADAMS & BERNSTEIN LLP
PNC Plaza
301 Fayetteville Street, Suite 1400
Raleigh, North Carolina 27601
T: (919) 828-0564
F: (919) 834-4564
Email: jeremylocklear@parkerpoe.com

*Attorney for Defendants Duke University, Donald Patrick McDonnell, Mary Frances Early Klotman, Geeta Krishna Swamy, Colin Stephen Duckett and Sharon Adele Dowell-Newton*

PPAB 12467900v7

## CERTIFICATE OF COMPLIANCE

Pursuant to LR 7.3(d) of the Rules of Practice and Procedure of the United States District Court for the Middle District of North Carolina effective October 1, 2023, the undersigned hereby certifies that the foregoing ***MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT*** was prepared on a computer using Times New Roman 13 point font and does not exceed 6,250 words (excluding the caption, signature lines, the certificate of service, and any cover page or index), as reported by word-processing software.

This 30th day of June, 2025.

/s/ Tory Ian Summey
Tory Ian Summey, N.C. State Bar No. 46437
PARKER POE ADAMS & BERNSTEIN LLP
Bank of America Tower
620 South Tryon Street, Suite 800
Charlotte, North Carolina 28202
T: (704) 372-9000
F: (704) 334-4706
Email: torysummey@parkerpoe.com

Jeremy D. Locklear, NC State Bar No. 50842
PARKER POE ADAMS & BERNSTEIN LLP
PNC Plaza
301 Fayetteville Street, Suite 1400
Raleigh, North Carolina 27601
T: (919) 828-0564
F: (919) 834-4564
Email: jeremylocklear@parkerpoe.com

*Attorney for Defendants Duke University, Donald Patrick McDonnell, Mary Frances Early Klotman, Geeta Krishna Swamy, Colin Stephen Duckett and Sharon Adele Dowell-Newton*

PPAB 12467900v7

## CERTIFICATE OF SERVICE

I hereby certify that on this date the foregoing "***MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT***" was electronically filed with the Clerk of Court using the CM/ECF system and served upon the *Pro Se* Plaintiff via the Court's electronic case filing system and pursuant to Pro Se Authorization Form to Receive Documents Electronically (DE 3).

This 30th day of June, 2025.

/s/ Tory Ian Summey
Tory Ian Summey, N.C. State Bar No. 46437
PARKER POE ADAMS & BERNSTEIN LLP
Bank of America Tower
620 South Tryon Street, Suite 800
Charlotte, North Carolina 28202
T: (704) 372-9000
F: (704) 334-4706
Email: torysummey@parkerpoe.com

Jeremy D. Locklear, NC State Bar No. 50842
PARKER POE ADAMS & BERNSTEIN LLP
PNC Plaza
301 Fayetteville Street, Suite 1400
Raleigh, North Carolina 27601
T:  (919) 828-0564
F:  (919) 834-4564
Email:  jeremylocklear@parkerpoe.com

*Attorney for Defendants Duke University, Donald Patrick McDonnell, Mary Frances Early Klotman, Geeta Krishna Swamy, Colin Stephen Duckett and Sharon Adele Dowell-Newton*

PPAB 12467900v7