**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

| | | |
|---|---|---|
| BRAHMAJOTHI VASUDEVAN MULUGU, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:23CV957 |
| | ) | |
| DUKE UNIVERSITY, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE**

This case comes before the undersigned Magistrate Judge for a recommended ruling on Defendants' Motion for Judgment on the Pleadings (Docket Entry 66) and Defendants' Motion for Summary Judgment (Docket Entry 72), as well as Plaintiff's Motion for Leave to Amend Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment (Docket Entry 81 ("Motion for Leave")). (See Docket Entry dated June 6, 2025 (referring Docket Entry 66); Docket Entry dated Sept. 11, 2025 (referring Docket Entry 72); Docket Entry dated Sept. 25, 2025 (referring Docket Entry 81).) For the reasons that follow, the Court (A) should grant in part and should deny in part the Motion for Judgment on the Pleadings (such that only Plaintiff's claims against Defendant Duke University for retaliation in violation of federal law and for breach of the implied covenant of good faith and fair dealing in violation of state law would remain), (B) should deny the Motion for Leave, and (C) should deny the Motion for Summary Judgment.

Plaintiff commenced this case pro se by filing the Complaint (Docket Entry 1), which, in short order, she amended as a matter of course under Federal Rule of Civil Procedure 15(a)(1) (see Docket Entry 5 (the "Amended Complaint")).  As the first defendant, the Amended Complaint names Duke University School of Medicine (see id. at 2-3),[1] but the Court (per the undersigned Magistrate Judge) later corrected that defendant's name to Duke University (see Docket Entry 46 at 19).  The Amended Complaint also identifies as defendants various employees of Defendant Duke University, including (as still relevant) Donald Patrick McDonnell, Mary Frances Earley Klotman, and Sharon Adele Dowell-Newton (collectively, "Individual Defendants," and, along with Defendant Duke University, "Defendants").  (See Docket Entry 5 at 2-3.)[2]

---

1 Pin cites to documents filed by Plaintiff refer to page numbers that appear in the footer appended to those documents upon their filing in the CM/ECF system (not to any original pagination). All quotations from Plaintiff's filings omit bold font.

2 The Amended Complaint additionally lists as defendants the late Mohamed Bahie Abou-Donia, Geeta Krishna Swamy, and Colin Stephen Duckett (see Docket Entry 5 at 2-3); however, the Court (per Chief United States District Judge Catherine C. Eagles) dismissed Dr. Abou-Donia from the case (see Docket Entry 56 at 1) and dismissed the claims lodged against Drs. Swamy and Duckett (see id. at 1-2; see also Docket Entry 46 at 13-14 (denying as futile Plaintiff's request to amend Amended Complaint to assert race discrimination claims against Drs. Swamy and Duckett under 42 U.S.C. § 1981); Text Order dated Dec. 4, 2025 (denying Plaintiff's request for reconsideration of denial of her prior request to add Section 1981 claims against Drs. Swamy and Duckett)).

2

The Amended Complaint asserts claims under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e to 2000e-17, and the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. §§ 621-634 (see Docket Entry 5 at 4), for "discriminatory conduct" (id. at 5), in the form of "[t]ermination of [Plaintiff's] employment[, f]ailure to promote [her], . . . [u]nequal terms and conditions of [her] employment[, r]etaliation[, and] . . . [f]raud" (id.). In particular, the Amended Complaint alleges "discriminat[ion] against [Plaintiff] based on [her] . . . race[,] Asian[,] color[,] Brown[,] gender/sex[,] Female[,] religion[,] Hindu[,] national origin[,] Indian[, and] age[, born] 1967." (Id. (parentheses omitted).) Subsequently, the Court (per the undersigned Magistrate Judge):

> deemed [the Amended Complaint further] amended to assert (i) a race discrimination claim under [42 U.S.C. §] 1981 against Defendants Duke University, McDonnell, and Klotman, for failing to promote Plaintiff to research assistant professor after she obtained [a Department of Defense ("DoD")] grant, (ii) a race discrimination claim under Section 1981 against Defendants Duke University, Klotman, and Dowell-Newton, for failing to keep proper records for Plaintiff's DoD grant, and (iii) a state-law claim for breach of the implied covenant of good faith and fair dealing against Defendant Duke University in connection with the research misconduct investigation against Plaintiff . . . .

(Docket Entry 46 ("Amendment Order") at 19-20; see also Docket Entry 56 at 1-2 (dismissing Title VII and ADEA claims against Individual Defendants).)

3

Discovery commenced on November 19, 2024. (See Text Order dated Nov. 19, 2024 (adopting Joint Rule 26(f) Report (Docket Entry 54)); see also Docket Entry 54 at 2 (providing for commencement of discovery upon adoption of Joint Rule 26(f) Report).) With just over a month left in the discovery period, Defendants filed their instant Motion for Judgment on the Pleadings. (See Docket Entry 54 at 2 (setting discovery deadline of May 30, 2025); Docket Entry 66 at 3 (documenting filing date of April 21, 2025).) In it, they contended "that all of Plaintiff's claims against [] Defendants stated in the Amended Complaint are either untimely or not plausibly pled . . ., except for Plaintiff's claim for retaliatory termination in violation of Title VII." (Docket Entry 66 at 1.) Plaintiff responded in opposition. (See Docket Entry 69.)

Following the close of discovery, Defendants filed their instant Motion for Summary Judgment. (See Docket Entry 72 at 3 (documenting filing date of June 30, 2025); see also id. at 1 ("Plaintiff cannot show a genuine dispute of material fact with respect to any of Plaintiff's claims and Defendants are therefore entitled to judgment as a matter of law.").) Via letter dated July 1, 2025, the Clerk advised Plaintiff of her "right to file a 20-page response in opposition to th[at M]otion [for Summary Judgment]" (Docket Entry 74 at 1; see also id. ("Your response may be accompanied by counter affidavits, or you may submit other responsive material.")), "within 30 days from the date of service

4

of th[at M]otion [for Summary Judgment]" (id.).[3] On the deadline for Plaintiff's summary judgment response, she moved for an extension "up to and including August 4, 2025." (Docket Entry 75 at 1; see also id. (bearing file-stamp of July 30, 2025).) To support that request, Plaintiff stated:

> Due to illness over the past several days, I have been unable to complete my response to Defendants' [M]otion for [S]ummary [J]udgment by today's deadline. I have been managing significant symptoms that have limited my ability to focus and work effectively. . . . I have been working diligently as my health allows. However, despite my efforts, I need additional time to finish researching, drafting, and finalizing my response so that it is complete and accurate.

(Id. at 2; see also id. at 3 ("Counsel for Defendants have indicated that they consent to this [m]otion.").) The Court (per the undersigned Magistrate Judge) granted Plaintiff that extension. (See Text Order dated July 31, 2025.)

When the extended deadline arrived, Plaintiff again moved for an extension, this time "up to and including August 11, 2025." (Docket Entry 76 at 1; see also id. (bearing file-stamp of August 4, 2025).) As her justification for that request, Plaintiff first pointed to continued illness (see id. at 2), then stated that she had "nearly finished drafting [her response]" (id.), and lastly cited "technical difficulties that have slowed [her] ability to

_____

3 Plaintiff received electronic service of the Motion for Summary Judgment at the time of its filing. (See Docket Entry 3 at 1 ("consent[ing] to receive service of documents and notices of electronic filing via the Court's Electronic Filing System" (internal parenthetical omitted)).)

5

compile and print the necessary exhibits" (id.; see also id. at 3 ("I request an extension of seven (7) days . . . to allow me time to compile my exhibits to my response . . . and ensure that my filing is complete. . . . Counsel for Defendants have indicated that they consent to this [m]otion.")). Once more, the Court (per the undersigned Magistrate Judge) extended Plaintiff's deadline. (See Text Order dated Aug. 5, 2025.) The day that second extension expired, Plaintiff filed yet another request for more time, "up to and including August 18, 2025." (Docket Entry 77 at 1; see also id. (bearing date-stamp of August 11, 2025).) According to that motion, "[w]hile finalizing [the] compiled exhibits for filing, [Plaintiff's] computer froze and requires restoration, preventing [her] from completing the process for filing." (Id. at 2; see also id. at 2-3 ("This unforeseen technical issue arose last night . . . . I have worked diligently and am otherwise ready to finalize the filing once my computer is restored. . . . Counsel for [D]efendants have consented to this motion, on the condition that this is the last extension for this filing.").) The Court (per the undersigned Magistrate Judge) granted that motion, but cautioned Plaintiff that she "should not anticipate receiving any further extensions of th[at by-then]-thrice-extended deadline." (Text Order dated Aug. 12, 2025.)

On August 18, 2025, Plaintiff filed a 28-page Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment

(Docket Entry 78 ("Summary Judgment Response") at 1-28), along with approximately 450 pages of exhibits (see Docket Entries 78-1 through 78-5; Docket Entry 79; Docket Entries 79-1 through 79-19). Fifteen days later, Plaintiff filed the instant Motion for Leave (see Docket Entry 81 at 1 (bearing date-stamp of September 2, 2025)), along with a 26-page Amended Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment (Docket Entry 83 ("Amended Summary Judgment Response") at 1-26), with over 2000 pages of exhibits (see Docket Entries 83-1 through 83-11; Docket Entry 84; Docket Entries 84-1 through 84-19; Docket Entry 85; Docket Entries 85-1 through 85-24; Docket Entry 86; Docket Entries 86-1 through 86-24; Docket Entry 87; Docket Entries 87-1 through 87-19). Defendants responded in opposition to the Motion for Leave (see Docket Entry 90) and Plaintiff replied (see Docket Entry 91).

## MOTION FOR JUDGMENT ON THE PLEADINGS

"After the pleadings are closed – but early enough not to delay trial – a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c) ("Rule 12(c)"). "A Rule 12(c) motion tests only the sufficiency of the complaint and does not resolve the merits of the plaintiff's claims or any disputes of fact." Drager v. PLIVA USA, Inc., 741 F.3d 470, 474 (4th Cir. 2014). Nonetheless, as with a motion to dismiss, in the face of a motion for judgment on the pleadings, "the complaint's factual allegations must be enough to raise a right to relief above the speculative

7

level – that is, the complaint must contain enough facts to state a claim for relief that is plausible on its face." Bass v. Weinstein Mgmt. Co., Inc., 56 F.4th 355, 360-61 (4th Cir. 2022) (internal quotation marks omitted); see also Bing v. Brivo Sys., LLC, 959 F.3d 605, 616 (4th Cir. 2020) ("[I]mportantly, [pleading a plausible claim] 'requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action[ ] will not do.'" (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007))); Independence News, Inc. v. City of Charlotte, 568 F.3d 148, 154 (4th Cir. 2009) ("applying the same standard for Federal Rule of Civil Procedure 12(c) motions as for motions made pursuant to [Federal] Rule [of Civil Procedure] 12(b)(6)").

## Section 1981 Claims

As detailed in the Introduction, the Amendment Order construed the Amended Complaint as asserting two Section 1981 race discrimination claims: (1) the first "against Defendants Duke University, McDonnell, and Klotman, for failing to promote Plaintiff to research assistant professor after she obtained [a] DoD grant" (Docket Entry 46 at 19); and (2) the second "against Defendants Duke University, Klotman, and Dowell-Newton, for failing to keep proper records for Plaintiff's DoD grant" (id.). To support their Motion for Judgment on the Pleadings, Defendants argued that "Plaintiff's [first] claim under Section 1981 against [Defendants] Duke [University], McDonnell, and [] Klotman is time-

8

barred." (Docket Entry 67 at 14.) Specifically, Defendants observed (A) that "[t]he statute of limitations for a Section 1981 claim is four years" (id. (citing 28 U.S.C. § 1658)), and (B) that "Plaintiff did not file this action until November 6, 2023, more than four years after she was informed that she would not be promoted in July 2019" (id. (citing Docket Entry 1 and Docket Entry 5 at 14); see also Docket Entry 47 at 88 (pleading as Fifth Affirmative Defense in Defendants' Answer to Amended Complaint: "To the extent Plaintiff's claims seek to address alleged acts or omissions beyond the applicable statute of limitations, such claims are barred.")). Plaintiff did not address (much less contest) that specific time-bar argument. (See Docket Entry 69 at 1-10.) The Court should grant judgment on the pleadings for Defendants Duke University, McDonnell, and Klotman on Plaintiff's failure-to-promote, Section 1981 claim.

Regarding that claim, the Amended Complaint alleges:

1) "[o]n May 1, 2018, [Plaintiff] received a letter of congratulations from DoD saying that a proposal [she] had submitted in 2017 was recommended for funding" (Docket Entry 5 at 10);

2) "[o]n May 29, 2018, Dr. Abou-[D]onia took [Plaintiff] to [Defendant] McDonnell . . . to recommend [Plaintiff] for a position change from research scientist to research assistant professor" (id.);

Case 1:23-cv-00957-CCE-LPA Document 99 Filed 01/16/26 Page 9 of 84

3) during that meeting, Defendant McDonnell "told [Plaintiff] that, ultimately, the decision to change [her] position rested with [Defendant] Klotman, and[,] if [Plaintiff] didn't hear from [Defendant McDonnell] in 3 months, [Plaintiff] was welcome to contact [Defendant] Klotman directly" (id.; see also id. at 11 (alleging that, after that meeting, Plaintiff "informed Dr. Swamy that . . . [Defendant] McDonnell was not willing to change [Plaintiff's] position"));

4) "[i]n April 2019, Dr. Abou-[D]onia suggested that . . . [Plaintiff] should send [Defendant] Klotman a request letter for a position change to [r]esearch [a]ssistant professor" (id. at 13);

5) "[Plaintiff] sent an email to [Defendant] Klotman on May 12, 2019, . . . requesting [he] recommend [her] for a position change to research assistant professor" (id. at 14);

6) "[Plaintiff] met [Defendant] McDonnell on July 24, 2019 to discuss the possibility of a position change in connection with [Plaintiff's] email to [Defendant] Klotman" (id.); and

7) "[d]uring th[at] discussion, [Defendant] McDonnell told [Plaintiff she was] better off moving to the Department of Medicine if [she was] seeking a faculty position" (id.; see also id. at 15 ("[Defendant] McDonell also told [Plaintiff] that he only talks to faculty and that he would not communicate directly with [her] in the future.")).

10

The foregoing allegations of the Amended Complaint establish that, as of July 24, 2019, Plaintiff knew she would not receive the promotion that she had requested from Defendants McDonnell and Klotman; however, Plaintiff did not institute this action until more than four years later, on November 6, 2023 (see Docket Entry 1 at 1).  "Section 1981 claims based upon conduct occurring after the formation of an employment contract, including . . . claims of discrimination . . . like the one[] raised here, arise under the 1991 amendments [to Section 1981].  Accordingly, [this S]ection 1981 claim[ is] subject to the four-year statute of limitations in [S]ection 1658 . . . ."  White v. BFI Waste Servs., LLC, 375 F.3d 288, 292 (4th Cir. 2004) (internal citations omitted).  Because Plaintiff did not file this action within four years of learning that Defendants Klotman and McDonnell would not grant her the requested promotion, her claim for race discrimination under Section 1981 against Defendants Duke University, McDonnell, and Klotman for failure to grant that requested promotion falls short as a matter of law based on the pleadings.  See, e.g., Rouse v. Duke Univ., 869 F. Supp. 2d 674, 678 (M.D.N.C. 2012) (Eagles, J.) ("Courts also routinely and appropriately dispose of cases on statute-of-limitations grounds at the Rule 12(c) stage when the pleadings themselves contain sufficient information to make a ruling."); see also West v. ITT Cont'l Baking Co., 683 F.2d 845, 846 (4th Cir. 1982) (affirming dismissal of case on Rule 12(c)

11

motion when "facts alleged" showed statute of limitations barred claim); Tollison v. B & J Mach. Co., 812 F. Supp. 618, 619 (D.S.C. 1993) ("A motion under Rule 12(c) is an appropriate procedure when the statute of limitations is alleged to provide an effective bar against a plaintiff's claims.").[4]

Similarly, Defendants have moved for judgment on the pleadings on Plaintiff's "'race discrimination claim under Section 1981 against Defendants Duke University, Klotman, and Dowell-Newton, for failing to keep proper records for Plaintiff's DoD grant'" (Docket Entry 67 at 19 (quoting Docket Entry 46 at 19)), on the ground that "Plaintiff was aware of the record[-]keeping issue no later than August 2018 but did not file this action until November 2023" (id. at 20; see also id. at 19-20 (discussing allegations in Amended Complaint regarding deficient record-keeping for grant)), such that said claim fails as "barred by the four-year statute of limitations applicable to Section 1981 claims" (id. at 20 (citing Section 1658)). Plaintiff did not respond to that particular, statute-of-

_____

4 In opposition to the Motion for Judgment on the Pleadings, Plaintiff did invoke "the continuing violation doctrine" (Docket Entry 69 at 7) and did cite authority for the proposition "that hostile environment claims by their nature involve repeated conduct and are treated as one continuing violation" (id. (emphasis added) (citing National R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 117 (2002)). But the continuing violation doctrine and its application to hostile work environment claims does not aid Plaintiff in this instance; to the contrary, "[b]ecause failure to promote is a discrete act of discrimination, the continuing violation doctrine does not apply here and cannot save [this] untimely claim[]." Williams v. Giant Food Inc., 370 F.3d 423, 429 (4th Cir. 2004) (internal citation omitted).

limitations argument in opposing the Motion for Judgment on the Pleadings. (See Docket Entry 69 at 1-10.) The Court should enter judgment in favor of Defendants Duke University, Klotman, and Dowell-Newton on this Section 1981 claim, due to its untimeliness, as the allegations in the Amended Complaint concerning inadequate record-keeping for Plaintiff's grant focus on events more than four years before she filed this action on November 6, 2023 (see Docket Entry 1 at 1). See White, 375 F.3d at 292 (holding that Section 1658's four-year statute of limitations applies to post-contract-formation, discrimination claims under Section 1981); see also Rouse, 869 F. Supp. 2d at 678 (recognizing that courts routinely dismiss cases under Rule 12(c) when pleadings show untimeliness).[5]

_____

5 More particularly (per the Amended Complaint), in 2018, Plaintiff sought to comply with procedures necessary to conduct human testing pursuant to her grant, but could not obtain "the first page of the submitted version of [her] grant" (Docket Entry 5 at 11), upon contacting "[Defendant] Duke University's Office of Research Administration, [which, in turn,] referred [her] to [her] department . . . as the source . . . responsible for keeping those records" (id.; see also id. (alleging that Defendant Dowell-Newton "failed to keep appropriate records of [Plaintiff's] submitted grant, although [Defendant Dowell-Newton] did this for others in [that department] who received grants, all of whom were lighter skinned than [Plaintiff]," as well as that "[Defendants] Klotman and Duke University failed to ensure that [said department's] administration maintained appropriate records . . ., creating a work environment that facilitated the creation of disparities")). Importantly, Plaintiff cannot rely on allegations of other, more recent instances of discrimination as to matters other than record-keeping to avoid the time-bar on this discrimination claim. See, e.g., Akpan v. Holy Cross Health, Inc., Civ. No. 23-2810, 2025 WL 2616656, at *14 n.11 (D. Md. Sept. 10, 2025) (unpublished) ("It is well-settled that the continuing violation doctrine cannot be used to pursue discrete act claims challenging time-barred conduct.").

13

As a result, the Court should grant the Motion for Judgment on the Pleadings as to Plaintiff's Section 1981 claims.

<u>Title VII and ADEA Claims</u>

The Amended Complaint also asserts claims against Defendant Duke University under Title VII and the ADEA for (A) discriminatory "[f]ailure to promote [her]" (Docket Entry 5 at 5), "[u]nequal terms and conditions of [her] employment" (<u>id.</u>), and "[t]ermination of [Plaintiff's] employment" (<u>id.</u>), due to her "race" (<u>id.</u>), "color" (<u>id.</u>), "gender/sex" (<u>id.</u>), "religion" (<u>id.</u>), "national origin" (<u>id.</u>), and "age" (<u>id.</u>), as well as for (B) "[r]etaliation" (<u>id.</u>) and (C) "[f]raud" (<u>id.</u>). Defendants have sought judgment on the pleadings as to all of those claims except for the retaliation claim. (<u>See</u> Docket Entry 67 at 2 & n.1.)

*Discrimination - Failure to Promote*

Starting with the Title VII and ADEA claims for discriminatory non-promotion, Defendants (in aid of the Motion for Judgment on the Pleadings) have argued that "Plaintiff's claims relating to lack of promotion to research assistant professor are barred by the statute of limitations" (<u>id.</u> at 13), because:

1) "[u]nder Title VII and the ADEA, plaintiffs must file an [Equal Employment Opportunity Commission ("EEOC")] Charge [of Discrimination] within 180 days of alleged discrimination" (<u>id.</u> (citing 42 U.S.C. § 2000e-5(e)(1) and 29 U.S.C. § 626(d)));

14

2) "Plaintiff was aware that she would not be promoted to research assistant professor no later than July 24, 2019" (id. (citing Docket Entry 5 at 14)); and

3) "[Plaintiff] did not file her initial Charge of Discrimination with the EEOC until August 19, 2021, . . . far past the 180-day deadline" (id. at 13-14 (citing Docket Entry 5 at 41)).

"Under Title VII, a timely charge [of discrimination] must be filed with EEOC within 180 days of the alleged discrimination." Welton v. Durham Cnty., No. 1:17CV258, 2017 WL 3726991, at *3 (M.D.N.C. Aug. 28, 2017) (unpublished) (Eagles, J.) (citing, inter alia, Section 2000e-5(e)(1)), aff'd, 781 F. App'x 242 (4th Cir. 2019). The ADEA likewise "requires that a charge of age discrimination be filed with the EEOC within 180 days after the alleged unlawful practice occurred." Taylor v. Home Ins. Co., 777 F.2d 849, 856 (4th Cir. 1985) (referring to Section 626(d)).

The Amended Complaint alleges that, "[o]n August 19, 2021, [Plaintiff] filed [her] complaints to the EEOC." (Docket Entry 5 at 41.) "Any claims of discrimination . . . that occurred [over 180 days] before [that date] . . . are time-barred and [should] be dismissed." Welton, 2017 WL 3726991, at *3.[6] As documented in the

---

6 "If North Carolina were a 'deferral state,' the time period [under Title VII] would be 300 days. See 42 U.S.C. § 2000e-5(e)(1). However, North Carolina is a deferral state only in limited circumstances not applicable here." Fulmore v. City of Greensboro, 834 F. Supp. 2d 396, 411 n.7 (M.D.N.C. 2011) (Schroeder, J.) (citing Bratcher v. Pharmaceutical Prod. Dev.,
(continued...)

15

discussion of the parallel claim for discriminatory denial of promotion under Section 1981, according to the Amended Complaint, by July 24, 2019 (i.e., more than two years before she filed her Charge of Discrimination with the EEOC), Plaintiff knew that she would not receive the promotion she had requested. The Court therefore should enter judgment on the pleadings for Defendant Duke University on Plaintiff's Title VII and ADEA claim(s) for failure to promote her. See, e.g., Rouse, 869 F. Supp. 2d at 678 (noting propriety of "dispos[ing] of cases on statute-of-limitations grounds at the Rule 12(c) stage when the pleadings themselves contain sufficient information to make a ruling").[7]

---

6(...continued)
Inc., 545 F. Supp. 2d 533, 539-43 (E.D.N.C. 2008) (discussing narrow situations in which 300-day limitation period applies in North Carolina)); see also Long v. Forsyth Cnty. Dep't of Soc. Servs., No. 1:15CV683, 2016 WL 7496122, at *4 (M.D.N.C. Dec. 30, 2018) (unpublished) (Schroeder, J.) (same as to ADEA).

7 Nothing in Plaintiff's opposition to the Motion for Judgment on the Pleadings alters this analysis; indeed, as concerns the statute of limitations, she merely baldly asserted that the continuing violation doctrine somehow renders timely all her allegations of discrimination "by Defendants from 2016 through [her] termination in 2022" (Docket Entry 69 at 7). (See id. at 1-10.) That bald assertion falls short: "[E]ven if [Plaintiff] is correct that [Defendant Duke University's] failures to promote her . . . were part of a broader pattern or practice of discrimination, those failures to promote remain discrete acts of discrimination." Williams v. Giant Food Inc., 370 F.3d 421, 429 (4th Cir. 2004). "Such discrete acts of discrimination are not actionable if time-barred, even when they are related to acts alleged in timely filed charges [of discrimination]." Id. (internal quotation marks omitted)); see also Welton, 2017 WL 3726991, at *3 ("Each allegedly unlawful practice must separately satisfy the 180-day test.").

16

*Discrimination - Unequal Terms and Conditions of Employment*

Next, to advance their Motion for Judgment on the Pleadings, Defendants have contended that "Plaintiff's Title VII and ADEA [c]laims for [u]nequal [t]erms and [c]onditions of [e]mployment [a]re [u]ntimely." (Docket Entry 67 at 14 (bold font omitted).) In furtherance of that contention, Defendants distilled from the Amended Complaint these allegations by Plaintiff of "unequal terms and conditions of employment" (id. (internal brackets and quotation marks omitted)): "she (a) was not given research support, including working in an 'under[-]resourced space' . . . [where] her 'belongings were taken from [her], and this theft was not investigated;' (b) 'was held to ambiguous standards in regard to her departmental role;' and (c) was investigated for research misconduct" (id. (internal brackets omitted) (quoting Docket Entry 5 at 45-46)). That distillation accurately quotes and summarizes the Amended Complaint's description of Plaintiff's three-part "[c]laim[]" (Docket Entry 5 at 45) for "[u]nequal terms and conditions of employment" (id.). (See id. at 45-46.) Moreover, in opposing the Motion for Judgment on the Pleadings, Plaintiff did not contest Defendants' construction of her claim(s) for unequal terms and conditions of employment. (See Docket Entry 69 at 1-10.)

For the first two, above-identified sub-claims (or categories) of unequal terms and conditions of employment, i.e., "the alleged lack of support and ambiguous standards" (Docket Entry 67 at 14

17

(internal quotation marks omitted)), Defendants requested that the Court rule any claim(s) "untimely because [Plaintiff] did not file an EEOC Charge of Discrimination within 180 days of either event" (id. (citing Section 2000e-5(e)(1) and Section 626(d))). To justify that request, Defendants argued:

> Plaintiff alleges that when she "joined Dr. Abou-Donia's lab in July of 2016, although every other lab was fully equipped, Dr. Abou-Donia was only provided a room that was used as a dumping area for surplus materials to be picked up." She also claims that she personally brought all supplies to the lab, did not receive a computer, and did not receive any information technology support. Plaintiff was aware that the lab was "under-resourced" no later than July 2016. Meanwhile, the "theft" of Plaintiff's personal belongings and [Defendant] Duke[ University's] failure to investigate allegedly occurred on August 23, 2019.

> Plaintiff's allegations that she was held to "ambiguous standards" all relate to actions taken by [Defendant] McDonnell while he served as Chair of PCB, a position he held until September 1, 2020. Plaintiff does not allege that [Defendant] McDonnell engaged in misconduct after September 1, 2020.

> Plaintiff filed her EEOC Charge August 19, 2021, which is well beyond 180 days after she was aware of the "lack of support" for her lab or the "ambiguous standards" of her position. As such, her Title VII and ADEA claims relating to those allegations are untimely.

(Id. at 14-15 (internal brackets, citations, and footnote omitted) (quoting and/or citing Docket Entry 5 at 7, 16, 35, 42).)

Plaintiff declined to engage with the above-quoted argument, other than to state that (A) "the continuing violation doctrine provides that[,] if the plaintiff experiences a series of separate acts that collectively constitute one unlawful employment practice,

the charge filing period (or limitations period) can be satisfied as long as at least one of the acts falls within the filing period" (Docket Entry 69 at 7 (emphasis added)), (B) "the Supreme Court [has] held that hostile work environment claims by their nature involve repeated conduct and are treated as one continuing violation" (id. (emphasis added) (referring to National R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 117 (2002))), and (C) the Amended Complaint's "allegations describe a continuous course of conduct by Defendants from 2016 through [Plaintiff's] termination in 2022" (id.; see also id. at 6 ("I experienced a continuing violation from 2016 to 2022: disparate treatment before and after my grant success, escalation to a hostile environment, and retaliation culminating in termination and reputational harm.")). Consistent with the first two of those statements, the United States Court of Appeals for the Fourth Circuit has observed that "[t]he continuing violation theory allows for consideration of incidents that occurred outside the time bar when those incidents are part of a single, ongoing pattern of discrimination, i.e., when the incidents make up part of a hostile work environment claim." Holland v. Washington Homes, Inc., 487 F.3d 208, 219 (4th Cir. 2007) (emphasis added) (citing Morgan, 536 U.S. at 118).

"However, this [continuing violation] exception to the [] limitations period is inapplicable for two reasons." Breck v. Maryland State Police, Civ. Action No. 16-2075, 2017 WL 2438767, at

19

*4 (D. Md. June 5, 2017) (unpublished). "First, [Plaintiff] d[id] not plead a hostile work environment claim in [the Amended] Complaint," id.; accord, e.g., Askew v. New York, No. 1:09CV553, 2013 WL 450165, at *7 (N.D.N.Y. Feb. 6, 2013) (unpublished); see also Adams v. U.S. Airways, Inc., Civ. Action No. 2:10-1658, 2011 WL 1326054, at *5 n.3 (D.S.C. Mar. 16, 2011) (unpublished) ("There can be no serious claim of a continuing violation because that doctrine is only applicable to a claim of hostile work environment, not pled in this case."), recommendation adopted, 2011 WL 1261451 (D.S.C. Apr. 5, 2011) (unpublished), aff'd, 451 F. App'x 293 (4th Cir. 2011). (See Docket Entry 5 at 45-46 (making no mention of "hostile work environment" in "[c]laim[]" for "[u]nequal terms and conditions of employment"); see also id. at 5 (failing to list "hostile work environment" in blank for description of "discriminatory conduct of which [Plaintiff] complain[ed]").)

Second, the inclusion in an opposition brief of "a mere conclusory allegation of a continuing violation is not sufficient to overcome the time and filing requirements of Title VII [and the ADEA]." Taylor v. City Nat'l Bank, 642 F. Supp. 989, 996 (S.D. W. Va. 1986), aff'd, No. 86-1715, 836 F.2d 547 (table), 1987 WL 30208 (4th Cir. Dec. 16, 1987) (unpublished); see also Holland v. Sam's Club, 487 F.3d 641, 644 (8th Cir. 2007) (rejecting "argu[ment that] the district court erred by not applying the continuing violations doctrine," where, "[i]n the district court proceedings, [the

20

plaintiff] never designated the specific facts supporting [its] application," as "the district court [wa]s not obligated to wade through and search the entire record for [such] specific facts" (internal quotation marks omitted)); Rodriguez Ruiz v. Microsoft Operations P.R., LLC, Civ. No. 18-1806, 2021 WL 933355, at *7 (D.P.R. Mar. 11, 2021) (unpublished) ("[The plaintiff's pleading] alleges that his supervisor . . . (1) transferred him . . . ., (2) evaluated him improperly, (3) refused to transfer him back, (4) refused to give him reasonable accommodations, (5) made disparaging comments . . ., (6) wrongfully reprimanded him, (7) imposed subjective goals . . ., and (8) terminated him . . . . [The p]laintiff's conclusory argument that all these acts are part of one continuous and repeated hostile work environment is insufficient." (internal quotation marks omitted)); Madera v. Metropolitan Life Ins. Co., No. 99 CIV. 4005, 2002 WL 1453827, at *4 (S.D.N.Y. July 3, 2002) (unpublished) ("[The p]laintiff's conclusory allegations that the [defendant's] acts amounted to a continuing violation are an insufficient substitute for an explanation of how these distinct acts are related.").

Regarding that second point, even if the Court construed the Amended Complaint's "[c]laim[]" (Docket Entry 5 at 45) for "[u]nequal terms and conditions of employment" (id.) as a hostile work environment claim, Plaintiff did not support her bald assertion that the Amended Complaint's "allegations describe a

21

continuous course of conduct by Defendants from 2016 through [her] termination in 2022" (Docket Entry 69 at 7 (emphasis added)), much less show the existence of a single, six-year, "'abusive working environment,'" Breck, 2017 WL 2438767, at *4 (quoting Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 67 (1986)). (See Docket Entry 69 at 6-8 (offering no citation (or even reference) to any particular allegations in Amended Complaint while invoking continuing violation doctrine).) Importantly, "[i]n order for the continuing violation doctrine to apply, [ P]laintiff has the burden to show that the hostile acts occurring outside the filing period were not isolated incidents and that at least one anchoring incident occurred during the filing period." Burrs v. Walter Kidde Portable Equip., Inc., No. 1:16CV1149, 2018 WL 1626120, at *3 (M.D.N.C. Mar. 30, 2018) (unpublished) (Eagles, J.) (emphasis added). Further, "in order for several events to qualify as part of the same hostile work environment, all of the incidents must be so significantly related to each other as to comprise one unitary and ongoing unlawful employment practice." Edwards v. Murphy-Brown, L.L.C., 760 F. Supp. 2d 607, 621 (E.D. Va. 2011) (emphasis added).

Hence, for the continuing violation exception to save Plaintiff from the time-bar defense to her first two sub-claims for unequal terms and conditions of employment, Plaintiff:

> must show that [] Defendant [Duke University] committed
> an act of sexual[, religious, racial, color-based,
> national origin-based, and/or age-based] harassment
> within [180] days of filing her Charge [of

22

> Discrimination] with the EEOC . . . . She can then
> support her claim with other earlier incidents if she can
> show that the timely act is part of the <u>same hostile work
> environment</u> as the earlier "untimely acts" . . . .

<u>Id.</u> at 622 (emphasis added).

As discussed above, the Amended Complaint's "[c]laim[]" (Docket Entry 5 at 45) for "[u]nequal terms and conditions of employment" (<u>id.</u>) focuses on three categories of alleged discriminatory treatment:

1) "[Plaintiff] was not given support throughout the research process . . . though other <u>lighter-skinned</u> researchers were given support in the research process, <u>such as Dr. [Elizabeth] Lapadula</u>" (<u>id.</u> (emphasis added)), in that (a) "[Plaintiff] had to work in an under-resourced space that [she] established with [her] belongings, [(b) her] belongings were taken from [her], and this theft was not investigated . . . [but,] instead, it was used against [her] even though she reported the loss first" (<u>id.</u>), and (c) "[she] lost many of [her] items when [she] was not allowed to return to work" (<u>id.</u>);

2) "[Plaintiff] was held to ambiguous standards in regard to [her] departmental role" (<u>id.</u> at 46), in that (a) "[Plaintiff] was given more responsibilities than a research scientist" (<u>id.</u>), yet was "accused of acting like a faculty" (<u>id.</u>), (b) Plaintiff "was held to compliance standards that were disproportionate to [her] role while being underpaid despite [her] grant, as demonstrated by [Defendant] Dowell-Newton's attempt to have [Plaintiff] come at specific times, when Dr. Lapadula did not have to do that" (<u>id.</u>;

23

see also id. (alleging that "Dr. Abou-[D]onia and [Defendant] Dowell-Newton expected [Plaintiff] to work until late night" and made "erroneous statements that [she] was a technician," as well as that "[Plaintiff] was asked to account for data that Dr. Abou-[D]onia had taken home with him")), and (c) "[Defendant] McDonnell was using his executive powers to appoint Dr. [Don] Fox and send out [Defendant] Dowel-Newton [sic] and Traci McNeil to constantly disturb [Plaintiff] . . . and scrutinize [her]" (id.); and

3) during the research misconduct investigation, "[Plaintiff] was not told there would be an attorney in the room, [her] data was being misinterpreted, [she] was deemed as disrespectful when [she] would correct incorrect statements, and . . . [she] was never communicated with in a timely and transparent fashion" (id.; see also id. ("Multiple times after the no-contact order was instituted, [Plaintiff] was ordered to only communicate with Dr. Abou-[D]onia . . . . [T]his no-contact order . . . obstructed any attempt on [Plaintiff's] part to clear [her] name of the allegations against [her] because [she] was unable to contact Dr. Abou-[D]onia to verify what data he had.")).

The allegations in the first category (quoted above) attribute the poor research support Plaintiff purportedly received while working in Dr. Abou-Donia's lab – which she "joined . . . in July of 2016" (id. at 7) – to discrimination based on race/color and single-out Dr. Lapadula as the comparator validating that

24

attribution.  (See id. at 45.)  But, per the Amended Complaint, Dr. Lapadula worked in the same allegedly "under-resourced space" (id.) as Plaintiff (see id. at 20 (alleging that, in "October of 2019[,] Dr. Abou-[D]onia had hired a new research scientist, Dr. [] Lapadula")), thus undermining reliance on Dr. Lapadula as a comparator to establish that researchers lighter-skinned (or of another race) than Plaintiff received better research support.  The allegation that Plaintiff up-fitted Dr. Abou-Donia's lab with her own "belongings" (id. at 45) similarly cannot sustain even a narrow claim of racial or color-based discrimination by Defendant Duke University in 2016 (let alone provide a plausible foundation for a broader claim that, from 2016 to 2022, Defendant Duke University continuously subjected Plaintiff to a work environment imbued with racial and color-based animus), given the Amended Complaint's admission that Plaintiff acquired materials she imported into Dr. Abou-Donia's lab through her prior job at Defendant Duke University (see id. at 7 ("[S]ince [Dr. Abou-Donia's] lab did not have anything, I brought all the supplies I had acquired from my first position at [Defendant] Duke University, where I was a research scientist . . . in the Department of Cardiology . . . .")).[8]

---

8 In other words, if Defendant Duke University discriminated against research scientists of Plaintiff's race/color by denying them proper research materials, why did Defendant Duke University supply Plaintiff with such materials in her prior post?  Moreover, the allegedly substandard conditions in Dr. Abou-Donia's lab predated Plaintiff's arrival (see Docket Entry 5 at 7 ("When I
(continued...)

The remaining allegations in the sub-claim for inadequate research support, i.e., loss of Plaintiff's belongings and failure to investigate (see id. at 45), date back to August 2019, when "[Plaintiff] found a trash bag on [her] chair" (id. at 16) and discovered that "[m]any files and items were missing from [her] desk, including an independent-study student's notebook and file folder" (id.). Per the Amended Complaint, "[Plaintiff] sent an email to [Defendant] Dowell-Newton" (id.), who "sent . . . the Coordinator . . . of Building Support Services" (id.), which resulted in "blame [being] directed at the custodian" (id.); however, "when [Plaintiff] checked with the custodian, he had not been in the room, and he told [her] that was not his trash bag" (id.). Plaintiff thereafter allegedly "reported [her] concerns repeatedly, [but] no further action was taken . . ., despite the disappearance of research files, and this set the stage for unfounded allegations against [Plaintiff] of data integrity violations as the days proceeded." (Id.) A similar, alleged

---

8(...continued)
joined Dr. Abou-[D]onia's lab in July of 2016, although every other lab was fully equipped, Dr. Abou-[D]onia was only provided a room that was used as a dumping area for surplus materials to be picked up.")) and therefore Plaintiff's race/color did not cause Defendant Duke University to improperly equip that lab. Nor (according to the allegations of the Amended Complaint) did Defendant Duke University afford Dr. Abou-Donia's lab different information technology ("IT") support than other labs in the same department. (See id. ("[E]ach lab was given the option to pay NetFriends for IT needs, and the labs would submit their invoices to [the department] for payment. . . . Many labs chose not to use [NetFriends's] services, including Dr. Abou-[D]onia's lab.").)

incident occurred in the fall of 2020. (See id. at 35 ("On September 1, 2020 I went back to work. . . . I noticed that many of my files and personal accessories were missing and still have not been returned, nor has the disappearance of my files and belongings been investigated or accounted for . . ., even though I reported it . . . .").) Plaintiff evidently viewed those events as discrimination based on her <u>race and/or color</u> because: "On Mar[ch] 17, 2020, they reported a theft from Dr. Kuhn's lab. [Plaintiff] ha[d] several times reported the theft of files from [her] desk in Dr. Abou-[D]onia's lab, but emails were never sent out. Dr. Kuhn is a <u>White</u> female." (Id. at 32 (emphasis added).)

Plaintiff's second category of "[u]nequal terms and conditions of employment" (id. at 45), i.e., that "[she] was held to ambiguous standards in regard to [her] departmental role" (id. at 46), begins with the allegation that "[she] was given more responsibilities than a research scientist" (id.), but was "accused of acting like a faculty by [Defendant] McDonnell" (id.). The Amended Complaint shows that Plaintiff knew of those responsibilities, as well as that accusation, when "[she] met with [Defendant] McDonnell on July 24, 2019" (id. at 14). (See id. at 15 ("Throughout the meeting, [Defendant] McDonnell would remark that I was acting like a faculty. However, the fact that I was given additional responsibilities beyond my role as a scientist . . . without the requisite increase in position or pay[] was never addressed.").)

Furthermore, the Amended Complaint does not elucidate how a reasonable fact-finder could infer that such treatment stemmed from racial, color-based, sexual, religious, national origin-based, and/or age-based bias. (See id. at 14-15.) As Defendants have argued, "[t]he closest [the Amended Complaint] comes to alleging [Defendant] McDonnell acted with discriminatory animus is [the] claim that[,] 'in his lab, at that time [July 2018], all of the scientists (who were lighter-skinned than [Plaintiff]) who got a grant were immediately promoted to research faculty positions.'" (Docket Entry 67 at 16 (emphasis added) (sixth set of brackets in original) (quoting Docket Entry 5 at 10).)

The next allegations in the "ambiguous standards" category concern events from late 2019 to early 2020 involving Defendant McDonnell (who, as just noted, allegedly secured promotions for lighter-skinned scientists but not Plaintiff) and Dr. Lapadula (who allegedly received better treatment than Plaintiff based on their color and/or religion). (Compare Docket Entry 5 at 46 (alleging that (A) Plaintiff "was held to compliance standards that were disproportionate to [her] role while being underpaid despite her grant, as demonstrated by . . . attempt[s] to have [her] come at specific times, when Dr. Lapadula did not have to," (B) "Dr. Abou-[D]onia and [Defendant] Dowell-Newton expected [Plaintiff] to work until late night . . . [and made] erroneous statements that [she] was a technician," and (C) "[Plaintiff] was asked to account for

28

data that Dr. Abou-[D]onia had taken home"), <u>with</u> <u>id.</u> at 15-16 (detailing incident in August 2019 when Dr. Abou-Donia required Plaintiff to work overnight), 17 ("Dr. Abou-[D]onia sent a memo on September 14, 2019, . . . per order from [Defendant] McDonnell, containing stipulations that [Plaintiff] must be there by 9 AM . . . ."), 20 (discussing Dr. Lapadula's hiring in October 2019, alleging that "[Plaintiff] was discriminated against compared to Dr. Lapadula because[,] although she had not been in a lab for 25 years, she was hired for the same position . . . but . . . not held to the same attendance and compliance standards [though] . . . paid more," and asserting that "only difference was [their] skin color and [] religion"), 21 (describing incident in November 2019 when Defendant Dowell-Newton confronted Plaintiff about files, "Dr. Abou-[D]onia admitted . . . he took the files home," and "[Defendant] Dowell-Newton did not say anything"), 25 (alleging that in January 2020 "Dr. Abou-Donia would also yell at [Plaintiff] . . . [that she] was just a technician" and "administration who witnessed this behavior . . ., including [Defendants] McDonnell[ and] Dowell-Newton . . . did not act to protect [Plaintiff]"), <u>and</u> 29 (alleging that in February 2020 Defendant Dowell-Newton "indicated that [Plaintiff was] just a technician").)[9]

---

[9] As pertains to Defendant Dowell-Newton, the Amended Complaint makes only one (largely conclusory) allegation from which one could infer racial or color-based animus: "[Department] administration, among whom [Defendant] Dowell-Newton was in charge,
(continued...)

29

Lastly – in relation to Plaintiff's discriminatory-treatment sub-claim that Defendant Duke University "held [her] to ambiguous standards in regard to her departmental role" (id. at 46) – the Amended Complaint alleges that "[Defendant] McDonnell was using his executive powers to appoint Dr. Fox and send out [Defendant] Dowel-Newton [sic] and [Ms.] McNeil to constantly disturb [Plaintiff] during working hours, and scrutinize [her]" (id.). That conduct by Defendant Dowell-Newton and Ms. McNeil (at the supposed behest of Defendant McDonnell) allegedly occurred in October 2019 (see id. at 19 (alleging that in October 2019 "[Plaintiff] was periodically monitored in the lab by [Defendant] Dowell-Newton and Ms. McNeil"), 20 (alleging that in October 2019 "[Plaintiff] was going through tremendous unpredictable harassment and interruptions from

―――――――――――――

9(...continued)
failed to keep appropriate records of [Plaintiff's] submitted grant, although they did this for others in [the department] who received grants, all of whom were lighter skinned than [Plaintiff]." (Docket Entry 5 at 11 (emphasis added); see also id. at 10-11 (alleging that grant-related, record-keeping failure came to light in 2018).) The Amended Complaint also makes this allegation of age-based bias against Defendant Dowell-Newton:

On July 19, 2019, I was asked to meet with [Defendant] Dowell-Newton . . . . [A]fter I had returned inside the building from the summer heat, I ran upstairs to the office of [Defendant] Dowell-Newton to meet her, when [she] saw me, she asked if I was premenopausal and then asked me my age. This was the first discriminatory statement I had heard directly from an administrator, and it occurred . . . [while Defendant] Dowell-Newton was representing [the department] as the Business Manager.

(Id. at 12 (emphasis added).)

[Defendants] Dowell-Newton and [] McDonnell, in spite of explaining and providing proof that the data that was previously obtained were periodically communicated to Dr. Abou-[D]onia by email")), while Dr. Fox's interactions with Plaintiff occurred in February 2020 (see id. at 26-27 (discussing Dr. Fox's appointment, his e-mail to Plaintiff, her response, and his reply); see also id. at 30 ("On Feb[ruary] 25, 2020, I sent [Defendant] Dowell-Newton . . . my performance report that I sent Dr. Fox.")). The Amended Complaint does not describe any overt racial, color-based, sexual, religious, national origin-based, and/or age-based aspect of those events. (See id. at 19-20, 26-27.)

Based on the foregoing analysis, the Amended Complaint's first two (of three) sub-claims for "[u]nequal terms and conditions of employment" (id. at 45), when viewed in the light most favorable to Plaintiff, show (at most) these (possibly) discriminatory events:

1) in August 2019 and September 2020, property of Plaintiff went missing from the lab where she worked and Defendant Duke University failed to adequately investigate her reports about those thefts, despite taking the more aggressive step of sending out e-mails about a theft reported by a white employee in a different lab in March 2020 (see id. at 16, 32, 35, 45);

2) in July 2019, Defendant McDonnell did not reward Plaintiff's performance of duties beyond the norm for her position as a research scientist (such as by securing her a promotion, as he

31

did for lighter-skinned scientists in his lab) and instead accused her of acting like a faculty member (see id. at 10, 14, 15, 46);

3) between August 2019 and February 2020, Dr. Abou-Donia, Defendant McDonnell, and/or Defendant Dowell-Newton (who (i) failed to keep proper records of Plaintiff's DoD grant in 2018, unlike with lighter-skinned grant recipients, and (ii) expressed age-based bias in July 2019) required Plaintiff to work late and to report at specific times, (a) while not imposing such requirements on (the lighter-skinned and Christian) Dr. Lapadula, who also received better pay with less experience, and (b) while blaming Plaintiff for missing files Dr. Abou-Donia took home and errantly calling her a technician (see id. at 11, 12, 15-17, 20, 21, 25, 29, 46);

4) in October 2019, Defendant McDonnell caused Defendant Dowell-Newton and Ms. McNeil to interrupt Plaintiff's work (see id. at 19-20, 46); and

5) in February 2020, Dr. Fox (presumably at Defendant McDonnell's direction) sought information (via e-mail) from Plaintiff about her research activities (see id. at 26-27, 46).

That hodgepodge of facially unconnected incidents interspersed over a seven-month period, which ended a year-and-a-half before Plaintiff filed her Charge of Discrimination on August 19, 2021 (see id. at 41), does not qualify as "so significantly related to each other," Edwards, 760 F. Supp. 2d at 621, let alone to other allegedly discriminatory acts that took place during the 180-day,

32

limitations period (or thereafter), such as Dr. Swamy's suspension of Plaintiff's DoD grant on March 10, 2021 (see Docket Entry 5 at 39), Dr. Duckett's notice of September 15, 2021 that Plaintiff's employment would end in November 2021 (see id. at 41), and Defendant Klotman's research-misconduct finding on October 31, 2022 (see id. at 45), "as to comprise one unitary and ongoing unlawful employment practice," Edwards, 760 F. Supp. 2d at 621 (emphasis added). Put another way, Plaintiff cannot "support [any discrimination] claim with [these] earlier incidents [because the Amended Complaint does not] show that [any] timely act is part of the same hostile work environment as the[se] earlier 'untimely' acts and is thus capable of 'anchoring' them to [any timely] claim." Id. at 622 (emphasis added); see also Burrs, 2018 WL 1626120, at *3 ("In order for the continuing violation doctrine to apply, the plaintiff has the burden to show that the hostile acts occurring outside the filing period were not isolated incidents and that at least one anchoring incident occurred during the filing period. Here, [the plaintiff] has not met that burden. The two [timely incidents] came months after . . . the last [untimely] event [the plaintiff] contends was part of the hostile work environment. Nor has [the plaintiff] shown that the scattered incidents occurring over an eight-month period [beyond the statute of limitations] were anything more than isolated occurrences." (internal citation omitted)).

33

"[T]he Fourth Circuit has made clear that invoking 'continuing violation' is not 'a talismanic or shibboleth term automatically relieving a [plaintiff] of any obligation to comply with the statutory time requirement for the filing of a charge with the EEOC under Title VII [and/or the ADEA].'" McCain v. Waste Mgmt., Inc., 115 F. Supp. 2d 568, 573 (D. Md. 2000) (quoting Hill v. AT&T Techs., Inc., 731 F.2d 175, 179-80 (4th Cir. 1984)). Here, "[Plaintiff] has offered only a passing, conclusory argument in support of applying the continuing violations doctrine, and the [Amended C]omplaint's factual allegations do not plausibly suggest a continuation of a violation into the [limitations period]." Shepherd v. Wilson, Civ. Action No. 15-373, 2015 WL 9685562, at *5 n.8 (S.D. Ala. Dec. 22, 2015) (unpublished) (internal quotation marks omitted), recommendation adopted, 2016 WL 110509 (S.D. Ala. Jan. 8, 2016) (unpublished), aff'd, 663 F. App'x 813 (11th Cir. 2016). Under these circumstances, Plaintiff's invocation of the continuing violation "theory, if accepted, would, as [the Fourth Circuit] ha[s] said . . ., destroy the policies of finality and repose inherent in the filing requirement[s] of Title VII [and the ADEA]." Hill, 731 F.2d at 180; see also Mohasco Corp. v. Silver, 447 U.S. 807, 825 (1980) ("By choosing what are obviously quite short deadlines, Congress clearly intended to encourage the prompt processing of all charges of employment discrimination."). The Court therefore should grant judgment on the pleadings in favor of

34

Defendant Duke University on Plaintiff's first two sub-claims of "[u]nequal terms and conditions of employment" (Docket Entry 5 at 45), due to their untimeliness under Title VII and the ADEA.[10]

That determination leaves only Plaintiff's third sub-claim for "[u]nequal terms and conditions of employment" (id.):

> Even when [Plaintiff] cooperated with the [research misconduct] investigation[,] Dr[]. Swamy, [Defendant] McDonnell[, and Dr.] Duckett levied against [her], [she] was not told there would be an attorney in the room, [her] data was being misinterpreted, [she] was deemed as disrespectful when [she] would correct incorrect statements, and [she] was to submit information according to their deadlines, but [she] was never communicated with in a timely and transparent fashion. Multiple times

---

10 As shown in prior quotations, the Amended Complaint's "[c]laim[]" (Docket Entry 5 at 45) for "[u]nequal terms and conditions of employment" (id.) does not make reference to Dr. Abou-Donia's alleged sexual harassment/assault of Plaintiff in late 2019 and early 2020 (see id. at 45-46; see also Docket Entry 41 at 59-60 (summarizing Plaintiff's allegations about such matters by citing and quoting Docket Entry 5 at 19-25, 28, 30, 32)). Regardless, those events fall well outside the applicable limitations period, which (as established above) reaches back 180 days before Plaintiff filed her Charge of Discrimination on August 19, 2021. (See Docket Entry 41 at 61 ("[T]he remainder of the Amended Complaint's chronology alleges no sexual harassment/assault after March 19, 2020. Moreover, the Amended Complaint reflects that events unfolded in a way that insulated Plaintiff from further sexual harassment/assault by Dr. Abou-Donia." (emphasis and internal citation omitted) (citing Docket Entry 5 at 32-45)), 62 ("[T]his distinct adverse employment action, i.e., sexual harassment/assault by Dr. Abou-Donia . . ., ended on March 19, 2020, and thus [any] corresponding Title VII sex discrimination claim accrued no later than that date." (emphasis and internal citations omitted)).) And – because Dr. Abou-Donia's alleged sexual harassment/assault of Plaintiff differs so markedly, including in terms of the nature, perpetrator, and timing of the conduct, from the alleged acts of discrimination that occurred within 180 days of her filing of her Charge of Discrimination (or later) – the continuing violation doctrine would not apply. See Burrs, 2018 WL 1626120, at *3; Edwards, 760 F. Supp. 2d at 621.

35

after the no-contact order was instituted, [Plaintiff] was ordered to only communicate with Dr. Abou-[D]onia, even though [she] was not allowed to communicate with him, nor did he with [her]. Further, this no-contact order instituted by [Defendant] Duke University further obstructed any attempt on [Plaintiff's] part to clear [her] name of the allegations against [her] because [she] was unable to contact Dr. Abou-[D]onia to verify what data he had.

(Id. at 46.) For purposes of the Motion for Judgment on the Pleadings, Defendants have not argued that said sub-claim runs afoul of the statute of limitations; rather, they made this argument: "[the Amended Complaint] does not plausibly allege that the investigation was the result of intentional discrimination in violation of Title VII or the ADEA." (Docket Entry 67 at 16.)

To bolster that position, Defendants quoted the Court's prior decision that the Amended Complaint lacks any "'factual allegations remotely indicative of <u>racial</u> discrimination by [Drs.] Swamy or Duckett[.]'" (Id. (emphasis added) (quoting Docket Entry 46 at 14).) Nor do the Amended Complaint's factual allegations about Drs. Swamy and Duckett reveal that they took any action due to hostility towards persons of Plaintiff's sex, color, national origin, religion, and/or age. (See Docket Entry 5 at 32 (alleging that "Dr. Abou-[Do]nia told [Plaintiff] that if [she] report[ed his sexual harassment] '[Defendant] McDonnell[] will use . . . Dr. Swamy[] to destroy [Plaintiff's] scientific career," because "faculties stick together and help each other"), 34 (describing investigation that Drs. Swamy and Duckett "supported" as

36

"unjustified" without stating anything about their motives), 35 (alleging that Dr. Duckett "inquir[ed] about the whereabouts of experiments notebooks" but offering no basis to conclude that Plaintiff's traits motivated his action), 38 (referring to "data integrity investigation" that "Drs. Duckett and Swamy had started" as "based upon [] spurious allegations," while failing to allege facts to show demographically-based bias by Drs. Swamy or Duckett), 39 (discussing (A) meeting with Dr. Swamy where (i) Plaintiff "was asked to either retract three of [her] papers and relinquish [her] grant [or] otherwise[ Defendant] Duke [University] would [do so]," and (ii) Plaintiff "was wrongly accused as being disrespectful," as well as (B) Dr. Swamy's subsequent suspension of Plaintiff's grant, all without alleging facts showing intent by Dr. Swamy to discriminate based on Plaintiff's characteristics and instead describing such activity as "retaliation"), 40 (asserting that "Drs. Swamy . . . and Duckett refused to provide a detailed report of the investigation" and "forced [Plaintiff] to keep everything confidential" but making no allegations about their motives), 41 (detailing facts about Dr. Swamy's termination of Plaintiff's grant and Dr. Duckett's notice of her firing without addressing their motives), 42 ("The retaliatory actions [in the research misconduct investigation] were initiated by Drs. Duckett and Swamy after [Defendant] McDonnell stepped down from chairmanship and Dr. Abou-[D]onia resigned.").)

37

In fact, the foregoing quotations show that the factual allegations in the Amended Complaint ascribe retaliation (not racial, color-based, national origin-based, sex-based, religious, or age-based discrimination), as the motive for Drs. Swamy's and Duckett's alleged mistreatment of Plaintiff during the research misconduct investigation. Likewise, the Amended Complaint's factual allegations about Defendant McDonnell's role in the research misconduct investigation label his motivation retaliatory. (See, e.g., id. at 43 (indicating that Plaintiff lodged internal complaint "that the processes that [Defendant] McDonnell initiated against [her]" constituted "retaliation"), 44 (detailing Plaintiff's contention during research misconduct investigation that Defendant McDonnell "initiated the previous investigation and this investigation" while "motivated to retaliate against [her]," in particular "because [she] requested a non-tenured faculty position and [he] construed that [she] was reporting about him to [Defendant Duke University's] officials"), 45 (asserting that Defendant McDonnell "utiliz[ed] his institutional authority to protect Dr. Abou-[D]onia and subject [Plaintiff] to . . . retaliation"); see also id. at 36 (alleging that, "[i]mmediately []after [Defendant Duke University's] internal investigation confirmed Plaintiff suffered sexual harassment,] retaliation

38

intensified" and she "was subjected to various retaliatory incidents as part of the ongoing unjustified investigation").)[11]

Simply put, the facts Plaintiff has pleaded in the Amended Complaint "allege[] retaliation by [Defendant Duke University] for her complaints [of discrimination] and her similar protected activities – which is not discrimination on the basis of her sex[, race, color, national origin, religion, or age]." Litman v. George Mason Univ., 156 F. Supp. 2d 579, 587 (E.D. Va. 2001) (emphasis and internal quotation marks omitted); see also Heuer v. Weil-McLain, 203 F.3d 1021, 1022-23 (7th Cir. 2000) ("[T]he conduct [at issue] had nothing directly or immediately to do with [the plaintiff's] being a woman, but rather with her having filed a charge of discrimination . . . . The charge arose out of [the] earlier creation of a hostile working environment motivated by [her] sex, but that is too remote a connection, for otherwise every claim of retaliation for filing charges of discrimination would be a claim for discrimination, even though Title VII makes discrimination and

---

11 Plaintiff's brief opposing the Motion for Judgment on the Pleadings does not argue otherwise; to the contrary, it describes her claim(s) about the research misconduct investigation as retaliation-based. (See, e.g., Docket Entry 69 at 2 (stating that Plaintiff brought claim for "retaliatory misconduct investigation, leading to [her] wrongful termination, that followed [her] harassment complaint"), 5 ("Instead of addressing my [sexual harassment] complaint, [Defendant] Duke [University] began scrutinizing me. . . . [J]ust seven days [after I made that complaint], my laptop was confiscated and I was placed under investigation for research misconduct. . . . [Dr. Abou-Donia] had previously warned me: 'If you report harassment, [Defendant] McDonnell will destroy your scientific career.'").)

39

retaliation separate wrongs."). Thus, however styled, Plaintiff's claim(s) of mistreatment during the research misconduct investigation – "which at their core allege that [s]he was mistreated because [she] had exercised rights protected by [anti-discrimination laws] – <u>sound in retaliation, not discrimination</u>. Accordingly, Defendants' [M]otion for [ J]udgment [on the Pleadings] on [Plaintiff's] discrimination claims based on alleged adverse employment actions [during the research misconduct investigation should be] granted." <u>Wu v. Metropolitan Transp. Auth.</u>, No. 1:18CV6543, 2020 WL 615626, at *10 (S.D.N.Y. Feb. 7, 2020) (unpublished) (emphasis added) (internal quotation marks and citation omitted); <u>see also</u> <u>Solorzano v. University of Miami</u>, No. 12-22852-Civ., 2014 WL 12498004, at *3 n.4 (S.D. Fla. Feb. 25, 2014) (unpublished) ("[The p]laintiff alleges that she was subjected to an adverse employment action because of her complaint [about race discrimination], not because of her race, thereby stating a claim for retaliation, not discrimination.").[12]

---

    12 The fact that Plaintiff has pleaded an apparently timely retaliation claim associated with the research misconduct investigation does not revive her untimely claim(s) about the inadequate investigation into the loss of her files (discussed previously), notwithstanding the Amended Complaint's allegations that said loss later "was used against [her]" (Docket Entry 5 at 45) and "set the stage for unfounded allegations against [her] of data integrity violations" (<u>id.</u> at 16). <u>See</u> <u>A Soc'y Without a Name v. Virginia</u>, 655 F.3d 342, 348 (4th Cir. 2011) ("[C]ontinual unlawful acts are distinguishable from the continuing ill effects of an original violation because <u>the latter do not constitute a continuing violation</u>." (emphasis added)).

*Discrimination – Termination of Employment*

Moving on to Plaintiff's Title VII and ADEA discrimination claims for "[t]ermination of [her] employment" (Docket Entry 5 at 46), Defendants have sought judgment on the pleadings on the ground that those "wrongful termination claims are not supported by sufficient factual allegations to render them plausible" (Docket Entry 67 at 18). On that front, Defendants contended as follows:

> [The Amended Complaint] does not allege that [Plaintiff's] race played any role in the termination of her employment. [The Amended Complaint] specifically identifies [Dr.] Swamy as the person who "terminated [Plaintiff's] grant . . . thus terminating [her] employment." But, as the Court has already recognized, "Plaintiff has tendered no factual allegations remotely indicative of racial discrimination by [Dr.] Swamy." Likewise, [the Amended Complaint] does not allege any facts indicating that [Dr.] Swamy terminated Plaintiff's grant based on her color, sex, religion, national origin, or age [].

(Id. (internal brackets and citations omitted) (ellipsis in original) (quoting Docket Entry 5 at 47 and Docket Entry 46 at 14, respectively); see also id. at 19 (arguing that Amended Complaint "makes no factual allegations that plausibly indicate that [Dr.] Swamy terminated [Plaintiff's] grant and her employment because of [her] race, color, sex, religion, national origin, or age").)

Plaintiff's brief opposing the Motion for Judgment on the Pleadings does not meaningfully challenge these contentions. (See Docket Entry 69 at 1-10.) Nor could it, as the Amended Complaint alleges (A) that, "[o]n March 10, 2021, Dr. Swamy went ahead and suspended [Plaintiff's] grant" (Docket Entry 5 at 39), (B) that, in

41

August 2021, Plaintiff received notice that "Dr. Swamy notified DoD of the[] research misconduct inquiry finding of a need for an investigation to start and requested unilateral termination of [Plaintiff's] grant" (id. at 41; see also id. at 43 ("Dr. Swamy took it upon herself to inform DoD to relinquish [Plaintiff's] grant . . . .")), and (C) "DoD offered an opportunity to do a no-cost extension of [Plaintiff's] grant, but[,] when [Plaintiff] informed Dr. Swamy, she terminated [Plaintiff's] grant instead, thus terminating [her] employment" (id. at 47), without (as documented in the preceding subsection) (D) offering any factual matter showing that Dr. Swamy – and/or Dr. Duckett, to the extent the Amended Complaint alleges that he played a part in Plaintiff's firing (see id. at 41) – ever exhibited bias based on a protected trait, but instead (E) asserting that they acted with retaliatory intent (see, e.g., id. at 42 (alleging that "retaliatory actions were initiated by Drs. Duckett and Swamy after Dr. McDonnell stepped down from chairmanship and Dr. Abou-[D]onia resigned"), 43 ("[Defendant Duke University] failed to prevent the retaliation I experienced through use of institutional hierarchy perpetrated by Drs. . . . Swamy[ and] Duckett . . . .")).[13]

---

[13] In addition, just as with Plaintiff's claim(s) for mistreatment during the research misconduct investigation (addressed in the preceding subsection), her opposition brief depicts her firing as a product of retaliation (not discrimination based on her race, color, sex, national origin, religion, or age). (See Docket Entry 69 at 2 (describing "retaliatory misconduct
<span style="text-align:right; display:block">(continued...)</span>

As a result, the Court should enter judgment on the pleadings in favor of Defendant Duke University on Plaintiff's Title VII and ADEA claims for discriminatory termination of her employment.

*Fraud*

The Amended Complaint identifies Title VII and the ADEA as the two, lone, legal bases for Plaintiff's claims. (See id. at 4 (checking boxes for Title VII and ADEA but not boxes for "Americans with Disabilities Act of 1990," "Other federal law," "Relevant state law," and "Relevant city or county law").) Regarding "[t]he discriminatory conduct of which [Plaintiff] complain[ed]" (id. at 5), the Amended Complaint lists – in addition to "[t]ermination of [her] employment" (id.), "[f]ailure to promote [her]" (id.), "[u]nequal terms and conditions of [her] employment" (id.), and "[r]etaliation" (id.) – "[o]ther acts" (id.), "specif[ied]" (id. (italics omitted)) as "[f]raud" (id.). Elsewhere, under the heading "Claims" (id. at 45) and the sub-heading "Fraud" (id. at 47), the Amended Complaint sets out "[t]he following [] illustrative examples of behavior supporting this claim" (id.):

> 1. [Defendant] Dowell-Newton made representations to [Plaintiff] that [she] would be given a new appointment letter after [she] received [her] grant

---

13(...continued) investigation," which "followed [Plaintiff's] harassment complaint," as "leading to [her] wrongful termination"), 5 ("On September 15, 2021, I was told my employment would end in November 2021, as my salary came from grant funds now under investigation."), 6 ("I experienced . . . retaliation culminating in termination and reputational harm.").)

43

and Dr. Abou-[D]onia's grant period ended, but [she] was never given this appointment letter. Further, even the previous appointment letter did not contain all the duties [she] was expected to do in Dr. Abou-[D]onia's lab.

2.    [Defendant] McDonnell made representations to [Plaintiff] that, if [she] did not hear from him within a month regarding promotion to a non-tenured faculty position, that [she] was welcome to contact [Defendant] Klotman.  Right after [Plaintiff] contacted [Defendant] Klotman, the incidents of harassment began against [Plaintiff].

3.    [Defendant] McDonnell also said that [Plaintiff] could take [her] grant and move to another department, but he stopped two opportunities for [her] to do that with Dr. Lee and Dr. Sanders, thus jeopardizing [Plaintiff's] ability to escape from the harassment [she] was experiencing in [Defendant McDonnell's department], as well as [her] future employment and promotion opportunities.

(Id. at 47-48.)

Defendants have requested judgment on the pleadings on the foregoing, Title VII and ADEA claim(s), because "[a]ll [three incidents] are untimely." (Docket Entry 67 at 17.)  Along those lines, Defendants documented (A) that, as to the first incident, the Amended Complaint placed the date on which the "grant funds were released to [Defendant] Duke [University as] August 1, 2018" (id. (citing Docket Entry 5 at 12)), (B) that, per the Amended Complaint, the alleged representation by Defendant McDonnell referenced in the second incident, happened "on May 29, 2018" (id. (citing Docket Entry 5 at 10); see also Docket Entry 5 at 13 (alleging that Plaintiff e-mailed Defendant Klotman about promotion in April 2019)), and (C) that the Amended Complaint dates Defendant

44

McDonnell's conduct at issue in the third incident to "March and April of 2020" (Docket Entry 67 at 17 (citing Docket Entry 5 at 32-33)). Defendants then reasoned that "[a]ny Title VII or ADEA claim relating to these incidents is untimely because [P]laintiff did not file her EEOC Charge [of Discrimination] until long after her 180-day deadline." (Id. at 18 (citing Section 2000e-5(e)(1) and Section 626(d)); see also Docket Entry 5 at 41 ("On August 19, 2021, I filed my complaints to the EEOC.").)

Plaintiff's brief opposing the Motion for Judgment on the Pleadings lists "fraud" (Docket Entry 69 at 2) among her "claims" (id.) in the section titled "Factual Background" (id. (large, all-caps font and underscoring omitted)), but makes no other mention of that claim (see id. at 1-10). To the extent Plaintiff has argued that the continuing violation doctrine renders timely all her Title VII and ADEA claims from 2016 to 2022 (see id. at 7), she has failed to show that any timely act of discrimination or retaliation alleged in the Amended Complaint and the three incidents of fraud set out in the Amended Complaint share similarities that make them "so significantly related to each other as to comprise one unitary and ongoing unlawful employment practice," Edwards, 760 F. Supp. 2d at 621; see also Burrs, 2018 WL 1626120, at *3 (noting that the plaintiff bears burden of establishing applicability of continuing violation doctrine). (See Docket Entry 69 at 1-10.)

45

For these reasons, the Court should grant Defendant Duke University judgment as a matter of law on Plaintiff's Title VII and ADEA claim(s) for fraud.

Breach of Implied Covenant of Good Faith and Fair Dealing

Via the Amendment Order, the Court (per the undersigned Magistrate Judge) "deemed [the Amended Complaint] amended to assert . . . a state-law claim for breach of the implied covenant of good faith and fair dealing against Defendant Duke University in connection with the research misconduct investigation against Plaintiff . . . ." (Docket Entry 46 at 19-20; see also Docket Entry 9 at 3-4 (seeking leave "to add an additional claim of breach of implied covenant of good faith and fair dealing, which arises from the same set of facts as the claims raised [in the Amended Complaint]" and contending, inter alia, that Defendant Duke University "violat[ed its] own policies in regards to scientific misconduct investigations and acting in good faith").)[14]     In

_____

    14 Under North Carolina law, "[t]o state a valid claim for breach of the implied covenant of good faith and fair dealing, a plaintiff must plead that the [defendant] took action 'which injured the right of the [plaintiff] to receive the benefits of the [parties'] agreement,' thus 'depriving the [plaintiff] of the fruits of the bargain.'" Conleys Creek Ltd. P'ship v. Smoky Mountain Country Club Prop. Owners Ass'n, 255 N.C. App. 236, 253, 805 S.E.2d 147, 158 (2017) (internal brackets omitted) (quoting Bicycle Transit Auth., Inc. v. Bell, 314 N.C. 219, 228-29, 333 S.E.2d 299, 305 (1985)); see also Tillis v. Calvine Cotton Mills, Inc., 251 N.C. 359, 363, 111 S.E.2d 606, 610 (1959) ("Parties to an executory contract for the performance of some act or services in the future impliedly promise not to do anything to the prejudice of the other inconsistent with their contractual relations . . . .").

reaching that result, the Amendment Order rejected Defendant Duke University's argument that "'Plaintiff failed to identify an underlying contract that would serve as the basis for this claim" (Docket Entry 46 at 17-18 (internal brackets omitted) (quoting Docket Entry 19 at 10)), by pointing to Plaintiff's submission of "e-mails showing that [she] executed a Science Culture and Accountability Plan with Defendant Duke University, which imposed personal and institutional obligations and which Defendant McDonnell thereafter invoked on behalf of Defendant Duke University to mandate certain acts by Plaintiff" (id. at 18 (internal brackets and quotation marks omitted) (citing Docket Entry 28-2 at 1-4)). Defendant Duke University could have objected to that aspect of the Amendment Order, see Fed. R. Civ. P. 72(a) ("A party may serve and file objections to [a magistrate judge's non-dispositive, pretrial] order within 14 days after being served with a copy."), but did not do so (see Docket Entries dated Sept. 23, 2024, to present (showing no such objections following docketing (and thus electronic service on Defendant Duke University) of Amendment Order)).

Nevertheless, Defendants now have asserted that the Court should enter judgment on the pleadings for Defendant Duke University on this contractual claim because "[n]either the Science Culture and Accountability Plan ('SCAP') signed by Plaintiff nor [Defendant] Duke[ University's] Research Misconduct Policy created

a contract with Plaintiff." (Docket Entry 67 at 22.) As concerns the SCAP, Defendants developed their argument as follows:

> The SCAP is a statement of the 'fundamental guiding principles' intended to guide research activities in the department [where Plaintiff worked]. The SCAP explains that

>> In [this] department, each laboratory sets its own research agenda and goals and is responsible for ensuring the integrity and provenance of research data. However, it is the responsibility of each member in the department (faculty, staff, fellows, and students) to make sure that they actively participate in the establishment and maintenance of a work environment that fosters high quality rigorous research.

> The SCAP is not supported by consideration and does not include any mutual obligations. Instead, it is a statement of the department's expectations for its researchers. Under North Carolina law, a statement of policy like this does not constitute an enforceable contract.

(Id. at 22-23 (internal citations omitted) (quoting and block-quoting Docket Entry 67-3 at 1) (citing Shaughnessy v. Duke Univ., No. 1:18CV461, 2020 WL 4227545, at *5 (M.D.N.C. July 23, 2020) (unpublished) (Eagles, J.)).) The Court should decline to grant Defendant Duke University judgment on the pleadings on Plaintiff's contractual claim based on that argument.

"North Carolina defines a contract as an agreement between two or more persons, upon sufficient consideration, to do or to refrain from doing a particular act. An offer and acceptance are essential elements of a contract, and they constitute the agreement between the parties." Gladden v. Pargas, Inc. of Waldorf, Md., 575 F.2d

48

1091, 1093 (4th Cir. 1978) (internal citation omitted) (citing McCraw v. Llewllyn, 256 N.C. 213, 216, 123 S.E.2d 575, 578 (1962), as support for first sentence, and Yeager v. Dobbins, 252 N.C. 824, 828, 114 S.E.2d 820, 823-24 (1960), as support for second sentence).  Notably, under North Carolina law, "[e]mployment contracts which are terminable at will may be modified at any time by either party with the continuance of the relationship serving as the consideration for the modification."  Fraver v. North Carolina Farm Bureau Mut. Ins. Co., 69 N.C. App. 733, 738, 318 S.E.2d 340, 344 (1984) (emphasis added); accord Jimoh v. Charlotte-Mecklenburg Housing P'ship, Inc., No. 3:08CV495, 2010 WL 1924480, at *9 (W.D.N.C. May 12, 2010) (unpublished), aff'd, 428 F. App'x 241 (4th Cir. 2011).  Considering those legal precepts and viewing the facts alleged by Plaintiff in the light most favorable to her, she has shown that she and Defendant Duke University entered into a contract which incorporated the SCAP.

To begin, the e-mails tendered by Plaintiff to justify the addition of this contractual claim could support a reasonable inference that, on or about June 7, 2020, Defendant Duke University – through its "Office of Scientific Integrity" (Docket Entry 28-2 at 1) – required Plaintiff, as a condition of continued employment, to execute the SCAP, the "[s]igning . . . [of which] convey[ed] . . . personal and institutional obligat[ions]" (id. at 2), i.e., obligations on both Plaintiff and Defendant Duke University.

49

Subsequently, on July 23, 2020, Defendant McDonnell sent an e-mail to Plaintiff (with a copy to Dr. Duckett, the then-dean of the medical school) regarding "concerns about the processes that [Plaintiff] use[d] to store data/images and the ability to provide raw data corresponding to images/figures in publications and grant applications." (Id. at 3.) In that e-mail, Defendant McDonnell advised Plaintiff that she bore "responsib[ility] for the management of all data [she] generate[d] and [that she] signed [the] SCAP [to] confirm[] that [she] underst[oo]d th[o]se responsibilities." (Id.) He also emphasized that, "[a]s Chair [of the department where Plaintiff worked], [he] ha[d] a responsibility to [Defendant Duke University] . . . to ensure that [she] maintain[ed] best practices in data storage and provenance." (Id.) Finally, Defendant McDonnell "set[] a deadline . . . for [Plaintiff] to provide [specified] information." (Id.) Those alleged statements by Defendant McDonnell could provide further support for an inference that the SCAP created obligations for <u>both</u> Plaintiff <u>and</u> Defendant Duke University (via its supervisory officials, like Defendant McDonnell and Dr. Duckett).[15]

---

15 The SCAP (a copy of which Defendants submitted with the Motion for Judgment on the Pleadings) includes terms that, when read in the light most favorable to Plaintiff, also indicate that the SCAP imposed duties not just on Plaintiff but also on Defendant Duke University (through its supervisory officials, such as the then-departmental chair, Defendant McDonnell). (See, e.g., Docket Entry 67-3 at 2 ("Mitigation of the impact of [negative] influences on the rigor and reproducibility of research is the responsibility
(continued...)

50

Taken together, such inferences could permit a reasonable fact-finder to conclude (A) that Defendant Duke University made an offer of continued employment to Plaintiff, conditioned upon her execution of the SCAP, and (B) that Plaintiff accepted said offer by signing the SCAP, after which (C) Defendant Duke University and Plaintiff proceeded with their employment relationship, subject to the mutual requirements of the SCAP, such that (D) "[t]he completed [SCAP] constituted a contract under North Carolina law," Gladden, 575 F.2d at 1093, despite (E) Defendant Duke University's present contentions that "[t]he SCAP [wa]s not supported by consideration and does not include any mutual obligations" (Docket Entry 67 at 23).[16]  Because, for purposes of the Motion for Judgment on the

---

15(...continued)
of everyone in the department."), 4 ("Scientific integrity and the provenance of data is the collective responsibility of all faculty, staff, fellows and students." (emphasis in original)).)

16 Shaughnessy does not require a different result. Concerning the SCAP, Defendants cited that case for the proposition that, under North Carolina law, "'unilaterally promulgated employment manuals or policies do not become part of the employment contract unless expressly included in it.'" (Docket Entry 67 at 23 (emphasis added) (internal brackets omitted) (quoting Shaughnessy, 2020 WL 4227545, at *5, which, in turn, quotes Walker v. Westinghouse Elec. Corp., 77 N.C. App. 253, 259, 335 S.E.2d 79, 83-84 (1985)).)  As shown above, a reasonable fact-finder could determine that Plaintiff and Defendant Duke University expressly included the SCAP in her employment contract (such that Shaughnessy provides no bar to Plaintiff's contractual claim predicated on the SCAP).  To the extent Defendants have relied on Shaughnessy to argue that "[Defendant] Duke[ University's] Research Misconduct Policy [in the Faculty Handbook] is not a contract" (id.; see also id. ("This Court has already recognized on multiple occasions that [Defendant] Duke[ University's] Faculty Handbook is not a (continued...)

51

Pleadings, Defendants did <u>not</u> contest the sufficiency of Plaintiff's allegations as to any element of her claim for breach of the implied covenant of good faith and fair dealing <u>other than the element requiring the existence of a contract</u> (<u>see</u> <u>id.</u> at 22-24), the Court should <u>not</u> enter judgment on the pleadings in favor of Defendant Duke University on that contractual claim.

In sum, Defendants have established their entitlement to judgment on the pleadings on both of Plaintiff's Section 1981 claims and all of her Title VII and ADEA claims other than for retaliation (which the Motion for Judgment on the Pleadings does not address), but Plaintiff has stated a viable claim for breach of the implied covenant of good faith and fair dealing.[17]

_____

16(...continued)
contract." (citing <u>Shaughnessy</u>, 2020 WL 4227545, at *5))), the Court need not address that argument to resolve the Motion for Judgment on the Pleadings, as the SCAP provides an adequate foundation for Plaintiff's contractual claim at the pleading stage.

17 Plaintiff's brief opposing the Motion for Judgment on the Pleadings states that, "[s]hould the Court have any doubt about the sufficiency of any particular claim, [Plaintiff] respectfully request[s] the opportunity to amend the [Amended C]omplaint." (Docket Entry 69 at 9.) Plaintiff, however, has not shown how she could amend her Amended Complaint to remedy any of the deficiencies (discussed above) that entitle Defendants to judgment on the pleadings on all of Plaintiff's federal claims except for retaliation under Title VII and/or the ADEA. (See <u>id.</u> at 1-10.) To the contrary, Plaintiff has insisted that any further amendment of her pleadings "should be unnecessary, as [her] current pleadings adequately notify Defendants of the claims and the grounds upon which they rest, which is all that [Federal] Rule [of Civil Procedure] 8 requires." (<u>Id.</u> at 10.) Furthermore, Plaintiff already has taken many swipes at refining her claims. (<u>See, e.g.</u>, Docket Entry 5 (Amended Complaint); Docket Entry 9 (Motion for (continued...)

<u>MOTION FOR LEAVE</u>

On August 13, 2024, the Court (per Chief Judge Eagles) notified the parties that "[t]he deadlines in the Local Rules provide adequate time for briefing in all but exceptional circumstances and [the] parties should not expect motions for extensions of time to be granted." (Docket Entry 43 ("Standard Preliminary Order") at 3; see also <u>id.</u> at 1 ("The Court enforces the requirements of the Local Rules, as modified and supplemented herein."), 3 ("The Court expects the parties to promptly move the case towards final resolution and to build in time for coping with delays and obstacles, as they are a normal part of litigation.").)

---

17(...continued)
Leave to File Amended Complaint against Two Additional Defendants, with an Additional Claim, and Additional Relief Requested), Docket Entry 10 (Amended Motion for Leave to File Amended Complaint, Requesting All Statements, Claims, and Relief Requested with an Additional Basis for Jurisdiction, and Challenges to Anticipated Objections Raised by Defendants), Docket Entry 22 (Motion for Substitution of Party), Docket Entry 50 (Motion for Leave to Amend Complaint), Docket Entry 92 (54(b) Motion to Reinstate Defendants Geeta Krishna Swamy and Collin Stephen Duckett).) "Hence, Plaintiff['s] unsupported, cursory request for leave to amend [should] be denied." <u>Swarey v. Desert Cap. REIT, Inc.</u>, Civ. Action No. 11-3615, 2012 WL 4208057, at *14 (D. Md. Sept. 20, 2012) (unpublished); <u>see also, e.g.</u>, <u>Patel v. Truist Bank</u>, No. 2:23CV54, 2023 WL 12204763, at *6 (D.S.C. Aug. 25, 2023) (unpublished) ("[A]s to [the p]laintiff's request for leave to amend to cure any deficiencies, the [c]ourt notes that [the p]laintiff has not filed a motion to amend or submitted a proposed amended pleading; nor does [the p]laintiff support his conclusory request to amend with any additional information identifying how a second amended complaint would cure the deficiencies. Additionally, because [the p]laintiff has already had the opportunity to file an amended complaint, the [c]ourt agrees with [the d]efendant that it is appropriate to dismiss the specific causes of action alleged against [the defendant] with prejudice." (emphasis omitted)).

53

Defendants thereafter filed (and thereby served on Plaintiff) their Motion for Summary Judgment on June 30, 2025. (See Docket Entry 72 at 3 (certifying that, on June 30, 2025, Defendants' counsel "filed [Motion for Summary Judgment] with the Clerk of Court using the CM/ECF system and served [it] upon . . . Plaintiff via th[at CM/ECF] system and pursuant to [her] Pro Se Authorization Form to Receive Documents Electronically" (citing Docket Entry 3)).) The Court's Local Rules thus required Plaintiff (A) to file any response by July 30, 2025, see M.D.N.C. LR 7.3(f) ("A respondent, if opposing a motion, shall file a response brief, within . . . 30 days if the motion is for summary judgment . . . ."); accord M.D.N.C. LR 56.1(e), and (B) to include within that response, inter alia, "the specific, authenticated facts existing in the record or set forth in accompanying affidavits that would be sufficient to support a jury finding of the existence of the disputed elements [of her claims]," M.D.N.C. LR 56.1(e); see also M.D.N.C. LR 7.2(a) (requiring inclusion in response briefs of "concise statement of the facts" with "[e]ach statement of fact . . . supported by reference to a part of the official record in the case").[18]

---

[18] Via the Standard Preliminary Order, Chief Judge Eagles also had cautioned Plaintiff that, for court filings, "factual assertions unsupported by citation to specific evidence in the record will be disregarded" (Docket Entry 43 at 1), as well as that "a citation to a multi-page exhibit . . . must contain a pin cite to the specific page . . . containing the cited material" (id.).

Consistent with those rule provisions, the Clerk promptly notified Plaintiff (in pertinent part) as follows:

> [ D]efendants . . . have filed a Motion for Summary Judgment on 06/30/2025 . . . .
>
> You have the right to file a 20-page response in opposition to th[at ] motion. Your response may be accompanied by counter affidavits, or you may submit other responsive material. . . . [F]ailure to respond or, if appropriate, to file counter affidavits or evidence in rebuttal within the allowed time may cause the [C]ourt to conclude that [Defendants'] contentions are undisputed. . . . Any response or counter affidavits or any other responsive material to a motion for summary judgment must be filed within 30 days from the date of service of [Defendants'] motion upon you.

(Docket Entry 74 at 1 (emphasis added).)

As detailed in the Introduction (and despite Chief Judge Eagles's warning not to expect extensions of briefing deadlines), Plaintiff requested and received (by order of the undersigned Magistrate Judge) three extensions of her deadline to respond to the Motion for Summary Judgment, for a total additional period of 19 days. (See Docket Entries 75, 76, 77; Text Orders dated July 31, Aug. 5, and Aug. 12, 2025.)[19] Plaintiff attributed (A) her need for the first extension to "illness over the past several days" (Docket Entry 75 at 2), and (B) her need for the second extension to continued "significant illness" (Docket Entry 76 at 2), as well

_____

19 On each occasion, Plaintiff waited until the afternoon of the response deadline to file her motion for extension of time. (See Notice of Elec. Filing, Docket Entry 75 (showing filing "on 7/30/2025 at 2:27 PM"); Notice of Elec. Filing, Docket Entry 76 (showing filing "on 8/4/2025 at 3:32 PM"); Notice of Elec. Filing, Docket Entry 77 (showing filing "on 8/11/2025 at 4:00 PM").)

55

as "technical difficulties that have slowed [her] ability to compile and print the necessary exhibits" (id.). In connection with that second extension request, Plaintiff emphasized that she had "nearly finished drafting [her response]" (id.) and committed that "this will be the last extension for this filing" (id. at 3). Contrary to that last commitment, when (a week later) Plaintiff's then-twice-extended deadline arrived, she once more moved for an extension, with this justification:

> While finalizing my compiled exhibits for filing, my computer froze and requires restoration, preventing me from completing the process for filing. This unforeseen technical issue arose last night, after my prior extension request.
>
> . . . I have worked diligently and am otherwise ready to finalize the filing once my computer is restored. Because filing must occur in person and all materials must be printed, I respectfully request an extension of seven (7) days, up to and including August 18, 2025, to complete this process and ensure my filing is accurate and complete.

(Docket Entry 77 at 2-3 (emphasis added).)

Given that, on August 4, 2025, Plaintiff had assured the Court that her response to the Motion for Summary Judgment then stood "nearly finished" (Docket Entry 76 at 2), with progress underway (though slowed) in her "compil[ing] and print[ing of] the necessary exhibits" (id.), and that, seven days thereafter, Plaintiff told the Court that she had begun "finalizing [her] compiled exhibits" (Docket Entry 77 at 2), such that – but for a last-minute, computer-glitch, which "prevent[ed her] from completing the

56

process" (id.) – she remained "ready to finalize [her] filing" (id.), the undersigned Magistrate Judge (while granting a third extension) reasonably advised Plaintiff that she "should not anticipate receiving any further extensions of this now-thrice-extended deadline" (Text Order dated Aug. 12, 2025). It appeared, at first, that Plaintiff took that advice to heart, as she filed her Summary Judgment Response by that last deadline. (See Docket Entry 78 at 1 (bearing file-stamp of August 18, 2025).) However, a half-month later, Plaintiff sought a belated, fourth extension of time to respond to the Motion for Summary Judgment, by filing the Motion for Leave (see Docket Entry 81 at 1 (bearing file-stamp of September 2, 2025)), along with the Amended Summary Judgment Response (see Docket Entry 83 at 1 (bearing file-stamp of September 2, 2025)) and a huge swath of new exhibits (compare Docket Entries 78-1 through 78-5, Docket Entry 79, and Docket Entries 79-1 through 79-19, with Docket Entries 83-1 through 83-11, Docket Entry 84, Docket Entries 84-1 through 84-19, Docket Entry 85, Docket Entries 85-1 through 85-24, Docket Entry 86, Docket Entries 86-1 through 86-24, Docket Entry 87, and Docket Entries 87-1 through 87-19).

The Motion for Leave "move[s] this Court pursuant to Rule 15(a) of the Federal Rules of Civil Procedure to amend the [Summary Judgment Response]." (Docket Entry 81 at 1.) In a supporting brief, Plaintiff purported to substantiate that request with these factual allegations, all of which lack record citations, contrary

to the directive in the Local Rules that "[e]ach statement of fact [in a brief] should be supported by reference to a part of the official record in the case," M.D.N.C. LR 7.2(a)(2), as well as the Standard Preliminary Order's admonition that "factual assertions unsupported by citation to specific evidence in the record will be disregarded" (Docket Entry 43 at 1):

1) Plaintiff filed the Summary Judgment Response "on August 18, 2025, the final date allowed under the Court's third extension, despite ongoing challenges with processing, compiling, printing, and delivering documents for this filing" (Docket Entry 82 at 2);

2) the Summary Judgment Response "is incomplete" (id.), in that it "did not contain a word-count certification, contained an unfinished paragraph, and lacked completed exhibits for the Statement of Facts, an exhibit index, and audio files which must be submitted manually on a flash drive" (id.);

3) "[d]ue to unexpected computer issues, the disk [Plaintiff] was working from became corrupted and many files could not be recovered" (id.);

4) "[Plaintiff] had to reconstruct the document quickly, which resulted in omissions and formatting problems, and [she] was unable to include the exhibits" (id.);

5) "[s]ince then, [Plaintiff] ha[s] worked diligently to recreate and correct the document to comply with the Court's standards" (id. at 2-3);

58

6) "[w]hile the [Amended Summary Judgment Response] could not be reduced below 7,584 words, it is shorter overall, and it contains the same number of pages as [] Defendants' memorandum [in support of the Motion for Summary Judgment]" (id. at 3);

7) "[t]he [A]mended [Summary Judgment Response] does not alter the legal argument section materially, other than a reduction of words; it only corrects deficiencies in the Statement of Facts by inserting exhibit references, attaching exhibits, and clarifying factual details" (id.); and

8) "[this] request is not made for purposes of delay or gamesmanship" (id.; see also id. ("I seek only to ensure the record is accurate and complete . . . .").

In response, Defendants rightly observed that "Plaintiff's request to file a new brief and over 1,500 pages of new exhibits is not governed by [Federal] Rule [of Civil Procedure] 15(a) because Plaintiff does not seek to amend a 'pleading'" (Docket Entry 90 at 3 (quoting Fed. R. Civ. P. 15(a))). See Fed. R. Civ. P. 7(a) (defining "pleadings" as "[o]nly" "complaint," "answer to a complaint," "answer to a counterclaim," "answer to a crossclaim," "third-party complaint," "answer to a third-party complaint," and, "if the court orders one, a reply to an answer"); see also Schwartz v. United States, 733 F. Supp. 235, 235 n.1 (D. Md. 1990) (agreeing "that [Federal] Rule [of Civil Procedure] 15(a) [wa]s inapplicable in that the original [m]otion [proposed for amendment] does not

fall within the [Federal] Rule [of Civil Procedure] 7(a) definition of 'pleadings' subject to the [Federal] Rule [of Civil Procedure] 15 liberal amendment provisions"). Defendants further asserted that, "[i]nstead, Plaintiff's request is governed by [Federal] Rule [of Civil Procedure] 6(b)[(1)(B)] which allows a party to seek leave to take an action after expiration of a deadline upon a showing of 'excusable neglect.'" (Docket Entry 90 at 4 (quoting Fed. R. Civ. P. 6(b)(1)(B)).) Plaintiff's reply concedes that Federal Rule of Civil Procedure 15(a) does not apply, but contests application of Federal Rule of Civil Procedure 6(b)(1)(B). (See Docket Entry 91 at 4-5 ("[T]he correct standard for th[is ] amendment is Federal Rule of Civil Procedure 16(b)(4) governing modification of the scheduling order, as was done here.").)

To support that position, Plaintiff argued that "[c]ourts in the Fourth Circuit have previously held 'the good cause modification provision specific to [Federal] Rule [of Civil Procedure] 16(b)(4) takes precedence over the generally applicable extension provisions of [Federal] Rule [of Civil Procedure] 6(b)(1),' governing excusable neglect." (Id. at 5 (internal brackets omitted) (placement of internal quotation mark corrected) (quoting United States, for the Use and Benefit of Manganaro Midatlantic LLC v. Grimberg/Amatea JV, Civ. No. 16-2816, 2018 WL 3818876, at *1 (D. Md. Aug. 10, 2018) (unpublished), as also quoted in Eichin v. Ethicon Endo-Surgery, Inc., No. 4:21CV3274, 2024 WL

4564611, at *5 (D.S.C. Oct. 24, 2024) (unpublished)).) That argument lacks force here because, in the quoted case, "a party s[ought] leave to file a dispositive motion after the deadline established by the scheduling order ha[d] passed," Manganaro Midatlantic, 2018 WL 3818876, at *1 (emphasis added); see also Eichin, 2024 WL 4564611, at *5 (addressing motion "seek[ing] leave to retain and file [party's] expert disclosures after the deadline established by the scheduling order ha[d] passed" (emphasis omitted)), whereas the Motion for Leave (as documented above) requests permission to file the Amended Summary Judgment Response after the deadline for filing such responses set by Local Rule (as extended by the Court), not any deadline in the scheduling order for this case (see Text Order dated Nov. 19, 2024 ("adopting [parties'] Joint Rule 26(f) Report (Docket Entry 54)" as scheduling order); Docket Entry 54 at 1-4 (setting no deadline for responses to summary judgment motions)). Given that distinction, the Court should resolve the Motion for Leave under the rule provision authorizing the Court to "extend the time," Fed. R. Civ. P. 6(b)(1), "[w]hen act [of responding to the Motion for Summary Judgment] may or must be done," id., based "on [Plaintiff's M]otion [for Leave] made after the time has expired if [she] failed to act because of excusable neglect," Fed. R. Civ. P. 6(b)(1)(B).

When considering whether Plaintiff has shown that, in seeking leave to file the Amended Summary Judgment Response 15 days after

the summary judgment response deadline passed, she previously "failed to act because of excusable neglect," id., the Court should note, as an initial matter, that the Fourth Circuit has made clear that "'[e]xcusable neglect' is not easily demonstrated, nor was it intended to be," Thompson v. E.I. DuPont Nemours & Co., 76 F.3d 530, 534 (4th Cir. 1996).  To that end, the United States Supreme Court has described the excusable neglect "determination [a]s at bottom an equitable one, taking account of all relevant circumstances surrounding the party's omission."  Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship, 507 U.S. 380, 395 (1993).  "These [circumstances] include . . . [1] the danger of prejudice to [Defendants], [2] the length of the delay and its potential impact on judicial proceedings, [3] the reason for the delay, including whether it was within the reasonable control of [Plaintiff], and [4] whether [Plaintiff] acted in good faith."  Id.

Examining those four Pioneer factors in light of the record of this case, the Court first and foremost should conclude that Plaintiff's explanation for her failure to file the Amended Summary Judgment Response by the response deadline – "[t]he most important of the factors identified in Pioneer for determining whether 'neglect' is 'excusable,'" Thompson, 76 F.3d at 534 – weighs against relief.  As detailed herein, the Motion for Leave attributes Plaintiff's failure to file a proper, timely response to the Motion for Summary Judgment to vaguely described and wholly

unsubstantiated computer issues; yet, the Supreme Court has held that courts should "give little weight to the fact that [a person responsible for a filing] was experiencing upheaval . . . at the time of the [deadline]," Pioneer, 507 U.S. at 398. Moreover, the record reflects that, as far back as January 2025, Plaintiff reported similar, litigation-related, "technical difficulties." (Docket Entry 90-3 at 3; see also id. at 2 (stating in e-mail dated January 27, 2025: "While I was able to upload some files over the weekend, I am still experiencing intermittent technical difficulties that have delayed the completion of the process [of producing documents].").) Then again, via letter of March 13, 2025 (see Docket Entry 90-5 at 2), Plaintiff blamed her delay in handing over materials to Defendants on "technical difficulties related to accessing and organizing [her] materials" (id. at 3). And (as previously documented) Plaintiff cited computer malfunctions as the basis for multiple requests to extend her summary-judgment-response deadline in early August 2025. (See Docket Entry 76 at 2; Docket Entry 77 at 2.) Plaintiff's decision to persist in relying on computer equipment and/or data management processes that had proven unreliable time after time warrants a finding that – to the extent problems of that sort contributed to her inability to file (what she deemed) a proper response to the Motion for Summary Judgment until September 2, 2025 – "th[at] reason for the delay . . . was within [her] reasonable control," Pioneer, 507 U.S. at 395.

63

Turning to the other _Pioneer_ factors, the Court should hold that permitting Plaintiff to file the Amended Summary Judgment Response out-of-time would cause "prejudice to [Defendants]," _id.,_ by rendering moot (and thus wasting the time and expense they devoted to) their timely filed reply (_see_ Text Order dated Sept. 2, 2025 (re-setting reply deadline to September 9, 2025); Docket Entry 89 at 15 (certifying electronic filing of Defendants' reply on September 9, 2025)). Acceptance of the untimely Amended Summary Judgment Response also would frustrate the Court's interest in resolving the Motion for Summary Judgment without the additional delay that would become necessary to allow time for Defendants to file a new reply addressing the Amended Summary Judgment Response; in that respect, granting the Motion for Leave would lead to a negative "impact on judicial proceedings," _Pioneer_, 507 U.S. at 395. Lastly, based on the foregoing considerations, "the length of the delay," _id.,_ associated with the Motion for Leave and the Amended Summary Judgment Response remains unreasonable, even if the Court assumes Plaintiff "acted in good faith," _id._

On balance (with at least three of the four _Pioneer_ factors, including the most important one, weighing against Plaintiff), she has not shown excusable neglect as she must to prevail on the Motion for Leave and the Court therefore should not accept the Amended Summary Judgment Response. _See id._ (indicating that courts should construe excusable neglect standard in fashion that deters

"parties from freely ignoring court-ordered deadlines in the hopes of winning a permissive reprieve"); see also Hairgrove v. City of Salisbury, No. 1:21CV814, 2023 WL 5985349, at *2 n.2 (M.D.N.C. Sept. 14, 2023) (unpublished) (Eagles, C.J.) ("The Court has considered whether to give [the plaintiff] another opportunity to correct her briefing.  But she has already been given several chances to adequately brief the motions.  It would not be fair to the defendants, who would yet again have to respond.  In its discretion, the Court declines to prolong the proceedings." (internal citation omitted)), aff'd, No. 23-2236, 2024 WL 4490634 (4th Cir. Oct. 15, 2024) (unpublished); Qayumi v. Duke Univ., No. 1:16CV1038, 2017 WL 6626193, at *3 (M.D.N.C. Dec. 28, 2017) (unpublished) (Eagles, J.) ("Deadlines are in place for a reason and they are relied upon by the parties and the Court to move a case efficiently and fairly towards final resolution.").[20]

---

[20] Plaintiff would have the Court place dispositive weight on "the need for the Court to consider a complete record." (Docket Entry 82 at 3; see also id. at 2 ("I now respectfully seek leave to amend [my Summary Judgment Response] and supplement the record so the Court may have a complete and largely rule-compliant submission upon which to base its decision.").)  However, an assessment "[t]hat the [Amended Summary Judgment Response] would be helpful to the Court does not establish good cause or excusable neglect for [Plaintiff's] failure to comply with filing deadlines." Bruce-Terminix Co. v. Terminix Int'l Co. Ltd. P'ship, No. 1:20CV962, 2022 WL 3028165, at *8 (M.D.N.C. Aug. 1, 2022) (unpublished) (Eagles, J.).  In any event, even a cursory review of the Amended Summary Judgment Response suggests it would do little to aid the Court in resolving the Motion for Summary Judgment.  (See, e.g., Docket Entry 83 at 2-18 (consistently citing to multi-page exhibits without pin-cites in contravention of Standard Preliminary Order).)

Defendants have "request[ed] that the Court grant summary judgment in their favor on Plaintiff's claims." (Docket Entry 72 at 1; <u>see also</u> Docket Entry 73 ("Summary Judgment Brief") at 1-2 ("Plaintiff cannot show that there is a genuine issue of material fact and Defendants are entitled to summary judgment on all claims.").) "The [C]ourt shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A material factual dispute exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). When considering summary judgment, the Court "tak[es] the evidence and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party . . . ." <u>Henry v. Purnell</u>, 652 F.3d 524, 531 (4th Cir. 2011) (en banc).

Based on the proposed resolution of the Motion for Judgment on the Pleadings, only Plaintiff's federal retaliation claim and state contractual claim require discussion at the summary judgment stage. In regard to the latter claim (for breach of the implied covenant of good faith and fair dealing under North Carolina law), Defendants' Summary Judgment Brief makes the same argument as Defendants made with their Motion for Judgment on the Pleadings, i.e., that "[n]either the SCAP nor [Defendant] Duke[ University's]

66

Research Misconduct Policy created a contract with Plaintiff"
(Docket Entry 73 at 23). (Compare id. at 23-24, with Docket Entry
67 at 22-24.) For the reasons detailed in the prior discussion of
this claim in relation to the Motion for Judgment on the Pleadings,
the Court should conclude that record evidence (viewed in the light
most favorable to Plaintiff) could sustain a finding that she and
Defendant Duke University entered into a contract that incorporated
the SCAP; accordingly, the Court should deny summary judgment for
Defendant Duke University on Plaintiff's claim for breach of the
implied covenant of good faith and fair dealing.

As to Plaintiff's only other, remaining "[c]laim[]" (Docket
Entry 5 at 45), for "[r]etaliation" (id. at 47), the Amended
Complaint states as follows:

> A week after [Plaintiff] asked [Defendant] Dowell-Newton
> not to report the harassment [Plaintiff] was experiencing
> due to [her] concerns about retaliation, [her] laptop was
> confiscated by Dr. Donna Kessler and given to [Defendant]
> McDonnell, and [he] told [Plaintiff] that he was going to
> destroy [her] and that he ha[d] executive powers [which]
> is a [form of] verbal abuse and a threat. There is a
> conflict of interest with [Defendant] McDonnell being a
> scientist, having his own research lab, and being an
> administrator of the department at that time as the
> Chairman of [the department]. He remarked during [a]
> meeting [with Plaintiff] that [she] ha[d] good
> grantsmanship and that scientists working in the lab had
> scientific discussions with [her]. On March 12th,
> 2020[,] Dr. Abou-[D]onia told [Plaintiff], "[Defendant]
> McDonnell will use that woman (indicating Dr. Swamy) to
> destroy your scientific career and you will be homeless."
> This started the chain of investigation against
> [Plaintiff] that was unjustified, unwarranted, and
> continues on [to the date of the filing of the Amended
> Complaint], affecting [her] ability to have a career in
> science and remain employed.

(Id.; see also id. at at 19 ("From October of 2019, Dr. Abou-[D]onia began sexually harassing [Plaintiff] on a frequent basis."), 22 (describing incident, on December 7, 2019, when Dr. Abou-Donia "made [Plaintiff] touch his penis"), 23-24 (detailing sexually harassing activity by Dr. Abou-Donia on January 7 and 8, 2020), 27-28 (discussing Plaintiff's communications with "investigator from [Defendant Duke University's] Office of Institutional Equity" ("OIE") on February 5 and 10, 2020, about sexual harassment), 30 (asserting that Plaintiff reported sexual harassment to Defendants Dowell-Newton and McDonnell on March 2, 2020), 31 (relating Plaintiff's interactions with Defendant McDonnell, Dr. Abou-Donia, and Dr. Kessler on March 9, 2020, including seizure of Plaintiff's personal laptop, as well as Defendant McDonnell's statements that he could "'take [her] laptop, [because he] ha[d] executive powers'" and that he could "'destroy [her]'"), 46 (making allegations about improprieties in research misconduct investigation in sub-claim for unequal terms and conditions of employment), 47 (stating, as to claim for termination of employment, that "DoD offered an opportunity to do a no-cost extension of [Plaintiff's] grant, but . . . [Dr. Swamy] terminated [Plaintiff's] grant instead, thus terminating [her] employment, before an investigation had even found any wrongdoing on [her] part" and despite "determinations made during the investigation that no further investigation was warranted").)

68

Elsewhere in the Amended Complaint, Plaintiff made more allegations that Defendant Duke University (through its supervisory officials) investigated her research activities in retaliation for, among other things, her objection to sexual harassment by Dr. Abou-Donia. (See, e.g., id. at 32 (alleging that, throughout "Mar[ch] 12-19th 2020," "Dr. Abou-[D]onia would continue to make sexual comments [to Plaintiff] and [he] would say 'now you can go tell [Defendant] McDonnell[]'" and "that if [she] report[ed] '[Defendant] McDonnell[] will use . . . Dr. Swamy[] to destroy your scientific career,'" as well as that "'no matter where you go and complain, faculties stick together and help each other'"), 35 (alleging (A) that, "[o]n July 17, 2020, [Plaintiff] received an email from [Defendant] Klotman that [Defendant] McDonnell was stepping down as chair [of Plaintiff's department]" and (B) that, "[o]n July 20, 2020," Dr. Kessler notified Plaintiff that Defendant Duke University "'ha[d] completed a review of the data integrity and publication concerns raised [about Plaintiff] and determined an inquiry under the research misconduct process [wa]s not warranted,'" but (C) nonetheless, "on July 23, 2020, Dr[]. Duckett and [Defendant] McDonnell sent [Plaintiff] an email inquiring about the whereabouts of experiments notebooks" and "retaliation began" again), 36 (alleging (A) that, on "November 5, 2020, [Plaintiff] received [Defendant] Duke [University's] OIE report . . . that the [OIE] investigation concluded with the preponderance of evidence

69

showing sexual harassment . . . occurred in [Plaintiff's department]" and (B) that "[i]mmediately thereafter retaliation intensified," as she "was subjected to various retaliatory incidents as part of the ongoing unjustified [research misconduct] investigation"), 37 ("On November 16, [2020,] Dr. Duckett sent [Plaintiff] an email that Dr. Abou-[D]onia had been relieved of his duties at [Defendant] Duke [University]. On November 25, [2020, Plaintiff] met with Dr. Duckett, who clarified his previous statement . . . by telling [her that] Dr. Abou-[D]onia had resigned . . . ."), 42 (alleging that "retaliatory actions were initiated by Drs. Duckett and Swamy after [Defendant] McDonnell stepped down from chairmanship and Dr. Abou-[D]onia resigned"), 44 (alleging (A) that "[Defendant] McDonnell and [Dr.] Abou-[D]onia . . . were motivated to retaliate against [Plaintiff] through this bad-faith research misconduct investigation," (B) that "[Defendant] McDonnell wanted to retaliate against [Plaintiff] because [she] requested a non-tenured faculty position and [he] construed that [she] was reporting about him to [Defendant Duke University's] officials," and (C) that "Dr. Abou-[D]onia wanted to retaliate against [Plaintiff] to help out [Defendant] McDonnell and because of [her] allegation of sexual harassment"), 45 (alleging that Defendant McDonnell "utiliz[ed] his institutional authority to protect Dr. Abou-[D]onia and subject [Plaintiff] to . . . retaliation").)

70

Plaintiff's foregoing claim of retaliation for reporting sexual harassment arises under Title VII, which "prohibits an employer from . . . retaliating against an employee for complaining about prior discrimination or retaliation." Foster v. University of Md.-E. Shore, 787 F.3d 243, 249 (4th Cir. 2015) (citing 42 U.S.C. §§ 2000e-2(a)(1), 2000e-3(a)). "Th[is] antiretaliation provision protects an individual . . . from retaliation that produces an injury or harm." Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 67 (2006). More precisely, to succeed on a Title VII retaliation claim, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Id. at 68 (internal quotation marks omitted); see also id. at 69 (recognizing that even relatively limited actions like "excluding an employee from a weekly training lunch that contributes significantly to the employee's professional advancement might well deter a reasonable employee from complaining about discrimination").

"Plaintiffs may prove these violations either through direct and indirect evidence of retaliatory animus, or through the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)." Foster, 787 F.3d at 249 (internal parallel citation omitted). "'Direct evidence [for a retaliation claim]

71

encompasses conduct or statements that both (1) reflect directly the alleged retaliatory attitude, and (2) bear directly on the contested [adverse action].'" <u>Johnson v. United Parcel Serv., Inc.</u>, 839 F. App'x 781, 783 (4th Cir. 2021) (internal brackets omitted) (quoting <u>Laing v. Federal Express Corp.</u>, 703 F.3d 713, 717 (4th Cir. 2013)). Conversely, "[t]o prevail under the *McDonnell Douglas* framework, [Plaintiff] must first establish a prima facie case by showing: (i) that she engaged in protected activity, (ii) that [Defendant Duke University] took adverse action against her, and (iii) that a causal relationship existed between the protected activity and the adverse [] activity." <u>Foster</u>, 787 F.3d at 250 (internal brackets and quotation marks omitted). "The burden then shifts to [Defendant Duke] University to show that its purportedly retaliatory action was in fact the result of a legitimate non-retaliatory reason." <u>Id.</u> "If [Defendant Duke University] makes this showing, the burden shifts back to [P]laintiff to rebut [Defendant Duke University's] evidence by demonstrating that [its] purported non-retaliatory reasons were not its true reasons, but were a pretext for [retaliation]." <u>Id.</u> (hyphen added for consistency) (internal quotation marks omitted).[21]

---

21 For example, "[i]f a plaintiff can show that she was fired under suspicious circumstances and that her employer lied about its reasons for firing her, the factfinder may infer that the employer's undisclosed retaliatory animus was the actual cause of her termination." <u>Foster</u>, 787 F.3d at 250.

Defendants' Summary Judgment Brief argues that Plaintiff cannot establish retaliation under the McDonnell Douglas burden-shifting framework. (See Docket Entry 73 at 12-18 (arguing that she cannot satisfy causation element of prima facie retaliation case and cannot show non-retaliatory justification for adverse action constituted pretext for retaliation).) Defendants, however, made no argument regarding Plaintiff's ability to prove retaliation "through direct and indirect evidence of retaliatory animus," Foster, 787 F.3d at 249. (See Docket Entry 73 at 12-18 (failing to mention that method of proof).) As a result, the Court should deny the Motion for Summary Judgment on Plaintiff's retaliation claim, as "[Defendant] Duke [University] has not met its initial burden to show that it is entitled to summary judgment on th[is] claim[]," Shaughnessy, 2020 WL 4227545, at *6 (citing Fed. R. Civ. P. 56(c)). See id. (denying summary judgment motion where the defendant did "not, as required by the Local Rules, identify the elements for [the] claim" and did "not explain why the evidence [wa]s insufficient to support a jury verdict" (citing M.D.N.C. LR 56.1(e))); see also Natera, Inc. v. NeoGenomics Laboratories, Inc., 797 F. Supp. 3d 580, 585 (M.D.N.C. 2025) (Eagles, C.J.) ("The moving party has the initial burden of demonstrating the absence of any material issue of fact . . . ."), appeal dismissed, Nos. 2026-1125, 2026-1206, 2025 WL 3640819 (Fed. Cir. Dec. 16, 2025) (unpublished); Hill v. Carvana, LLC, No. 1:22CV37, 2022 WL 1625020,

73

at *5 (M.D.N.C. May 23, 2022) (unpublished) (Eagles, J.) ("It is not the Court's job to undertake the analysis and legal research needed to support a perfunctory argument, nor should a party expect [the C]ourt to do the work that [the party] elected not to do." (internal citation and quotation marks omitted)).[22]

---

22 Because Defendants' Summary Judgment Brief fails to contest Plaintiff's ability to prove retaliation "through direct and indirect evidence of retaliatory animus," Foster, 787 F.3d at 249, it matters not that Plaintiff also failed to address that issue in her Summary Judgment Response (see Docket Entry 78 at 24-26 (responding to Defendants' contentions about prima facie case and pretext in opposing summary judgment on retaliation claim)). See Natera, 797 F. Supp. 3d at 585 (explaining that "non-moving party must come forward with evidentiary material demonstrating the existence of a genuine issue of material fact requiring a trial" only "once the moving party meets its initial burden"). Consistent with that notion, another district court in the Fourth Circuit recently examined the evidentiary record to determine whether the plaintiff "ha[d] provided any such direct or indirect evidence [of retaliation]," Covington v. Union Mem'l Hosp., Civ. Action No. 22-2655, 2024 WL 3784539, at *30 (D. Md. Aug. 13, 2024) (unpublished), even though "[the p]laintiff d[id] not request to proceed by direct or indirect evidence of retaliation," id. See id. at *30-31 (identifying nine different evidentiary items from record before concluding that "none provide direct or indirect evidence that [the d]efendants terminated [the plaintiff's] employment because of [his] reports"). If the Court undertook that same sort of record review in this case, it might well conclude that, "under ordinary principles of proof[, Plaintiff could] avert summary judgment in [Defendant Duke University's] favor, [because she] 'produce[d] direct evidence of a stated purpose to retaliate and/or indirect evidence of sufficient probative force to reflect a genuine issue of material fact,'" Hailey v. Donahoe, No. 6:11CV22, 2012 WL 1356594, at *5 (W.D. Va. Apr. 19, 2012) (unpublished) (internal brackets omitted) (quoting Rhoads v. Federal Deposit Ins. Corp., 257 F.3d 373, 391 (4th Cir. 2001)). Specifically, along with her Summary Judgment Response, Plaintiff produced her deposition, which (read in the light most favorable to her) includes her "testimony [(A) that,] on February 28th, 2020, [she] actually sent [an] e-mail [reporting sexual harassment] directly to [Defendant] McDonnell" (Docket Entry 78-4 at 38), (B) that, within a matter of days,
(continued...)

74

Alternatively, the Court should conclude that material questions of fact regarding causation at the prima-facie-case and pretext stages of the McDonnell Douglas, burden-shifting, proof scheme preclude summary judgment for Defendant Duke University on Plaintiff's retaliation claim. Beginning with the prima face case, "[Plaintiff] has established the first two elements of the prima facie case through undisputed evidence." Jacobs v. North Carolina Admin. Off. of the Cts., 780 F.3d 562, 578 (4th Cir. 2015). First, "she engaged in protected activity," Foster, 787 F.3d at 250 (internal brackets and quotation marks omitted), by (as conceded by

_____

22(...continued)
Defendant McDonnell urgently convened a meeting with Plaintiff (see id. at 61; see also id. at 63 (placing date of said meeting as March 9, 2020), 65 (same)), after which he sent her to her lab with Dr. Kessler (see id. at 61-62), who (once there) took Plaintiff's "personal computer" (id. at 65) and gave it to Defendant McDonnell (see id.), and (C) that, when Plaintiff "went and talked to [Defendant McDonnell] twice to get [her] computer back" (id.), he "said that he had executive authority [over her]" (id. at 66) and "also threatened to destroy [her]" (id.; see also id. at 66-67 ("[I]t happened. [The] first time, he shut the door on me, and then he came back and he was shivering and angry. . . . I was concerned. . . . I have known people shouting, but not so close on my face. . . . He was screaming . . . ."), 73 (testifying that research misconduct investigation "started with [Defendant McDonnell] as [an] internal investigation")). "[I]n examining th[at] record, the Court [could] find[] the tenor of the communications between Plaintiff and [one of] her supervisors could allow a juror to infer a causal link between retaliatory animus against Plaintiff and [materially adverse action]." Staley v. McDonough, No. 1:22CV317, 2025 WL 1014738, at *7 (M.D.N.C. Apr. 4, 2025) (unpublished) (Biggs, S.J.); see also id. (citing "[e]mails from [the p]laintiff's supervisors . . . [that] could be read as tense, with some appearing to reflect open frustration and annoyance" and "[o]ther emails . . . [that] could be reasonably read as short-tempered or rude, and importantly, some of that emotion was directly conveyed to [the p]laintiff").

75

Defendants) "reporting [sexual] harassment . . . on February 28, 2020" (Docket Entry 73 at 13; see also Docket Entry 73-37 at 2 (setting out Defendant Dowell-Newton's declaration under penalty of perjury that, on February 28, 2020, she became "aware of [the] alleged sexual harassment by Dr. [] Abou-Donia towards Plaintiff")). See, e.g., Traore v. Baltimore Police Dep't, Civ. Action No. 22-793, 2024 WL 4361860, at *7 (D. Md. Sept. 30, 2024) (unpublished) ("Internal complaints of discrimination are protected activities."). Second, Defendant Duke University "took adverse action against [Plaintiff]," Foster, 787 F.3d at 250 (internal quotation marks omitted), (again as Defendants conceded) via "the research misconduct investigation and its consequences" (Docket Entry 73 at 13), acts which "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination," Burlington, 548 U.S. at 68 (internal quotation marks omitted).

Furthermore, because the research misconduct investigation followed (or, at a minimum, suddenly and dramatically escalated) very close in time to Plaintiff's internal report of sexual harassment,[23] a reasonable fact-finder also could determine "that

_____

23 For instance, viewing Plaintiff's deposition in the light most favorable to her, a reasonable fact-finder could determine that, immediately after Plaintiff disclosed Dr. Abou-Donia's sexual harassment to Defendants McDonnell and Dowell-Newton on February 28, 2020, the department's "admin[istrators] were like dynamos running around" (Docket Entry 78-4 at 37), and Defendant McDonnell summoned Plaintiff to his office for a meeting on March 9, 2020, after which he sent her back to her lab with Dr. Kessler, to
                                                        (continued...)

76

a causal relationship existed between the protected activity and the adverse [] activity," Foster, 787 F.3d at 250 (internal quotation marks omitted).  See Jacobs, 780 F.3d at 579 ("[C]lose temporal proximity is sufficient to establish a disputed issue of fact as to the causation element of the prima facie case."); see also Thomas v. City of Annapolis, 851 F. App'x 341, 350 (4th Cir. 2021) ("[E]stablishing a 'causal relationship' at the prima facie stage isn't an onerous burden.").  Defendants have requested that the Court find that "Plaintiff cannot show that her protected activity . . . was the but-for cause of the research misconduct investigation and its consequences because [Defendant] Duke [University] began investigating concerns about Plaintiff's research practices **before** the protected activity."  (Docket Entry 73 at 13 (emphasis in original).)  The Court should reject that request for several reasons.

For starters, to support their position, Defendants' Summary Judgment Brief asserts that "[Defendant] McDonnell first identified concerns with Plaintiff's research practices in September 2019, a month before Plaintiff experienced any [sexual] harassment."  (Id. at 14.)  As the evidentiary basis for that assertion, Defendants

---

23(...continued)
investigate data handling, including by seizing Plaintiff's personal computer (see id. at 61-65; see also id. at 66 (recounting that, on March 9, 2020, Defendant McConnell stated to Plaintiff that "he had executive authority" and "threatened to destroy [her]"), 67 ("He was screaming . . . .")).

cited "Ex. F." (Id.) "Exhibit F" (Docket Entry 73-7 at 1 (large, bold, all-caps font omitted)) consists of six pages of lengthy e-mails (see id. at 2-7). That approach to citation contravenes the express terms of the Standard Preliminary Order, which mandate that "a citation to a multi-page exhibit . . . must contain a pin cite to the specific page . . . containing the cited material." (Docket Entry 43 at 1.) Defendants' assertion on this point thus effectively amounts to a "factual assertion[] unsupported by citation to specific evidence in the record [which] will be disregarded" (id. (emphasis added)). See, e.g., Cray Commc'ns, Inc. v. Novatel Comput. Sys., Inc., 33 F.3d 390, 396 (4th Cir. 1994) (upholding district court's "discretion [to] refus[e] to ferret out the facts that counsel had not bothered to excavate").[24]

---

24 To the extent the Court elects to consider the e-mails in question, it may note that they involve communications between Defendant McDonnell and Dr. Abou-Donia about concerns (most unrelated to data handling) that Dr. Abou-Donia raised about Plaintiff. (See Docket Entry 73-7 at 6-7 (initial e-mail from Defendant McDonnell to Dr. Abou-Donia following up on meeting between them); see also id. at 1-6 (follow-up e-mails between Dr. Abou-Donia and Defendant McDonnell).) Read in the light most favorable to Plaintiff, those e-mails could support reasonable inferences (A) that Dr. Abou-Donia contacted Defendant McDonnell to shift blame to Plaintiff for Dr. Abou-Donia's own missteps and to remind Defendant McDonnell of their intertwined interests (see, e.g., id. at 6 (setting out Dr. Abou-Donia's concern about becoming "the 'scapegoat'" despite "hav[ing] fully cooperat[ed] with [Defendant McDonnell]" and asking that, before "be[ing] accused [of] anything," he receive opportunity "to protect [him]self")), and (B) that Defendant McDonnell perceived Plaintiff as a threat (see id. at 7 ("[Plaintiff] has reported to [Defendant Duke Univesity's] leadership that I am treating her unfairly as she tries to gain independence of you in her research activities. The
(continued...)

Next, Defendants have pointed to e-mails Defendant McDonnell exchanged with Drs. Fox and Swamy on February 26 and 27, 2020, regarding, inter alia, data management practices in Dr. Abou-Donia's lab. (See Docket Entry 73 at 14 (citing Docket Entries 73-12 and 73-13).) Defendants, however, failed to note that the principal concern about Plaintiff highlighted by Dr. Fox related to whether she denied other researchers co-authorship credit for her three publications, not whether she committed research misconduct related to those publications (or anything else). (See Docket Entry 73-12 at 2.) And – in any event – those communications simply raise a material question of fact: Did Defendant McDonnell take aggressive measures to investigate Plaintiff starting on March 9, 2020, because of legitimate concerns raised by Dr. Fox on February 26, 2020, or because of the report of sexual harassment committed by Dr. Abou-Donia made by Plaintiff on February 28, 2020?

---

24(...continued)
timing of you releasing the memo/issues to me (yesterday) and my response to these issues could be seen by her as retaliation. I do not appreciate been [sic] put in this situation.")). Those e-mails thus would not compel a finding that, as of September 2019, a legitimate basis existed for Defendant McDonnell to commence a research misconduct investigation of Plaintiff, particularly not in the manner that he launched it on March 9, 2020 (as documented in Footnotes 22 and 23 from Plaintiff's deposition testimony). Moreover, other record evidence suggests that, by November 26, 2019, after receiving information from Plaintiff – not just Dr. Abou-Donia – Defendant McDonnell's concern about Plaintiff's conduct in this area had ebbed, as he expressed "appreciat[ion to her for] establishing a system to allow reporting and storage of [her] data in a secure manner." (Docket Entry 73-10 at 3; see also id. ("I am sure the system you develop will be excellent.").)

Finally, Defendants have contended that "the research misconduct [investigation] proceeded in good faith according to [Defendant] Duke [University's] policy." (Docket Entry 73 at 14.) But, as their Summary Judgment Brief tacitly acknowledges, the record gives rise to material questions of fact regarding at least some steps in the investigatory process, such as why the research misconduct investigation against Plaintiff continued (or re-started) after an initial finding that no basis existed to pursue it. (See id. at 15 (conceding that "initial [a]ssessment found that an inquiry [into whether Plaintiff committed research misconduct] was not warranted because of the inadequacy of the available research record" (emphasis added) (internal quotation marks omitted) (citing Docket Entry 73-18)).) Defendants evidently would have the Court accept as irrefutable facts both (A) that Defendant Duke University could not proceed with a research misconduct investigation against Plaintiff because she could not produce her data and (B) that Defendant Duke University could resume a research misconduct investigation against Plaintiff (and ultimately find her guilty of research misconduct) because she could not produce her data. (Compare, e.g., id. ("[A]n inquiry could not be conducted [as of July 13, 2020] simply because Plaintiff could not produce any source data to support her grant or papers."), with, e.g., Docket Entry 73-24 at 4 (finding research misconduct inquiry warranted on February 26, 2021, because "absence

of and/or failure to provide adequate documentation to support the research described in the three 2020 publications and 2018 DoD grant may constitute evidence of data fabrication or falsification").) Perhaps Defendants could satisfy a reasonable fact-finder that said course of events bespeaks good-faith adherence to sound policy, but (at least at this juncture) they have not provided a sufficient basis for the Court to rule that no reasonable fact-finder could view that course of events more skeptically, particularly given that Defendant Duke University's apparent about-face over the propriety of a research misconduct inquiry came after the OIE investigation corroborated Plaintiff's report of sexual harassment by Dr. Abou-Donia and he lost his job (see Docket Entry 78-4 at 56 (confirming that, "[i]n November of 2020, OIE issued a report substantiating [Plaintiff's] complaint of sexual harassment" and that "Dr. Duckett later informed [Plaintiff] that Dr. Abou-Donia had been relieved of his duties")).

Given the foregoing discussion, the Court should conclude that Defendants have failed to show entitlement to judgment as a matter of law on Plaintiff's retaliation claim on the ground that she cannot make out a prima facie case under the McDonnell Douglas framework. That conclusion leaves just the question of whether the Court should grant summary judgment in Defendant Duke University's favor pursuant to McDonnell Douglas's pretext prong. (See Docket Entry 73 at 15 ("[Defendant] Duke [University] has identified

81

legitimate nonretaliatory reasons for its actions that Plaintiff cannot show were pretextual.").)  Here, just as with its attack on causation at the prima facie stage, Defendant Duke University insists that it "had serious concerns about Plaintiff's research practices" (<u>id.</u>) and "followed each step of the Research Misconduct Policy while investigating Plaintiff's conduct" (<u>id.</u> at 16 (citing Docket Entry 73-14)).[25]  However, for reasons discussed above,

> [C]onsidering the facts in the light most favorable to [Plaintiff], the Court [should] find[] that there is sufficient evidence to create a genuine issue of material fact whether the proffered legitimate, non-retaliatory reasons for the [adverse] actions were pretextual, and whether the true reason for those actions was retaliation for [her] protected activity.

<u>Vedula v. Azar</u>, Civ. Action No. 18-386, 2020 WL 5500279, at *14 (D. Md. Sept. 11, 2020) (unpublished).

Of particular note, the portions of Plaintiff's deposition addressing the events of March 9, 2020 (detailed in Footnotes 22 and 23), "support[] a reasonable inference that [Defendant McDonnell's] retaliatory animus motivated [at least some of Defendant Duke University's] materially adverse actions," <u>id.</u> Accordingly, although the ultimate conclusion of the research misconduct investigation in 2022 may stand untainted, due to the

---

25 Once more, Defendants relied on an undifferentiated citation to a multi-page document as its sole support for the above-quoted assertion (in contravention of the Standard Preliminary Order).  (<u>See</u> Docket Entry 73 at 16 (offering no pincites to Docket Entry 73-14); Docket Entry 73-14 at 2-13 (setting out 12 single-spaced pages of policies and procedures).)

absence of "evidence to suggest that numerous independent decisionmakers, including [Drs.] Kessler, Swamy, Duckett, . . . and the six committee members, were taking orders from [Defendant] McDonnell rather than fulfilling their responsibilities in good faith" (Docket Entry 73 at 18), Plaintiff need only show that some retaliatory action taken by Defendant McDonnell along the way "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination," Burlington, 548 U.S. at 68 (internal quotation marks omitted). "In short, [Plaintiff] has provided enough evidence for her retaliation claim to survive the [M]otion for [S]ummary [J]udgment. Ultimately, a jury should decide whether [any of the adverse actions at issue occurred] in retaliation for her reporting [Dr. Abou-Donia's] unlawful conduct." Seaton v. City of N. Charleston, No. 2:10CV3186, 2013 WL 6859050, at *9 (D.S.C. Dec. 30, 2013) (unpublished).

CONCLUSION

All of Plaintiff's federal claims in the Amended Complaint (except for retaliation) fail as a matter of law based on the pleadings; however, even disregarding the untimely Amended Summary Judgment Response, her federal retaliation claim and her state contractual claim should proceed to trial.

**IT IS THEREFORE RECOMMENDED** that the Court (A) grant in part and deny in part the Motion for Judgment on the Pleadings (Docket Entry 66), by (i) granting judgment on the pleadings in favor of

83

Defendants on both of Plaintiff's Section 1981 claims and all of her Title VII and ADEA claims other than for retaliation (which the Motion for Judgment on the Pleadings does not address), but (ii) denying judgment on the pleadings for Defendant Duke University on Plaintiff's claim under North Carolina law for breach of the implied covenant of good faith and fair dealing, (B) deny the Motion for Leave (Docket Entry 72), and (C) deny the Motion for Summary Judgment (Docket Entry 81).

/s/ L. Patrick Auld
**L. Patrick Auld**
**United States Magistrate Judge**

January 16, 2026